In re: **NATURAL GAS ROYALTIES** *QUI TAM* **LITIGATION**

No. 99–MD–1293–D.

United States District Court, D. Wyoming.

Oct. 20, 2006.

Bradley C. Weber, J. Robert Beatty, Locke Liddell & Sapp, Dallas, TX, Amanda Newton, Raymond B. Hunkins, Jones Jones Vines & Hunkins, Wheatland, WY, Edward A. Dauer, Denver, CO, Edwin Taylor Grauke, Ilona L. Dotterrer, Michael W. Coriden, Roger A. Jatco, Samuel Yahn, Grynberg Petroleum Company, Greenwood Village, CO, Josephine T. Porter, Albuquerque, NM, Michael S. Porter, Law Firm of Michael S. Porter, Wheat Ridge, CO, David Boies, Boies Schiller & Flexner, Armonk, NY, for Jack J. Grynberg.

Daniel M. McClure, Fulbright & Jarowski LLP, Houston, TX, for Shell Oil Company, Shell Land & Energy Company, Shell Offshore, Inc., Shell Pipe Line Corporation and Shell Western E&P, Inc.

L. Poe Leggette, Nancy L. Pell, Fulbright & Jaworski LLP, Washington, DC, for Kerr-McGee Corporation, Kerr-McGee Refining Corporation, and Oryx Energy Company.

## ORDER ON REPORT AND RECOMMENDATIONS OF SPECIAL MASTER

DOWNES, District Judge.

This matter comes before the Court on the Report and Recommendations of Special Master on: (A) Coordinated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction; (B) Arco's, Unocal's and Dauphin's Motion and Brief on Jurisdiction; (C) Moving 1997 Defendants' Memorandum to Dismiss Relator's Complaints for Lack of Subject Matter

Jurisdiction; and (D) Relator's Cross Motion for Summary Judgment with Authority Pursuant to Fed.R.Civ.P. 56, on Issue of Public Disclosure Under 31 U.S.C. § 3729 et seq. The Court, having considered the briefs and materials in support of the Special Master's recommendations and the objections thereto, having heard oral argument of counsel, and being otherwise fully advised, FINDS and ORDERS as follows:

## BACKGROUND

As set forth in the Special Master's Report, the subject motions are directed at 73 cases filed under the *qui tam* provisions of the False Claims Act by Relator Jack J. Grynberg, in which he accuses over 300 gas pipelines and other gas measurers of mismeasuring gas produced from federal and/or Indian lands ("the 1997 *qui tam* cases"). Beginning in June of 1997, Relator commenced filing the instant *qui tam* suits in Federal District Courts in Colorado, Wyoming, Oklahoma, Louisiana, Texas, Michigan, California, and New Mexico. In October of 1999, the Judicial Panel on Multidistrict Litigation transferred 66 cases to this Court for coordinated or consolidated pretrial proceedings. Subsequently, additional cases were transferred, bringing the total now pending to 73. The complaints in each of these cases asserts that all of the Defendants named therein employ a series of mismeasurement techniques that allows them to knowingly underreport or cause others to underreport the heating content and volume of gas, and that this conduct has resulted in an underpayment of federal royalties over a 10-year period. Relator's complaints are brought under the "reverse false claim" provision contained in 31 U.S.C. § 3729(a)(7).

In April of 1995, Relator filed a *qui tam* action in the United States District Court for the District of Columbia against forty-four defendants, alleging that they had defrauded the federal government by underpaying royalties on gas purchased from federally owned or Indian lands. Relator asserted that the underpayments were the result of mismeasurement of gas volume and improper analysis of gas heating content. The 1995 *Qui Tam* Complaint identified a number of mismeasurement techniques, and asserted that each of the defendants employed one or more of them.

Relator amended the 1995 *Qui Tam* Complaint to add defendants and mismeasurement techniques. An Amended Complaint filed on December 7, 1995, and a Second Amended Complaint, filed on May 13, 1996, each named several new defendants, ultimately bringing the total number of defendants sued in the 1995 action to 70. On March 27, 1997, United States District Judge Thomas F. Hogan dismissed the 1995 *qui tam* action without prejudice for failure to plead fraud with particularity and for improper joinder of parties. There were 63 defendants in the 1995 *qui tam* action at the time the order of dismissal was entered.

The bulk of the allegations in the *qui tam* actions currently pending before this Court accuse the named Defendants in each case of knowingly utilizing specifically identified techniques to measure gas volume and analyze gas heating content in a manner that produces an artificially low wellhead price. Because federal royalties are based on the wellhead price, the use of these mismeasurement techniques also allegedly results in an underpayment of royalties to the United States. The Special Master found that twenty of the alleged mismeasurement techniques are common to all 73 cases, while other mismeasurement practices are case specific. Each Complaint asserts that each of the named Defendants utilized each of the mismeas-

**1128**

urement techniques identified therein. A few of the cases name only one Defendant. The rest identify multiple Defendants that are alleged to be affiliated companies acting in concert through the same employees and personnel.

Following a massive and complex discovery process limited to jurisdictional issues, the parties filed the instant motions, accompanied by hundreds of pages of briefs and thousands of pages of exhibits. The Special Master heard two full days of oral argument. The Defendants' motions to dismiss contend that Relator has failed to comply with the *qui tam* jurisdictional provisions contained in 31 U.S.C. § 3730(e)(4). Specifically, Defendants argue that Relator's 1997 *Qui Tam* Complaints are based upon public disclosures of allegations or transactions from one of the sources listed in § 3730(e)(4)(A), and that he is not an original source, as that term is defined in 31 U.S.C. § 3730(e)(4)(B). Additionally, the Defendants assert that Relator has failed to comply with and/or violated the disclosure and seal provisions of 31 U.S.C. § 3730(b)(2). Relator's cross-motion contends that there are no material issues of fact in dispute and that Relator has met the requirements of § 3730(e)(4) as a matter of law.

Section 3730(e)(4) of the False Claims Act provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

### Special Master's Findings Regarding Public Disclosure

The Special Master reviewed the various categories of documents proffered by Defendants as constituting public disclosures. He first determined that numerous documents from the technical literature on gas measurement were not public disclosures within the statute's meaning. Though the articles did indicate that commonly employed methods of measurement were not the most accurate, the Special Master rejected them as qualifying public disclosures because the documents did not place anyone's conduct "in a questioning light" and/or did not "disclose any transaction in which the representations of any particular gas measurer were different than the true facts." (Report at 1156.) Similarly, he declined to accept as public disclosures the documents related to a 1988–89 investigation by the United States Senate into gas mismeasurement on federal and Indian lands because they named only "Koch Oil" (Report at 1157), a company already dismissed from these proceedings. "The fact that these documents, while noting widespread fraud, specifically identify only one company" was "central" to his conclusion. *Id.* After reviewing case law from various circuits, the Special Master determined that, "generally speaking, public disclosure of widespread wrongdoing in an industry does not trigger the statutory public disclosure bar as to every industry member." (Report at 1162.)

The Special Master then turned to whether documents from Relator's 1995 *qui tam* litigation ("1995 *Qui Tam* Action Documents")[1] met the statutory requirements for public disclosures. He determined that these documents do qualify as public disclosures from one of the listed sources, rejecting Relator's assertion that such a finding would undermine the policies underlying the FCA. The Special Master further found that the nature of the dismissal of Relator's 1995 *qui tam* case has no bearing upon the question of whether the pleadings and orders entered therein constitute public disclosures of allegations or transactions under § 3730(e)(4)(A).

Having determined that the 1995 *Qui Tam* Action Documents are public disclosures of allegations or transactions from one of the sources listed in the FCA, the Special Master next addressed the question of whether and to what extent Relator's 1997 *qui tam* cases are based upon those public disclosures. He found that "if the gist of the fraudulent scheme has been publicly disclosed in a source listed in § 3730(e)(4)(A), a subsequent *qui tam* action alleging a substantially identical fraudulent scheme against the same or related defendants is barred unless the relator qualifies as an original source." (Report at 1166.) The Special Master concluded that, at least as to the 56 "Overlapping Defendants," the 1997 *qui tam* cases are based upon the 1995 *Qui Tam* Action Documents.

The more difficult question for the Special Master relates to the impact of the 1995 *Qui Tam* Action Documents on the Defendants in the 1997 *qui tam* cases which were not expressly named in the 1995 action ("Unnamed Defendants").

The Special Master determined that the publicly disclosed allegations against the defendants in the 1995 *Qui Tam* Action Documents also constitute public disclosures of allegations as to affiliated corporations named as Defendants in the 1997 *qui tam* cases. His finding is based on Relator Grynberg's having specifically asserted in his 1995 *Qui Tam* Complaint that the defendants' affiliates were participants in the fraud; accordingly, the prior public disclosure undoubtedly placed the government on the trail of the alleged fraud. (Report at 1168–70.)

Defendants argued that these materials trigger the public disclosure bar not only with regard to the defendants named in the 1995 *qui tam* action and their affiliated companies, but also with regard to all companies sued in the 1997 *qui tam* cases. The Special Master disagreed, rejecting Defendants' assertion that Relator's 1995 *Qui Tam* Action Documents clearly alleged *universal* fraud by all purchasers of gas from federal and Indian properties. Even so, the Special Master found no case in which allegations against specifically identified wrongdoers, accompanied by averments of universal fraud directed at such a large and multifaceted group as "gas purchasers," have been held to trigger the public disclosure bar against all group members. (Report at 1172.) He determined that cases dealing with similar, but not identical, generalized allegations of fraud against large industry groups have concluded that such allegations constitute public disclosures *only* as to those industry members specifically identified in the allegations. (Report at 1172–73) (citing, *e.g.*, *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir.1994); *United States ex rel. Aflatooni v. Kitsap*

---

1. These documents include Relator's Complaints and various pleadings from the 1995 action, Judge Hogan's Order dismissing the case, and several newspaper and media accounts of the litigation.

*Physicians Servs.*, 163 F.3d 516 (9th Cir. 1999); and *Friedman v. Rite Aid Corp.*, 152 F.Supp.2d 766 (E.D.Pa.2001)). The Special Master determined that "[t]hose few cases that extend the public disclosure bar to companies not expressly identified in the public disclosure itself involve very small groups of alleged wrongdoers and/or entities performing services at government owned and controlled facilities." (Report at 1172) (citing, *e.g., United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir.1995); *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675 (D.C.Cir.1997); and *United States ex rel. Harshman v. Alcan Elec. and Eng'g, Inc.*, 197 F.3d 1014 (9th Cir.1999)). The Special Master ultimately concluded that although the allegations in Relator's 1995 *Qui Tam* Action Documents trigger the public disclosure bar of 31 U.S.C. § 3730(e)(4)(A) as to all Defendants named therein, as well as affiliated companies acting in concert with them, its reach does not extend to all unnamed purchasers of gas from federal and Indian lands throughout the United States. (Report at 1173.)

Finally, the Special Master turned to other categories of public disclosure. In the main, he found that many of these categories qualified as public disclosures of allegations or transactions, but only named defendants already identified through Relator's 1995 *qui tam* litigation. Others qualified, but identified companies not sued by Grynberg and were deemed by the Special Master to be irrelevant. Some public disclosures did raise the bar as to some companies not also identified by the 1995 litigation. The remainder of the documents, nearly all of which identified particular companies, were rejected by the Special Master on one or more grounds: (1) insufficient proof that the documents had been disclosed to the public; (2) Grynberg's allegations were different than what

the documents alleged; (3) no evidence that various litigation documents had actually been filed in court; (4) the given document did not put a defendant's conduct in a questioning light; and (5) the disclosure did not come from a source listed in § 3730(e)(4), particularly a report on Grynberg's allegations by an agency of the State of Alabama.

### Special Master's Findings Regarding Original Source Status

Having found the public disclosure bar triggered as to some of the 1997 *qui tam* cases before this Court, Relator can survive Defendants' § 3730(e)(4) motions as to those cases only if he demonstrates that he is an original source of the information underlying his allegations or there are at least triable issues of material fact regarding his status as an original source. The Special Master found two primary factors controlling the "direct and independent knowledge" requirement for original source status. The first of these factors is the source of the Relator's knowledge regarding the information supporting his allegations. Application of this factor is more difficult where, as here, a relator claims original source status based upon information derived from an independent investigation, rather than from information obtained as a whistle-blowing insider. The second factor is the extent to which the information supporting Relator's allegations was already in the public domain. "In the context of an independent investigation, the public information factor assures that the relator brings something of real value to the table." (Report at 1199.)

In sum, the Special Master determined that "in order to demonstrate original source status based upon an independent investigation, a relator must show that: (a) a substantial amount of the knowledge of the key information underlying the allega-

tions in the complaint is first-hand, and not derived from the knowledge or labors of others; and (b) he or she was the first to uncover a material element of the fraud (*i.e.*, either the true state of facts or the misrepresented facts) that had not previously been in the public domain." (Report at 1201.) The Special Master further found a relationship between the direct and independent knowledge and the voluntary disclosure requirements of § 3730(e)(4)(B). "[I]n assessing whether a relator has 'direct and independent knowledge of the information' on which his allegations are based, the 'information' to be considered is that which was voluntarily provided to the government prior to the filing of the *qui tam* case." (Report at 1202.)

The Special Master found that "from a quantitative standpoint, a majority of Relator's knowledge of the information on which he relies to support the allegations in his 1997 *Qui Tam* Complaints is second-hand or comes from publicly available sources." (Report at 1214.) However, he agreed with Relator that the quality of his discovery and investigation is more significant, *i.e.*, "the extent to which a relator's first-hand knowledge, possibly aided to some degree by deductions drawn from innocuous public information, was instrumental in allowing him or her to uncover the material elements of the alleged fraud and to complete the fraud equation." *Id.* After a thorough analysis of the components of the alleged "fraud equation," the Special Master concluded that the combination of speculation, information derived from publicly available materials, and second-hand knowledge compiled from third party interviews is not sufficiently "direct and independent" under the Tenth Circuit case law to qualify Relator as an original source. (Report at 1218.)

The Special Master separately analyzed Relator's original source status with respect to the *qui tam* cases against the Transwestern, Questar, and KN groups, finding Relator's claim of such status to be stronger against these Defendants. (Report at 1220.) "The key question is whether Relator's direct and independent knowledge of how these Defendant groups measure gas [is] sufficient to complete, or at least significantly assist in completing the equation of fraud that Relator has posited in his Complaints against them." *Id.* The Special Master recognized that Relator's allegations against these Defendant groups are based, at least in part, upon Relator's own testing and analysis and/or personal business records. With little guidance from case law, the Special Master determined that if Relator's contribution in terms of direct and independent knowledge was substantial, then portions of the fraud equation may be completed with information derived from innocuous public sources. (Report at 1223.) Ultimately, he concluded that Relator has not met his burden of demonstrating that he is an original source of the allegations in his Complaints against these Defendant groups.

### Special Master's Findings Regarding Disclosure and Seal Requirements

Section 3730(b)(2) of the False Claims Act states:

A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it

receives both the complaint and the material evidence and information.

The Special Master first addressed the parties' dispute as to whether these written disclosure and seal requirements are "jurisdictional" or "procedural." (Report at 1226.) Having determined that there is no controlling Tenth Circuit precedent on the issue, the Special Master concurred with "a substantial body of federal case law from other Circuits" which has "uniformly rejected attempts to read § 3730(b)(2) as implicating a court's subject matter jurisdiction," the import being that violation of those requirements does not mandate dismissal. (Report at 1227–28.) The Special Master further found that the criteria qualifying a disclosure for consideration in assessing compliance with 31 U.S.C. § 3730(b)(2) are two-fold: (a) the disclosure must be in writing; and (b) it must be served in accordance with Fed. R.Civ.P. 4. (Report at 1230.) He concluded that only certain documents offered by Relator meet this two-fold test ("the A series of exhibits"). *Id.*

Having identified the types of materials properly considered under § 3730(b)(2), the Special Master addressed whether there was a violation of the disclosure requirement in this case. He determined that while a relator's § 3730(b)(2) disclosure should include much of what he will rely upon to support his contentions and allegations, the plain language of the statute does not contemplate an evaluation of the evidentiary quality of a relator's disclosure. (Report at 1232.) Noting an apparent lack of precedent, the Special Master rejected the assertion that the disclosure requirement is a mechanism for Defendants to challenge a relator's disclosure on qualitative grounds. The Special Master analyzed the plain language of the statute and the purpose sought to be achieved by Congress in requiring such disclosure. He concluded,

> At least where the government itself is not seeking dismissal under 31 U.S.C. § 3730(c)(2)(A), . . . a relator complies with his duty to provide a copy of the complaint and written disclosure of "substantially all of the material evidence and information in his possession" if: (a) the complaint and written disclosures contains substantially all of the evidence and information that the relator relies upon to support the *qui tam* claim; and (b) the government is able effectively to exercise its right of intervention.

(Report at 1235.) Applying this standard to the cases at issue here, the Special Master found that no prejudice to the government has been demonstrated and that Relator made a meaningful effort to disclose a substantial portion of the evidence and information on which he was relying. (Report at 1236.)

Finally, the Special Master addressed whether Relator Grynberg violated the seal requirement and, if so, whether dismissal is an appropriate remedy. The Defendants argue that Relator violated the seal requirement by discussing the existence and substance of his 1997 *Qui Tam* Complaints with various potential victims and attorneys during the seal period. The Special Master found evidence in the record to support the Defendants' allegations, but agreed with Relator that the sanction of dismissal is unwarranted. Because the Defendants had been "tipped off" by Relator's 1995 *Qui Tam* Complaint, he concluded that Relator Grynberg's various efforts to "shop" his claims to other alleged victims did not frustrate the purpose of the seal provision or impede the government's investigation.

The Special Master's findings and conclusions resulted in the recommendation

for dismissal of just over half of the cases pending before the Court in this multi-district litigation.

### STANDARD OF REVIEW

Rule 53 of the Federal Rules of Civil Procedure governs this Court's review of the Special Master's Report and Recommendations. The Court must afford the parties an opportunity to be heard and may adopt or affirm, modify, or wholly or partly reject the Master's Report and Recommendations, or may resubmit the matter to the Master with instructions. FED. R. CIV. P. 53(g)(1). The Court must decide *de novo* all objections to the Master's findings of fact and conclusions of law. FED. R. CIV. P. 53(g)(3) & (4).

### DISCUSSION

With respect to the Report and Recommendations related to the requirements of § 3730(e)(4), the Coordinated Defendants assert three reasons for the Court to modify the Special Master's determination that the public disclosure bar had not been raised as to ninety-nine of the Defendants: (1) the Report did not consider that gas measurement facilities are extensively regulated by the federal government, and that both producers and pipelines have direct contractual relationships with the Department of the Interior; (2) allegations of gas mismeasurement were so widespread and identified so many companies that the government was taken to the trailhead of the alleged fraud; and (3) the Report overlooked that Grynberg's complaints could be "based upon" public disclosures through reports of "transactions," even if those reports do not place a defendant's conduct in a questioning light.

Relator contends that the Special Master erred in the following respects: (1) in concluding that private litigation involving common law claims as to a very small number of natural gas mismeasurement techniques and a limited number of companies constitutes a public disclosure of all Relator's numerous *qui tam* claims against all of those companies and all of their affiliates; (2) in concluding the "1995 *Qui Tam* Action Documents" constitute a public disclosure as to all of the Defendants named in that 1995 case and all of those Defendants' affiliates; (3) by inappropriately making factual determinations on the issue of original source in the course of resolving the pending motions for summary judgment; and (4) in establishing a new legal standard for determining whether a relator qualifies as an original source, contrary to *Kennard v. Comstock Resources, Inc.,* 363 F.3d 1039 (10th Cir.2004) and other prevailing False Claims Act authority.

### Public Disclosure

Relator Grynberg contends that the Special Master erred in finding that certain documents from private litigation constitute public disclosure of his current *qui tam* claims against those certain Defendants. Specifically, Relator argues that a *qui tam* action is not based upon an earlier public dissemination unless the public disclosure identified the same facts that give rise to the clear inference of fraud, identified the same defendants, and expressly alleged that the fraud was perpetrated upon the Federal Government. However, the Court finds that Tenth Circuit authority does not support Relator's position.

"Based upon," in 31 U.S.C. § 3730(e)(4)(A), means "supported by." *United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1545 (10th Cir.1996). "It refers to the degree of similarity between the allegations or transactions that are set out in the *qui tam* complaint and the allegations or transactions that have been publicly disclosed." (Report at 1166.) The nexus necessary to fulfill the "based upon" requirement is "substantial identity"

between a relator's allegations and a public disclosure. *United States ex rel. King v. Hillcrest Health Center, Inc.*, 264 F.3d 1271, 1279 (10th Cir.2001). Under this test, even *qui tam* actions only partially based upon publicly disclosed allegations or transactions may be barred. *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir.2004). Furthermore, the fact that a relator's *qui tam* complaint incorporates additional or somewhat different details does not defeat the public disclosure bar. *See, e.g., MK–Ferguson*, 99 F.3d at 1546–47. The Tenth Circuit has explained that this "based upon" test is designed to operate as a "quick trigger" for the more exacting original source inquiry. *Id.* at 1545. The Court agrees with the Special Master that Relator's suggested approach is inconsistent with the "quick trigger" concept.

 A *qui tam* action is based upon a public disclosure if the allegations in the disclosure have already set the government squarely on the trail of the alleged fraud. *See United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995). The Court agrees that "[a]n allegation that a named purchaser of gas at the wellhead is underpaying because it intentionally mismeasures volume and heating content is sufficient to alert anyone with a financial stake in gas acquired by the same purchaser that their interests are in jeopardy." (Report at 1176–77.) As this

Court has previously determined, it is the alleged filing of reports of undermeasured gas that is the gravamen of Relator's present allegations, not the use of any particular measurement technique. Admittedly, there are differences between the allegations in Grynberg's private litigation and the averments in the 1997 *Qui Tam* Complaints. However, these private lawsuits also accused the opposing parties of stealing gas by mismeasuring volume and/or heating content through use of one or more of the same mismeasurement techniques at issue in the 1997 *qui tam* cases now before this Court. Accordingly, the Special Master correctly concluded that to the extent that the Grynberg Private Litigation Documents constitute public disclosures of allegations or transactions from a statutory listed source, they trigger the original source inquiry only as to those specific companies.[2] Likewise, because the testimony found in Document 133[3] questioned the propriety of Exxon's gas measurement practices, and pointed out that Exxon's practices could result in an under-measurement of gas volume, it would place the government on the trail of the similar, but expanded allegations of gas mismeasurement against Exxon in 99 MD 1621. Therefore, the Special Master correctly concluded that 99 MD 1621 is at least based in part upon the publicly disclosed allegations and transactions in Document 133 and thus triggers the public disclosure bar.

**2.** The Special Master found that the 1997 *qui tam* actions against these specific Defendants and their respective affiliated companies were based upon the publicly disclosed allegations in the 1995 *Qui Tam* Action Documents. (*See* Report at 1176.) This Court, *infra*, agrees with the Special Master regarding the effect of the 1995 *Qui Tam* Documents. As a result, the question of whether the Grynberg Private Litigation Documents also trigger the public disclosure bar as to these entities and their affiliates is of little or no consequence.

**3.** Document 133 is a transcript of trial testimony in *Studley Resources v. Exxon Corp. and Beothos* concerning a field audit of Exxon wells, during which the auditors observed, among other things, nicked and pitted orifice plates and improper orifice plate sizes. The witness indicated that he also observed the same deficiencies, as well as dirty orifice plates and improperly calibrated meters, all of which could cause under-measurement of gas.

Relator further disputes that his 1995 *Qui Tam* Action Documents constitute public disclosures of any of the allegations or transactions on which his 1997 *qui tam* cases are based. First, Relator argues that the judge presiding over his 1995 *qui tam* action made a binding determination that the contents of the 1995 *Qui Tam* Complaint and amendments thereto were too vague and imprecise to be deemed disclosures of "allegations or transactions" of fraud, within the meaning of § 3730(e)(4)(A). Thus, Relator contends, the principle of issue preclusion prevents this Court from finding otherwise. Second, Relator argues that the 1995 *Qui Tam* Action Documents do not constitute a public disclosure because they fail to link any of the defendants with a particular mismeasurement technique.

■ The Court disagrees with both contentions. Relator cites no authority which equates Fed.R.Civ.P. 9(b)'s technical requirements for pleading fraud with particularity to that which constitutes an "allegation or transaction" under § 3730(e)(4)(A). Relator's assumption is at odds with the different purposes underlying Rule 9(b) and the public disclosure bar of the FCA. "The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir.1992) (citation omitted). In contrast, the purpose of the public disclosure bar is to prevent parasitic suits when information in the public domain is sufficient to set the government on the trail of fraud.

More importantly, as stated previously, it is not the identification of each specific technique of mismeasurement, but rather the allegation that Defendants underpay royalties to the federal government by intentionally mismeasuring gas volume and heating content which operates as a "quick trigger" of the public disclosure bar.[4]

Relator Grynberg also objects to the Special Master's ruling that the public disclosure bar was raised as to defendants not specifically named in the 1995 *qui tam* action. In *Sandia, supra,* the Tenth Circuit Court of Appeals rejected the relator's argument that his complaint was not based upon the public disclosures at issue because the disclosures did not specifically identify defendant Sandia as a wrongdoer. The appellate court pointed out that the disclosures in the General Accounting Office report and Congressional hearing detailed the mechanics of the allegedly wrongful practice, revealed that at least two of Sandia's eight sister laboratories were employing it, and indicated the United States Department of Energy's acquiescence. Under these circumstances, concluded the court, the public disclosures sufficiently alerted the government to the likelihood that Sandia would also engage in the alleged fraud. *Sandia,* 70 F.3d at 571. *Sandia* demonstrates that there is no *per se* rule in the Tenth Circuit that the public disclosure must name the later *qui tam* defendant.

Nevertheless, after reviewing case law from various circuits, the Special Master determined that *Sandia* established an exception to the general rule that public

---

4. In support of his argument that the 1995 *Qui Tam* Action Documents are not a public disclosure as to mismeasurement techniques not identified in the 1995 Complaint, Relator cites to the district court opinion in *United States ex rel. Fine v. MK–Ferguson,* 861 F.Supp. 1544 (D.N.M.1994), where the court determined that because one of Fine's claims had not been addressed in any publicly disclosed document, the jurisdictional bar did not apply to that claim. *Id.* at 1553. This Court finds, however, that a completely different type of fraud is distinguishable from a different mismeasurement technique resulting in the same type of fraud on the government, *i.e.* the underpayment of royalties owed.

disclosure of widespread wrongdoing in an industry does not trigger the statutory public disclosure bar as to every industry member. (Report at 1158–62.) Similarly, the identification of one or a few defrauders in an industry does not operate as a public disclosure of unlawful conduct by other, unrelated companies. Exceptions to this general rule appear to be limited to situations where the proposed public disclosure asserts fraud by a small group of businesses who are easily identifiable through information in the public domain and/or widespread fraud by a narrow or discrete group of companies having unique contractual relationships with the federal government that allow for substantial government oversight. As the *Sandia* court observed in distinguishing *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562 (11th Cir.1994), a case relied on by Relator Grynberg: "When attempting to identify individual actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laboratories." *Sandia,* 70 F.3d at 572.

Thus, the Special Master recognized authority for the principle that the public disclosure bar can be raised as to defendants not named in a prior public disclosure where the allegations in the publicly disclosed documents allow for easy identification of unnamed wrongdoers by the federal government. This principle is consistent with the axiom that a *qui tam* action is based upon the allegations in a prior public disclosure if the disclosure squarely places the government on the trail of the alleged fraud. (Report at 1168.) The Special Master concluded that, because Relator Grynberg's 1995 *qui tam* action and 1997 *qui tam* cases both specifically allege concerted action among affiliated companies, and because the affiliates of the defendants named in the 1995 *qui tam* action represent a relatively small group of companies readily identifiable from easily accessible information, the publicly disclosed allegations against the defendants in the 1995 *Qui Tam* Action Documents also constitute public disclosures of allegations as to affiliated corporations named as Defendants in the 1997 *qui tam* cases. The Special Master declined to extend the public disclosure bar to all unnamed purchasers of gas from federal and Indian lands throughout the United States, however, finding that the purpose of the FCA is best served by applying the public disclosure bar only to those wrongdoers expressly identified in the publicly disclosed allegations, affiliates acting in concert with expressly identified wrongdoers, and groups of alleged wrongdoers who, although not individually named in the public disclosure, are quickly and easily identified because of the group's small size and/or the group's close connection to government owned and controlled facilities.

Contrary to Relator's argument, Defendants contend that the public disclosure bar has been raised as to *all* Defendants in Grynberg's 1997 *qui tam* cases. Defendants argue, first, that all of Relator's cases fall within the exception to the general rule recognized by the Special Master. In support, Defendants assert the following: the ninety-nine remaining Defendants have been sued for mismeasuring natural gas from federal and Indian lands, that the measurements occur at government controlled and approved facilities called "facility measurement points" or "points of royalty settlement," and that these points are located on federally or tribally owned lands; at these measurement facilities, "Gas Measurers" have direct contractual relationships with the federal government (they are either federal or Indian lessees or pipelines holding federally-issued

rights-of-way); and both legislative branch and executive branch inspectors had actually inspected, as a part of an investigation or required routine regulatory inspections, the measurement equipment at the very meters which are the subject of Grynberg's allegations.

■ Under these circumstances, the Court agrees with Defendants that the public disclosures would apply to all of the 1997 *qui tam* Defendants because the allegations concerned "widespread fraud by a group of companies having unique and direct contractual relationships with the federal government that allow for substantial government oversight." (Report at 1162.) The activities of Relator's "Gas Measurers" have long been subject to close oversight by the Interior Department. Although this group potentially involved hundreds, if not thousands of companies, all potential wrong-doers were readily identifiable by the government without the assistance of Mr. Grynberg. Mr. Grynberg has not assisted the government in narrowing this large group by providing "significant independent information that is not already in the public domain." *See United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675, 682 (D.C.Cir.1997). Rather, Relator Grynberg has simply sued nearly all "Gas Measurers" in the industry, speculating that the fraud is widespread, if not universal. Relator adds no value to the government by researching the publicly available names of the industry's members.

As set forth previously, the Tenth Circuit test for determining whether a relator's complaint is "based upon" publicly disclosed "allegations or transactions" is whether "substantial identity" exists between the publicly disclosed allegations and the *qui tam* complaint. *MK–Ferguson*, 99 F.3d at 1545. "The False Claims Act can thus bar a *qui tam* action that is only partly based upon publicly disclosed allegations or transactions. Moreover, this 'based upon' analysis is a threshold inquiry 'intended as a quick trigger' to reach the 'original source' analysis." *Id.* (citing *Precision*, 971 F.2d at 552). The Court disagrees with the Special Master's application of this test to the ninety-nine remaining Defendants which were not named in the 1995 *Qui Tam* Action Documents or the Senate Committee Documents, or affiliated with a named Defendant. Instead, the Court finds that the principles set forth in *United States ex rel. Fine v. Sandia Corp.* lead to the conclusion that Relator's 1997 *Qui Tam* Complaints are based upon these prior public disclosures as to *all* Defendants named therein.

In *Sandia*, the United States General Accounting Office (GAO) issued a report examining the research and development (R & D) activities at three out of nine multiprogram laboratories, including Sandia National Laboratory, owned by the United States government and operated by private or university contractors under the Department of Energy's (DOE) administrative oversight. 70 F.3d at 569. The report included a section which focused on the "taxing" of nuclear waste funds by two of the laboratories during fiscal years 1988 and 1989. Concluding that those funds should be used only for research involving the storage and disposal of radioactive waste, the report noted that the Los Alamos and Lawrence Livermore Laboratories had taxed the waste fund for their discretionary R & D projects in 1989. The report further indicated that the DOE knew some of its laboratories were "taxing" nuclear waste funds for use in discretionary research and did not condemn the practice. *Id.* A subsequent congressional hearing "shed further light on the national laboratories' practice," although the hear-

ing did not specify that Sandia was "taxing" nuclear waste funds. *Id.* at 570.

At the time of the GAO report and congressional hearing, Mr. Fine was employed by the DOE's Office of Inspector General, where his duties included auditing Sandia. He continued to investigate the activities of Sandia and other government contractors following his retirement in 1991. In 1992, Mr. Fine filed a *qui tam* action alleging that Sandia improperly taxed the nuclear waste funds during fiscal years 1991 and 1992 and used the diverted funds in generic, discretionary R & D activities. The district court concluded that it lacked jurisdiction over Mr. Fine's complaint, holding that "the general allegations regarding the laboratories' 'taxing' of nuclear waste funds contained in the 1990 GAO report and the 1991 congressional hearing were sufficient to constitute 'public disclosures' of the practice." *Id.* On appeal, the relator insisted that his complaint was not based upon the public disclosures at issue because the disclosures merely described the Energy Department's nine national laboratories' general practice of improperly using money from a "nuclear waste fund," whereas his complaint specifically identified Sandia as engaging in the practice. *Id.* at 571.

The Tenth Circuit disagreed. "Because these disclosures detailed the mechanics of the practice, revealed that at least two of Sandia's eight sister laboratories were engaged in it, and indicated the DOE's acquiescence, we conclude that they sufficiently alerted the government to the likelihood that Sandia would also 'tax' nuclear waste funds in the future." *Id.* In reaching this conclusion, the Court of Appeals considered the goal of the FCA's jurisdictional scheme to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Id.* (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir. 1994)).

> We analyze Mr. Fine's claim in the context of Congress' twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.... Because the GAO report and the congressional hearing *set the government squarely on the trail of the alleged fraud* without Mr. Fine's assistance, we believe it would be contrary to the purposes of the FCA to exercise jurisdiction over his claim.

*Id.* (internal quotations and citations omitted) (emphasis added).

■ Thus, in determining whether the government has been set on the trail of fraud in the face of detailed allegations of widespread fraud in an industry, the issue is not whether a public disclosure names names; instead, the issue is whether, once alerted by the public disclosure to the nature of the wrongdoing, the federal government can identify the wrongdoers through whatever means are at its disposal. *United States ex rel. Gear v. Emergency Med. Assoc. of Illinois, Inc.,* 436 F.3d 726, 729 (7th Cir.2006) ("Industrywide public disclosures bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures.").[5]

---

5. The *Gear* court determined, "We are unpersuaded by an argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records. The disclosures at issue here were of industry-wide abuses and investigations.... Where a public disclosure has occurred, the government is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose." *Gear,* 436 F.3d at 729 (internal quotations and citations omitted).

Like the GAO report in *Sandia*, the Senate investigation, hearing, and report,[6] and certainly Relator's 1995 *Qui Tam* Action Documents, put the government on notice of "widespread theft through mismeasurement of oil and gas by purchasers of gas" from wells on federal and Indian lands. (Report at 1157.) These public disclosures "identified various mismeasurement practices" and a "vast opportunity for theft." *Id.* Because the Senate disclosures indicated that information concerning other unnamed companies had been turned over to the Department of Justice, the Court can presume that any further investigation would have looked at any company measuring gas from federal or Indian lands. While, admittedly, this group of "Gas Measurers" is much larger than the group of laboratories at issue in *Sandia*, these companies are readily identifiable by the government. The Court finds that Relator Grynberg is an "opportunistic plaintiff" who has little or no significant information to contribute of his own. Rather, Mr. Grynberg merely speculates that the fraud is occurring industrywide, naming nearly the entire industry in this action and hoping that discovery will

---

**6.** The Senate Committee Documents arising from the 1988–89 investigation disclosed the industry-wide practice of mismeasurement of natural gas produced from federal and Indian lands. The investigation and resulting report was conducted by the Senate Select Committee on Indian Affairs and the investigation focused on the "underpayment of mineral royalties and other items on Indian lands...." (JDPD 1–4 at 2.) While the Senate Committee reported on alleged fraud committed on various Indian Tribes, it also referred to a number of past investigations on federal lands.

After commencing its investigation, the Senate Committee reported on its inquiry into "alleg[ations] that the [Interior] Department has ... failed to safeguard Indian oil and gas properties against wholesale theft and against gross under-reporting of production volume by industry[.]" (JDPD 141–159 at 150). During further hearings on the investigations, the Senate Committee disclosed a "vast opportunity ... for theft and mismeasurement in the natural gas area," publicly warning that these techniques were "the type of scheme that can be used on Federal or Indian land at any time...." (JDPD 161–188 at 166 and 174.)

While the Senate Committee's work highlighted the conduct of one corporation in particular, it made clear that the focus of the investigation was industry-wide. The Senate Committee reported:

- "[T]hat this [investigation of Koch] is taken as an example of what is happening in this whole issue.... We believe the same kind of practice is going on—it is just that this particular case was taken to highlight the problem so that we can address the issue legislatively.... [Koch] is one of a number of companies that we had information about...." (JDPD 161–188 at 165.)
- "We've found that these problems were not confined simply to one company or even one particular method of theft." (JDPD 428–479 at 430.)
- "[The results of the investigation are] representative of the types of activities that occur throughout Indian producing lands." (JDPD 161–188 at 166.)

After months of investigation and inspections, the Committee reported that:

Theft is by no means limited to oil. Natural gas, in fact, is more easily stolen through fraudulent mismeasurement than crude oil. The Committee uncovered evidence to indicate that some companies were stealing natural gas by similar sophisticated mismeasurement techniques. Indeed, on the Southern Ute Indian Reservation, 76 percent of the gas meters independently tested for the Committee were calibrated to allow mismeasurement, whether by negligence of by theft. Moreover, internal data of one of the largest natural gas producers in the United States, with substantial Indian production, shows that in 1987, through mismeasurement, natural gas purchasers received at least $9.5 million worth of natural gas they never paid for.

(JDPD 189–426 at 305.) The Senate Report and investigation culminating in such Report clearly informed the public and the government of the mismeasurement allegations resonating throughout the natural gas industry on federal and Indian lands.

reveal the necessary evidence to support his vast claims. His present *qui tam* complaints are clearly "based upon" the prior public disclosures of widespread fraud.

The holding in *United States ex rel. Findley v. FPC–Boron Employees' Club, supra,* further supports this Court's findings. In *Findley,* the relator sued "all employees' clubs of the [Bureau of Prisons] and the United States Department of Justice that earn revenue from the provision of vending services on federal property." 105 F.3d at 678. The relator specifically named one club of employees who worked at the prison camp in Boron, California, alleging that its members were unlawfully retaining money from vending machines in employee and visitor rooms at the prison, money he alleged should have been paid into the Treasury. The court found that the relator's complaint was based upon three public disclosures. The first was a forty-year-old government report disclosing that it was doubtful that federal employees clubs could lawfully retain the profits received from vending machines on government premises. The report mentioned only the clubs of the United States Postal Service and the Federal Bureau of Investigation. *Id.* at 685. The second was a 1974 Senate report regarding amendments to the Randolph–Sheppard Act which noted that federal employee welfare and recreation groups had long retained money from vending machines on federal property, despite suggestions that the practice was unlawful. The third was a decision of the Court of Appeals for the Federal Circuit which referenced these two documents. *Id.* at 686. None of these disclosures specifically mentioned either the club at FPC–Boron or even the more general class of clubs at Bureau of Prisons facilities.

To determine the meaning of "based upon," the *Findley* court took guidance from the Tenth Circuit's opinion in *United States ex rel. Precision Co. v. Koch Indus., Inc.* wherein the court explained that "[a]s a matter of common usage, the phrase 'based upon' is properly understood to mean 'supported by.' " *Findley,* 105 F.3d at 682 (quoting *Precision,* 971 F.2d at 552). The D.C. Circuit further noted, "[T]he Tenth Circuit reasoned that its limited interpretation of who could sue under the statute protected the incentive for private citizens with first-hand knowledge to expose fraud, but also prohibited civil actions brought by opportunists who do not contribute anything significant to the exposure of the fraud." *Id.* Upon review of the language, structure, history and purpose of the FCA, the *Findley* court concluded that "Congress sought to limit *qui tam* actions 'to those in which the relator has contributed significant independent information [that is not already in the public domain].' " *Id.* (quoting *Springfield Terminal Ry.,* 14 F.3d at 653).

The relator in *Findley* argued that allowing the public disclosure bar to be raised by generic allegations of wrongdoing by employees' clubs would "frustrate the purpose of the *qui tam* provisions by foreclosing suits by whistleblowers who have identified specific instances of fraudulent conduct." *Id.* at 686. The D.C. Circuit, however, found this concern untenable. "When the publicly disclosed transaction is sufficient to raise the inference of fraud . . . ., there is little need for *qui tam* actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue." *Id.* at 687. "The disclosures recognize that the practice occurs throughout the federal government, thus their relevance cannot be confined to specific agencies." *Id.* Those disclosures "specifically identify the nature of the fraud—illegal retention of mo-

nies owed to the government and unauthorized administrative approval of the practice—as well as the federal employee actors engaged in the allegedly fraudulent activity." *Id.* The court found that Findley's complaint substantially repeated what the public already knew and "add[ed] only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice" from the universe of "easily identifiable federal employee organizations that provide vending services on federal property." *Id.*

The Court finds that the consolidated cases before it are more closely akin to *Findley* than to *Cooper,* a case on which the Special Master relied in concluding that the public disclosure bar had not been raised as to previously unnamed Defendants. Like *Findley,* with its disclosures regarding generically labeled "federal employee welfare and recreation groups" on federal property—a class numbering in the hundreds—these cases are presaged by public disclosures alleging gas mismeasurement on federal and Indian lands, both by many identified companies and by more generically described groups such as "gas measurers," "gas pipelines," or the "natural gas industry." Like *Findley,* the complaints here alleged that a class of defendants engaged in identical fraud. And the Defendants here are "easily identifiable" actors in gas measurement on federal and Indian lands because of their contracts with and/or oversight by the Department of the Interior. The Court concludes, therefore, that because Relator Grynberg's 1997 *Qui Tam* Complaints merely echo publicly disclosed, allegedly fraudulent conduct that "already enables the government to adequately investigate the case and to make a decision whether to prosecute," the public disclosure bar applies to all Defendants. *Id.* at 688.

*Cooper* stands in contrast. There the relator had repeatedly seen his claims for insurance reimbursement denied by Blue Cross Blue Shield of Florida ("BCBSF"), which always asserted it was an insurer secondary to Medicare. *Cooper,* 19 F.3d at 564. After researching his benefits and the law governing payment of his claims, he learned that this conduct might be occurring at other insurance companies. Other public disclosures discussed widespread Medicare Secondary Payer ("MSP") fraud and named certain insurance companies, but none named BCBSF. The court ruled that the public disclosure bar had not been raised by these disclosures, reasoning that to require "allegations specific to a particular defendant be publically disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of fraud will be revealed." *Id.* at 566.

Unlike Mr. Grynberg and the relators in *Findley,* Mr. Cooper did not begin with an assertion of widespread fraud, then go in search of defendants. Cooper sued only one defendant with allegations arising out of years of direct dealings with the company. Unlike *Findley* and the present cases, BCBSF was not operating on federal property, subject to routine government inspections, and in a direct contractual relationship with the government. No evidence in *Cooper* showed the government could know (without the help of a public disclosure) which entity was supposed to be acting as Cooper's primary insurer; the evidence in the present cases shows that the government knew exactly who was measuring gas produced from federal and Indian lands. Relator Grynberg's 1997 *qui tam* cases against hundreds of "Gas Measurers" on federal and Indian lands are clearly based upon the public disclosures of widespread fraud, not on signifi-

cant independent information regarding specific companies.

■ Having determined that the 1995 *Qui Tam* Action Documents and the Senate Select Committee Documents raise the public disclosure bar as to all Defendants named in Relator's 1997 *qui tam* cases, the Court need not address whether other documents the Special Master rejected as qualifying public disclosures also raise the bar. However, it should be noted that the Court agrees with Defendants' argument that a particular disclosure on its own does not have to place a defendant's conduct in a questioning light. "[T]he public disclosure of the material elements of the fraudulent transaction bars *qui tam* actions even if the disclosure itself does not allege any wrongdoing." *Sandia,* 70 F.3d at 572. More recently, the Tenth Circuit has held that the public disclosure bar is raised where "[a]ll of the material elements of the fraudulent *transaction* were already in the public domain." *United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1051 (10th Cir.2004) (emphasis added).

> The relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed.

*Findley,* 105 F.3d at 688 (internal quotations and citations omitted).

■ The Court also notes its disagreement with the Special Master's rejection as a public disclosure of an administrative report of an audit and investigation by the State of Alabama ("the Evaluation Report") naming certain companies, including Mobil Oil Exploration & Producing South-

east, Inc., Shell, Exxon, Offshore Group, Inc., Callon Petroleum, Legacy Resources Co., Scana Petroleum Resources, Mobile Gas Company, and Transcontinental Gas Pipeline. The Special Master found that the Evaluation Report, in addition to an explanation of the measurement techniques employed by these companies, also discusses many of the gas measurement issues raised in Relator's 1997 *Qui Tam* Complaints. (Report at 1190.) The Special Master further found that, although the Report does not contain allegations of wrongdoing, it arguably discloses "transactions" from which wrongdoing can be inferred, particularly when combined with other public disclosures. Nevertheless, the Special Master concluded that the Evaluation Report did not qualify as a statutory source under § 3730(e)(4)(A) because it had not been issued by an agency of the federal government. (Report at 1191.)

The Special Master was persuaded by the reasoning of *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734 (3rd Cir.1997), which held that state administrative reports and investigations do not qualify as public disclosures from any of the statutory listed sources. *Id.* at 745. Focusing on the statutory phrase "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation," the Special Master concluded that because the word "administrative" appeared in between two entities that are clearly federal—Congress and the GAO—the term must be understood to refer to only *federal* administrative investigations and reports, and not state reports. He added that his conclusion was supported by policy. Seeing the goal of public disclosure as one of putting the federal government on notice of fraud, the Special Master determined that "[r]eports generated by the myriad of state, county, and

local administrative agencies *that do not relate to joint state-federal programs* are unlikely candidates to fulfill the notice function." (Report at 80) (emphasis added).

The Shell, Exxon and Mobil Defendants separately objected to the Special Master's findings on this issue, arguing that the Evaluation Report constitutes a public disclosure even under the Special Master's reading of the limited precedent, and that the Special Master's reading of the statute was overly restrictive. In *United States ex rel. Hays v. Hoffman,* 325 F.3d 982 (8th Cir.2003), the Eighth Circuit concluded that the *Dunleavy* court ruled more broadly than necessary in stating that a state agency disclosure may never qualify as an "administrative ... report, hearing, audit, or investigation" for purposes of § 3730(e)(4)(A). *Id.* at 989. Rather, the *Hays* court rejected the Third Circuit's textual approach and concluded "that Medicaid compliance audits and audit reports conducted and prepared by the state agency authorized to administer this cooperative federal/state program are public disclosures within the meaning of § 3730(e)(4)(A)." *Id.* at 988.

These Defendants contend that, because the Alabama Evaluation Report related to a joint state/federal program, it should likewise qualify as a public disclosure. Defendants argue that the Special Master failed to consider applicable federal regulations and certain relevant facts contained in the Evaluation Report which indicate the Report was the product of a cooperative program. The Report clearly addresses the measurement of gas production in an area of cooperative federal and state offshore development. The Report's Introduction states, "[I]t is imperative that all the hydrocarbon production from offshore state waters and certain federal blocks are accurately measured and that payments are received in full for all such production." The Court finds that this state-generated report that investigates gas measurement of gas streams, including those from federal leases, would likely place the federal government on notice of fraudulent activities impacting the federal fisc.

■ Furthermore, the Court finds that limiting the word "administrative" to only federal administrative reports, audits and investigations is inconsistent with the plain language of the phrase at issue as well as the language and interpretation of the remaining portions of § 3730(e)(4)(A).[7] The immediately preceding phrase in that statutory section provides that public disclosures include any "criminal, civil, or administrative hearing," and courts have consistently interpreted that phrase to include both *state* and *federal* litigation and administrative hearings. *A–1 Ambulance Service, Inc. v. California,* 202 F.3d 1238, 1244 (9th Cir.2000); *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.,* 384 F.3d 168 (5th Cir. 2004); *United States ex rel. O'Keeffe v. Sverdup Corp.,* 131 F.Supp.2d 87, 91–92 (D.Mass.2001). Likewise, this section of the FCA also gives public disclosure status to "the news media" regardless of whether that media is national, state, or local. There is no reason to conclude that Congress intended to limit administrative reports, audits, and investigations to *federal* actions, while simultaneously allowing

---

7. Although the Tenth Circuit Court of Appeals has not addressed this issue, it has recognized, as a "potential argument," that a state administrative audit may not qualify as a public disclosure because it is not made by Congress, a federal administrative agency, or the Government Accounting Office. *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1518 n. 2 (10th Cir.1996).

all *state* and *local* civil litigation, *state* and *local* administrative hearings, and *state* and *local* news media to be treated as public disclosures. To interpret the statute so narrowly would have the anomalous result of allowing public disclosure status to the most obscure local news report and the most obscure state and local civil lawsuit or administrative hearing, but denying public disclosure status to a formal public report of a state government agency, such as the Alabama Evaluation Report.

The public disclosure bar is designed to limit *qui tam* jurisdiction "to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware." *Findley*, 105 F.3d at 678. If all state administrative reports, audits, or investigations were automatically excluded as public disclosures because they do not originate from the federal government, a primary purpose of the statute would be undermined in that relators would be empowered to copy the results of widely disseminated audits or investigations regarding fraud and nonetheless be permitted to proceed with their parasitic *qui tam* action merely because the federal government had not issued the report. Therefore, this Court rejects the Special Master's findings with respect to the Alabama Evaluation Report.

■ Finally, Relator Grynberg contends that he is being denied equal protection because he now must meet the "more exacting" original source standard in this re-filed *qui tam* action than he would have needed to satisfy in his 1995 *qui tam* case. "If a law neither burdens a fundamental right nor targets a suspect class, [a court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). "*Qui tam* relators" are not a suspect class, and no one has a fundamen-

tal right to sue on the government's behalf. Thus, the rational basis test applies.

"Under the rational basis test, the court upholds the policy if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Copelin Brown v. New Mexico State Personnel Office*, 399 F.3d 1248, 1255 (10th Cir.2005) (internal quotations and citation omitted). The policy behind the public disclosure bar provides the rational basis. "[W]here public disclosure of the fraud has already occurred, no incentive for a private *qui tam* suit is needed." *United States ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1546 (10th Cir.1996). The public disclosure bar, as construed by the Special Master and this Court, is rationally related to Congress' purpose in limiting *qui tam* actions.

### *Original Source*

In objecting to the Special Master's findings on the original source issue, Relator first contends that the Special Master improperly resolved disputed material facts regarding his lack of direct knowledge of the information upon which he based his complaints. The Court finds that the Special Master viewed the record in the light most favorable to Relator. (Report at 1144.) Accepting Relator Grynberg's portrayal of his investigation as true, the Special Master categorized Relator's knowledge of the information on which his allegations are based as either "direct and independent" or "secondhand." *Id.* at 1213. Knowledge that the Special Master determined to be "secondhand," or from publicly available sources, was rejected as legally insufficient to meet the original source standard. The Special Master then determined whether Grynberg possessed sufficient direct and independent knowledge to qualify as an original source.

Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The statutory provisions of 31 U.S.C. § 3730(e)(4) implicate this Court's subject matter jurisdiction. Since federal courts are courts of limited jurisdiction, the Court presumes no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction. *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir.1999). Since Defendants have challenged the Court's jurisdiction, the burden is on Relator to show that jurisdiction exists. *United States ex rel. Stone v. Rockwell Intern. Corp.*, 282 F.3d 787, 797 (10th Cir.2002). "[Relator] must therefore sustain the burden of alleging the facts essential to show jurisdiction and supporting those facts with competent proof. Mere conclusory allegations of jurisdiction are not enough." *Id.* (internal quotations and citations omitted). The Special Master did not improperly weigh the evidence; rather, he concluded that Relator's knowledge of the information on which his allegations are based is not sufficiently "direct and independent" as a matter of law to qualify Relator as an original source.

Part and parcel of the original source analysis is the statutory mandate that prior to filing suit, a *qui tam* relator must have voluntarily provided the information on which the allegations are based to the government. *United States ex rel. King v. Hillcrest Health Center, Inc.*, 264 F.3d 1271, 1280 (10th Cir.2001). Thus, to avoid the jurisdictional bar, "a relator must have direct and independent knowledge of the information on which the *qui tam* allegations are based and must have provided the *same* information to the government prior to filing the *qui tam* action." *Id.* (emphasis added). As with other statutes conferring jurisdiction on federal courts, § 3730(e)(4)(B) must be strictly construed, with doubts resolved against federal jurisdiction. *Id.* Relator Grynberg contends that the Special Master erred in limiting the "information" that may be considered in assessing whether a relator has "direct and independent knowledge of the information" on which his allegations are based to only that "information" which Relator voluntarily provided to the government prior to filing the *qui tam* action. Relator argues that in doing so, the Special Master failed to consider "very significant portions of Relator's evidence." (Relator's App. of Objections ¶ 16.) The Court disagrees.

The Tenth Circuit has clearly stated that "before filing the *qui tam* action, a relator must voluntarily provide the Government with the essential elements or information on which the *qui tam* allegations are based." *King*, 264 F.3d at 1280. A relator may utilize all information voluntarily disclosed to the government before filing suit in order to demonstrate direct and independent knowledge of the information on which the allegations in the *qui tam* complaint are based.[8] *See United*

---

8. Relator argues that the Special Master improperly discounted certain proffered evidence of Relator's voluntary disclosure to the government because it lacked specificity or contained other evidentiary flaws. As noted previously, it is Relator who bears the burden of alleging the facts essential to show jurisdiction and supporting those facts with competent proof. The Court finds that the Special Master correctly concluded there is insufficient evidence in the record to support consideration of either Relator's oral communications with government employees or documents that may have been copied by government representatives during their reviews of Relator's files. (Report at 1207–08.)

*States ex rel. Detrick v. Daniel F. Young, Inc.,* 909 F.Supp. 1010, 1017 (E.D.Va.1995). Conversely, however, a relator is precluded from attempting to establish that he or she is an original source by proffering information that was not submitted to the government in accordance with § 3730(e)(4)(B). The withholding of significant portions of evidence "deprives the government of key facts necessary in its efforts to confirm, substantiate or evaluate the fraud allegations." *King,* 264 F.3d at 1281. If Relator Grynberg had significant information on which his *qui tam* allegations are based that he did not voluntarily provide to the government, then Grynberg failed to meet the jurisdictional requirements of an original source. *Id.*

Relator Grynberg further faults the Special Master for failing to consider the 1995 *Qui Tam* Complaint and "significant supporting documentation" in the original source analysis as information Relator voluntarily provided to the government. (Relator's App. of Objections ¶ 30.) However, the 1995 Complaint merely contains "allegations" not "information" upon which his 1997 allegations are based. As for the "significant supporting documentation" Grynberg references, it is apparent that the Special Master did consider such information in detail, despite some uncertainty as to whether all of the proffered documents were actually given to the government before filing suit. (Report at 1208.)

Relator also contends that the Special Master incorrectly employed a "substantial first-hand knowledge" test in determining whether Relator qualifies as an original source. Relator argues that such a test is inconsistent with Tenth Circuit and other leading authorities. Relying on *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645 (D.C.Cir.1994), Relator maintains that he merely needs direct and independent knowledge of *"any essential element"* of the alleged fraud without regard to the *quantity* of information he has added to the equation. The Special Master recognized that Relator Grynberg has direct and independent knowledge of some of the information upon which some of his allegations are based. However, the Master found that "from a quantitative standpoint, a majority of Relator's knowledge of the information on which he relies to support the allegations in his 1997 *Qui Tam* Complaints is second-hand or comes from publicly available sources." (Report at 1214.) Ultimately, the Special Master concluded that Relator's "combination of speculation, information derived from publicly available materials, and second-hand knowledge compiled from third party interviews is not sufficiently 'direct and independent' under the Tenth Circuit case law to qualify Relator as an original source."[9] *Id.* at 1218.

The FCA defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Under

9. The Special Master separately analyzed Grynberg's claim of original source status with respect to the *qui tam* cases against the Transwestern, Questar, and KN groups of defendants, finding that, in each of these cases, Grynberg is not only the originator of a few of the general theories of mismeasurement, but he also has direct and independent knowledge that each Defendant group measures gas and, more importantly, direct and independent knowledge of at least some of the group's measurement practices. (Report at 1220–21.) However, as with the other defendants, the Special Master concluded that Relator's mismeasurement allegations against these defendants are based largely upon the knowledge of others, speculation, or both. *Id.* at 1225.

Tenth Circuit authority, knowledge is "direct and independent" if it is "marked by the absence of an intervening agency," and "unmediated by anything but the relator's own labor." *United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1547 (10th Cir.1996). Independent knowledge is knowledge which is not secondhand; rather, a relator must demonstrate that he discovered the information on which the allegations are based through his own efforts and not by the labors of others, and that the information was not derivative of the information of others. *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1162 (10th Cir. 1999). "To establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *Id.* Secondhand information, speculation, background information or collateral research do not satisfy a relator's burden of establishing the requisite knowledge. *Id.* at 1162–63; *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991) (a relator's background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is insufficient to establish original source).

Relator Grynberg insists that, when comparing the "character of the discovery and investigation" undertaken by the relators in *Kennard v. Comstock Res.,* 363 F.3d 1039 (10th Cir.2004), who were found to be original sources, with the "character of the discovery and investigation" by Grynberg, he clearly qualifies as an original source. *Id.* at 1045–46. Relators Kennard and Wright conducted their own research and investigation into the alleged fraud on the Government, part of which included a review of public records. The Tenth Circuit declined to adopt any bright-line rule disqualifying a relator as an original source when he examines public records as part of an independent investigation. Instead, the *Kennard* court gave consideration to the availability of the information and the amount of labor and deduction required to construct the claim. *Id.* at 1046. Because Relators Kennard and Wright relied on personal royalty records and "relatively obscure public documents" in "ferreting out" the alleged fraud, the Court of Appeals found that they qualified as an original source. *Id.*

■ Nevertheless, a relator's knowledge must still be direct, not secondhand, and a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator simply comes forward with additional evidence. *United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1054 (10th Cir.2004); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 655 (D.C.Cir.1994). To be an original source, a relator must do more than assemble information. The Tenth Circuit has consistently recognized that "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *Praxair,* 389 F.3d at 1053 (quoting *Findley,* 105 F.3d at 688); *Kennard,* 363 F.3d at 1045 (same).

In *Hafter,* the court compared the detail and scope of the allegations with the relator's direct knowledge and determined that the information provided by relator was "relatively minor and insignificant," the "core information" having come from a

third party's independent research and investigation. 190 F.3d at 1163–64. In *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548 (10th Cir. 1992), the relator's "independent information" was "weak, informal and strikingly redundant" when compared to the information obtained secondhand. *Id.* at 554. In *MK–Ferguson,* where the information was derived from a publicly disclosed audit report, the court determined the relator contributed "no significant information of his own." 99 F.3d at 1548. And in *Praxair,* the court compared Grynberg's purported "independent" knowledge with information already in the public domain, and concluded that the character of Grynberg's discovery and investigation was insufficient to qualify him as an original source. 389 F.3d at 1054.

Grynberg contends that through his independent investigation and research he obtained direct and independent knowledge of information which provides an essential element of his claims. However, the Special Master determined that any direct knowledge Grynberg possessed did not make a significant contribution given the nature and scope of his allegations, the amount of information in the public domain, and Grynberg's heavy reliance on second-hand information and speculation. This Court agrees. A review of the character of Grynberg's discovery and investigation in this case reveals that most of Grynberg's knowledge was secondhand, public, or based on speculation, and that what little he knew about a few practices of a few Defendants was insubstantial when compared to the breadth and scope of the allegations in his complaints. Rela-

tor Grynberg complains of the irony that had he focused his *qui tam* suit on those few defendants for which he had some direct and independent knowledge as to a few of the alleged mismeasurement techniques, then he might have faired better in the original source analysis. However, as the Court sees it, this "ironic twist" results not from an incorrect interpretation of the law, but from Relator's own overreaching. Grynberg deliberately chose to make sweeping allegations of fraud against nearly the entire industry, based in large part on rank speculation. By employing such odious tactics he now becomes the instrument of his own undoing.

### Conclusion

Relator Grynberg's *qui tam* cases before the Court are based upon the public disclosures of industry-wide natural gas measurement abuses on federal and/or Indian land. Furthermore, Relator Grynberg has not satisfied his burden of showing he qualifies as an original source. Accordingly, pursuant to the provisions of 31 U.S.C. § 3730(e)(4), the Court lacks subject matter jurisdiction over Relator's 1997 *qui tam* cases.

The Court finds that the Special Master's Report and Recommendations should be **MODIFIED** to the extent set forth above, and adopted in all other respects not specifically addressed herein.[10] THEREFORE, it is hereby

**ORDERED** that the Coordinated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Arco's, Unocal's and Dauphin's Motion and Brief on Jurisdiction, and Moving 1997 Defendants' Motion to Dismiss for Lack of Subject

---

10. Because the Court's findings with respect to the jurisdictional provisions of § 3730(e)(4) are dispositive with respect to all Defendants in Relator's 1997 *qui tam* cases, it is unnecessary for the Court to address the separately-filed, individual objections of certain Defendants and the Special Master's Report and Recommendations related to the requirements of 31 U.S.C. § 3730(b)(2).

Matter Jurisdiction are **GRANTED**; it is further

**ORDERED** that Relator's Cross Motion for Summary Judgment on Issue of Public Disclosure is **DENIED**; it is further

**ORDERED** that the following cases are **DISMISSED** for lack of subject matter jurisdiction: 99–MD–1601; 99–MD–1602; 99–MD–1603; 99–MD–1604; 99–MD–1605; 99–MD–1607; 99–MD–1608; 99–MD–1609; 99–MD–1610; 99–MD–1611; 99–MD–1612; 99–MD–1613; 99–MD–1614; 99–MD–1615; 99–MD–1616; 99–MD–1617; 99–MD–1618 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendant Mobil Exploration & Producing U.S., Inc.);[11] 99–MD–1619; 99–MD–1621 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendant Exxon Co., U.S.A.); 99–MD–1622; 99–MD–1623; 99–MD–1624; 99–MD–1625; 99–MD–1626; 99–MD–1627; 99–MD–1628; 99–MD–1629 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendants Shell Land and Energy Co. and Shell Western E & P, Inc.); 99–MD–1630; 99–MD–1631; 99–MD–1637; 99–MD–1638; 99–MD–1639; 99–MD–1640; 99–MD–1641; 99–MD–1642; 99–MD–1643; 99–MD–1644; 99–MD–1645; 99–MD–1646; 99–MD–1647; 99–MD–1648; 99–MD–1649; 99–MD–1650; 99–MD–1651; 99–MD–1652; 99–MD–1653; 99–MD–1654; 99–MD–1655; 99–MD–1656; 99–MD–1657; 99–MD–1658; 99–MD–1659; 99–MD–1660 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendant Amerada Hess Corp.); 99–MD–1661; 99–MD–1662; 99–MD–1663; 99–MD–1664; 99–MD–1665 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendants ARCO Oil & Gas Co. and ARCO Permian, d/b/a Atlantic Richfield Co.); 99–MD–1666; 99–MD–1667; 99–MD–1668 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendants Oxy–USA); 99–MD–1669; 99–MD–1670; 99–MD–1671; 99–MD–1672 (except as to claims pertaining to the royalty value of carbon dioxide ($CO_2$) against Defendant Cross Timbers Operating Company); 99–MD–1673; 00–MD–1632; 00–MD–1633; 00–MD–1634; 00–MD–1635; 00–MD–1636; 02–MD–1682; 04–MD–1684.

**REPORT AND RECOMMENDATIONS OF SPECIAL MASTER ON: (A) COORDINATED DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; (B) ARCO'S, UNOCAL'S AND DAUPHIN'S MOTION AND BRIEF ON JURISDICTION; (C) MOVING 1997 DEFENDANTS' MEMORANDUM TO DISMISS RELATOR'S COMPLAINTS FOR LACK OF SUBJECT MATTER JURISDICTION; AND (D) RELATOR'S CROSS MOTION FOR SUMMARY JUDGMENT WITH AUTHORITY PURSUANT TO FED. R. CIV. P. 56, ON ISSUE OF PUBLIC DISCLOSURE UNDER 31 U.S.C. § 3729 ET SEQ.**

PRINGLE, Special Master.

This matter comes before the Special Master on the following dispositive motions: (a) Coordinated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (hereinafter the "Coordinated Defendants' Motion to Dismiss"); (b)

---

11. Several of Relator's currently operative Complaints contain $CO_2$ *valuation* claims against certain Defendants. By separate order, this Court will address the Special Master's Report and Recommendation on those Defendants' Motion to Dismiss $CO_2$ Royalty Claims Based on First–To–File Rule.

Arco's, Unocal's and Dauphin's Motion and Brief on Jurisdiction (hereinafter "Arco's Motion to Dismiss"); (c) Moving 1997 Defendants' Memorandum to Dismiss Relator's Complaints for Lack of Subject Matter Jurisdiction (hereinafter "the 1997 Defendants' Motion to Dismiss"); and (d) Relator's Cross Motion for Summary Judgment with Authority Pursuant to Fed.R.Civ.P. 56, on Issue of Public Disclosure Under 31 U.S.C. § 3729 et seq. (hereinafter "Relator's Cross Motion"). On August 19, 2003, the United States District Court for the District of Wyoming entered a Second Order Appointing Special Master (Second Order). Among the matters referred to the Special Master in the Second Order was the authority to issue Recommendations as to the appropriate resolution of dispositive motions. The above captioned motions have been fully briefed and argued. The Special Master now issues this Report and Recommendation:

## I. BACKGROUND

### A. General Nature of the Cases

The Coordinated Defendants' Motion to Dismiss, Arco's Motion to Dismiss, and the 1997 Defendants' Motion to Dismiss are directed at 73 cases filed under the *qui tam* provisions of the False Claims Act by Relator Jack J. Grynberg (hereinafter "Relator"), in which he accuses over 300 gas pipelines and other gas measurers of mismeasuring gas produced from federal and/or Indian lands (hereinafter "the 1997 *qui tam* cases").[1] The Complaint in each of these 73 cases asserts that all of the

Defendants named therein employ a series of mismeasurement techniques that allows them to knowingly underreport or cause others to underreport the heating content and volume of gas, and that this conduct has resulted in an underpayment of federal royalties over a 10–year period in excess of 20%.[2]

### B. Relator Grynberg

Relator Jack Grynberg (hereinafter "Relator") received undergraduate and graduate degrees from the Colorado School of Mines and, for approximately the past 40 years, has operated a privately owned oil and natural gas production firm. During the course of operating this company, he has had business dealings with many of the Defendants named in the 1997 *Qui Tam* Complaints. These business dealings led to a substantial amount of private litigation between Grynberg, his business entities, and family members on the one hand, and various pipelines and operators on the other hand. Grynberg's private litigation, which continued unabated for more than 20 years, involved a variety of issues, including disputes over gas volume measurement and gas heating content analysis.

### C. The 1995 Qui Tam Suit

On April 17, 1995, Relator filed a *qui tam* action in the United States District Court for the District of Columbia against forty-four defendants, alleging that they had defrauded the federal government by underpaying royalties on gas purchased from federally owned or Indian lands. Re-

---

**1.** Seventy-two of the cases were filed in 1997 and 1998 and then transferred to the United States District Court for the District of Wyoming for pretrial purposes as multidistrict litigation under 28 U.S.C. § 1407. One additional case was transferred to the District of Wyoming in 2004. For convenience, the

Complaints in these cases will be referred to collectively as the "1997 *Qui Tam* Complaints."

**2.** Relator's Complaints are brought under the "reverse false claim" provision contained in 31 U.S.C. § 3729(a)(7).

lator asserted that the underpayments were the result of mismeasurement of gas volume and improper analysis of gas heating content. The Complaint (hereinafter the "1995 *Qui Tam* Complaint") identified a number of mismeasurement techniques, and asserted that each of the defendants employed one or more of them.

Relator amended the 1995 *Qui Tam* Complaint to add defendants and mismeasurement techniques. An Amended Complaint filed on December 7, 1995, and a Second Amended Complaint, filed on May 13, 1996, each named several new defendants, ultimately bringing the total number of defendants sued in the 1995 *qui tam* action to 70.

On March 27, 1997, United States District Judge Thomas F. Hogan dismissed the 1995 *qui tam* action without prejudice for failure to plead fraud with particularity and for improper joinder of parties. There were 63 defendants in 1995 *qui tam* case at the time the order of dismissal was entered.

### D. The 1997 Qui Tam Cases

Beginning in June of 1997, Relator commenced filing the instant *qui tam* suits in Federal District Courts in Colorado, Wyoming, Oklahoma, Louisiana, Texas, Michigan, California, and New Mexico (hereinafter the "1997 *qui tam* cases"). On October 20, 1999, the Judicial Panel on Multidistrict Litigation issued a Transfer Order, transferring 66 cases to the United States District Court for the District of Wyoming, and assigning them to the Honorable William F. Downes for coordinated or consolidated pretrial proceedings. Subsequently, additional cases were transferred, bringing

the total now pending in the District of Wyoming to 73.

On November 19, 1999, the Defendants moved to dismiss the actions pursuant to Fed.R.Civ.P. 8(a), 9(b), and 12(b). The motion was denied by the Court. A subsequent motion to dismiss, attacking certain valuation claims (as opposed to mismeasurement claims) contained in the 1997 *Qui Tam* Complaints, was granted by the Court on October 9, 2002. Additionally, Defendants moved to dismiss other claims asserted in the 1997 Complaints involving carbon dioxide under the "first-to-file" rule, 31 U.S.C. § 3730(b)(5). The Special Master has issued a Recommendation that the motion be granted. The Recommendation is pending before Chief Judge Downes.

The bulk of the allegations in the 73 *Qui Tam* Complaints initiated by Relator and currently pending in the District of Wyoming are unaffected by either the "first-to-file" Order or the carbon dioxide Recommendation. These remaining allegations accuse the named Defendants in each case of knowingly utilizing specifically identified techniques to measure gas volume and analyze gas heating content in a manner that produces an artificially low wellhead price. Because federal royalties are based on the wellhead price, the use of these mismeasurement techniques also allegedly results in an underpayment of royalties to the United States. Twenty of the alleged mismeasurement techniques are common to all 73 cases. Additionally, there are other mismeasurement practices that are case specific. Each Complaint asserts that each of the named Defendants utilized each of the mismeasurement techniques identified therein.[3] A few of the cases

---

**3.** The 1995 *Qui Tam* Complaint accused each defendant of mismeasuring gas by employing one or more of the techniques discussed in the allegations. Judge Hogan's Order dis-

missing the case found fault with this accusation, concluding that the failure to identify which mismeasurement technique or techniques were applicable to each particular de-

name only one Defendant. The rest identify multiple Defendants that are alleged to be affiliated companies acting in concert through the same employees and personnel.

### E. The Instant Motions to Dismiss and the Cross Motion

In 2002, Chief Judge Downes authorized limited discovery relating to jurisdictional issues. A massive and complex discovery process ensued, including but not limited to a deposition of the Relator that consumed approximately 30 days; voluminous document production; and the filing of a plethora of discovery motions. Pursuant to an order entered by Chief Judge Downes on August 19, 2003, a Special Master was appointed effective September 15, 2003, to oversee the discovery proceedings; to resolve nondispositive motions; and to issue Recommendations on dispositive motions.

In the summer of 2004, Defendants filed their jurisdictional motions, accompanied by hundreds of pages of briefs and thousands of pages of exhibits. Relator not only responded to Defendants' motions in kind, but also filed his own Cross Motion. Reply and sur-reply briefs added to the already overwhelming amount of documentation submitted in support of and in opposition to the jurisdictional motions. On March 17 and 18, 2005, the Special Master heard two full days of oral argument.

The Coordinated Defendants' Motion to Dismiss, Arco's Motion to Dismiss, and the Moving 1997 Defendants' Motion to Dismiss each contend that Relator has failed to comply with the *qui tam* jurisdictional provisions contained in 31 U.S.C. § 3730(e)(4). Specifically, Defendants argue that Relator's *Qui Tam* Complaints are based upon public disclosures of allegations or transactions from one of the sources listed in § 3730(e)(4)(A), and that he is not an original source, as that term is defined in 31 U.S.C. § 3730(e)(4)(B). Additionally, the Defendants assert that Relator has failed to comply and/or violated the disclosure and seal provisions of 31 U.S.C. § 3730(b)(2). Relator's cross motion asseverates that there are no material issues of fact in dispute and that Relator has met the requirements of § 3730(e)(4) as a matter of law.

## II. THE DEFENDANTS' MOTIONS TO DISMISS BASED UPON THE PUBLIC DISCLOSURE/ORIGINAL SOURCE BAR OF THE FALSE CLAIMS ACT (31 U.S.C. § 3730(e)(4)) AND RELATOR'S CROSS MOTION FOR SUMMARY JUDGMENT

Defendants have moved to dismiss all of Relator's 1997 *qui tam* cases on the ground that they are based upon public disclosures of allegations and transactions, and that Relator is not an original source. The argument is premised on an amendment to the federal False Claims Act (hereinafter the "FCA") enacted in 1986 as 31 U.S.C. § 3730(e)(4). The 1986 amendment represents Congress' latest attempt to craft *qui tam* provisions that achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90

---

fendant caused the Complaint to run afoul of the specificity requirements of Fed.R.Civ.P. 9(b). Relator's allegation in each of the 1997 *Qui Tam* Complaints that each named defendant employed each of the listed mismeasurement techniques appears to be designed to overcome the lack of particularly found by Judge Hogan.

F.3d 1514, 1517 (10th Cir.1996).[4] Section 3730(e)(4) provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Relator's Cross Motion contends that, as a matter of law, his 1997 *Qui Tam* Complaints are not based upon any public disclosures meeting the requirements of § 3730(e)(4)(A).

The United States Court of Appeals for the Tenth Circuit has enunciated a four-part inquiry for determining whether the jurisdictional requirements of § 3730(e)(4) have been met:

Generally speaking, the jurisdictional inquiry under 31 U.S.C. § 3730(e)(4)(A) involves four questions: (1) whether the alleged 'public disclosure' contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made 'public' within the meaning of the FCA; (3) whether the relator's complaint is 'based upon' this 'public disclosure'; and, if so, (4) whether the relator qualifies an 'original source' under § 3730(e)(4)(B).

*United States ex rel. Holmes v. Consumer Ins. Group*, 318 F.3d 1199, 1203 (10th Cir.2003).

If any of the first three questions are answered in the negative, the subject matter jurisdiction requirements of § 3730(e)(4) are met, and there is no need to address the fourth question relating to original source. However, if each of the first three queries is answered in the affirmative, relator must qualify as an "original source," as that term is defined in 31 U.S.C. § 3730(e)(4)(B). *Id.*

It is clear that with respect to *qui tam* claims under the FCA, the public disclosure/original source jurisdictional inquiry arises out of the same statute that creates the substantive claim. In such situations, Tenth Circuit law considers the jurisdictional inquiry to be intertwined with the merits. As a result, Defendants' public disclosure/original source motions and Relator's Cross Motion must be resolved under Fed.R.Civ.P. 12(b), or, after proper conversion into a motion for summary judgment, under Rule 56. *United States ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1543 (10th Cir.1996). Because voluminous amounts of documentation outside of the pleadings have been submitted by the parties, and because all parties have been given reasonable opportunity to present pertinent evidentiary materials, the motions will be resolved pursuant to Rule 56 procedures.

---

4. This Report and Recommendation will not trace the tortuous, wending history of the FCA's *qui tam* provisions. For a good discussion of the FCA's history and Congress' various attempts to strike a balance between those relators who enhance the governments' ability to recover losses sustained from fraud and those relators who add little or nothing to the mix, *see United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649–51 (D.C.Cir.1994).

On the one hand, the traditional Rule 56 principles apply. Consequently, the moving party must demonstrate that there is no genuine material issue of fact in dispute. The evidentiary record must be viewed in the light most favorable to the non-moving party. On the other hand, because the motions are directed at the Court's subject matter jurisdiction, there remains a presumption that no jurisdiction exists absent a showing of proof by the party asserting federal jurisdiction. *United States ex rel. Precision Co. v. Koch Indus. Inc.*, 971 F.2d 548, 551 (10th Cir. 1992) (hereinafter *"Precision I"*), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993).[5] As a result, despite the application of Rule 56 procedures, the party invoking the Court's subject matter jurisdiction bears the ultimate burden of demonstrating by competent evidence that jurisdiction exists under the FCA. *Holmes*, 318 F.3d at 1203. In the context of the instant motions, although Relator is entitled to have the evidentiary record viewed in the light most favorable to him, he must still show that, when so viewed, there is competent proof establishing that he meets the FCA's jurisdictional requirements.[6]

### A. Public Disclosure

As indicated above, the public disclosure prong of § 3730(e)(4)(A) involves three questions. The first query, which consists of two subparts, is whether the alleged disclosure contains (a) allegations or transactions; (b) from one of the sources listed in the statute. The second question is whether the alleged disclosure has been made public. The third question is whether the allegations in Relator's 1997 *Qui Tam* Complaints are based upon the alleged disclosure. If any of these are answered in the negative, the provisions of § 3730(e)(4) pose no impediment to the Court's subject matter jurisdiction.

Exhibit 2 to the Coordinated Defendants' Public Disclosure/Original Source Memorandum consists of over 600 documents that Defendants contend meet all of the public disclosure criteria of 31 U.S.C. § 3730(e)(4)(A). The Special Master has reviewed all of the Exhibit 2 documents, and has separated them into 17 categories for ease of analysis. The Special Master now makes the following Findings of Fact and Conclusions of Law regarding the application of § 3730(e)(4)(A)'s public disclosure bar to each such category and the documents contained therein.

### 1. Documents Without Highlighting

The Special Master granted Relator leave to serve an Interrogatory and Request for Production of Documents, requiring the Defendants to identify each document that they relied upon as meeting the statutory requirements for a public disclosure of the allegations or transactions on which Relator's 1997 Complaints were based. In their initial response and several supplemental responses, Defendants identified over 600 items consisting of some 19,000 pages. Some of the individual items were several hundred pages in length. Exhibit 2 is comprised of these materials produced in response to Relator's discovery request.

---

**5.** A later decision by the United States Court of Appeals for the Tenth Circuit in a second *qui tam* suit filed by Precision against Koch dealt with Precision's attempt to amend its Complaint to join additional parties as plaintiffs. *United States ex rel. Precision Co. v. Koch Indus. Inc.*, 31 F.3d 1015 (10th Cir. 1994).

**6.** The parties are in disagreement as to whether Defendants' motion premised on § 3730(b)(2) goes to the Court's subject matter jurisdiction. This issue is fully discussed in Section III of this Report and Recommendation, *infra*.

Thereafter, Relator filed a Motion to Compel Sufficient Answers to Interrogatories 1(c) and 1(g). One of the issues raised in the motion was the difficulty in determining what portions of the over 600 documents actually constituted the alleged public disclosures. Relator asserted that the responses to his interrogatory and request for production were unusable unless Defendants provided an additional road map of exactly what language in each document allegedly qualified as a public disclosure meeting the requirements of § 3730(e)(4)(A).

The Special Master agreed with Relator that further information was necessary in order to adequately understand Defendants' responses. Accordingly, the Special Master entered an oral order during a telephonic conference on March 10, 2004, followed by a written order on March 30, 2004. Among other things, these orders required Defendants physically to highlight those portions of each document that Defendants were relying upon as public disclosures within the meaning of § 3730(e)(4)(A). The Special Master informed Defendants that he would not consider any un-highlighted documents or un-highlighted portions of documents in determining whether Relator's Complaints were based upon public disclosures of allegations or transactions from one of the statutory sources.

Of the documents comprising Exhibit 2, 199 are not highlighted. See Appendix A, attached hereto. Pursuant to the Special Master's orders of March 10, 2004 and March 30, 2004, Defendants are precluded as a matter of law from asserting that any

of these materials meet the public disclosure prong of 31 U.S.C. § 3730(e)(4)(A). As a result, no further consideration of them is required in the analysis of the parties' contentions regarding public disclosure.

### 2. The Gas Measurement Articles

The largest category of documents in Exhibit 2 to the Defendants' § 3730(e)(4) briefs consists of 291 trade journal essays, educational materials, seminar papers, instruction manuals, and newspaper articles discussing the technical aspects of gas measurement and the factors that can cause mismeasurement to occur (hereinafter the "Educational and Instructional Materials").[7] See Appendix B, attached hereto. We may assume for purposes of discussion that each of the 291 Educational and Instructional Materials constitutes a public disclosure from one of the listed sources, since the term "news media" in 31 U.S.C. § 3730(e)(4)(A) includes published articles and scholarly or scientific periodicals. United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc., 186 F.Supp.2d 458, 461 (S.D.N.Y.2002), aff'd, 53 Fed.Appx. 153 (2d Cir.2002), cert. denied, 540 U.S. 949, 124 S.Ct. 413, 157 L.Ed.2d 281 (2003). Nevertheless, as Relator correctly observes, none of the materials in this category contain "allegations or transactions," and thus, do not trigger the original source inquiry.

 Under § 3730(e)(4)(A), a public disclosure must be of "allegations or transactions." A public disclosure of informa-

---

**7.** Many of the Educational and Instructional Materials are self-authenticating under Fed. R.Evid. 902(5) and/or 902(6). It may be fairly debatable whether some of the items in this category are "newspapers or periodicals," within the meaning of 902(6). However, since the Special Master has determined that none of the documents in this category contain "allegations or transactions," no purpose would be served at this point in undertaking a detailed analysis of each particular item to determine if it constitutes a "newspaper or periodical."

tion that is innocuous and non-accusatory does not operate to trigger the inquiry into whether a relator is an original source. As stated in *United States v. A.D. Roe Co., Inc.*, 186 F.3d 717, 724 (6th Cir.1999):

'[A]llegations or transactions' must consist of more than simply innocuous information.... Before the 1986 amendments to the FCA, the FCA precluded suits based on 'evidence or information' already in the government's possession. 31 U.S.C. § 3730(b)(4) (superseded). By changing the phrase to read 'allegations or transactions,' Congress clearly intended that the public disclosures at issue be of something more than simple information from which no one could deduce that fraud had occurred.

*See also Springfield*, 14 F.3d at 653 ("We too find a distinction between 'allegations and transactions' and ordinary 'information' as a matter of common usage and sound interpretation of the FCA.").

Cases from the Tenth Circuit have taken a similar approach, indicating that a disclosure constitutes an "allegation" or "transaction" sufficient to trigger the public disclosure bar when it discusses conduct "in a questioning light." *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1005 (10th Cir.1996); *United States ex rel. Grynberg v. Praxair, Inc.*, 207 F.Supp.2d 1163, 1184 (D.Colo.2001), *aff'd in part and rev'd and remanded in part on other grounds*, 389 F.3d 1038 (10th Cir.2004), *petition for cert. denied*, 545 U.S. 1139, 125 S.Ct. 2964, 162 L.Ed.2d 888 (2005).

■ Most of the Educational and Instructional Materials do not identify any companies, do not contain allegations of wrongdoing, and do not disclose any transaction in which the representations of any particular gas measurer were different than the true facts. Nevertheless, Defendants suggest that a few of the Education-

al and Instructional Materials go further and can be read as allegations of wrongdoing by specific Defendants named in the 1997 *qui tam* cases. For example, they reference Exhibit 2, document 85, an article in the American Oil & Gas Reporter, discussing Oryx Energy's decision in 1990 to purchase and utilize gas flow computers, thereby eliminating the need for chart integration. The article indicates that the gas flow computers are generally more accurate than measurement by means of circular chart recorders and manual integration. Defendants assert that the article as a whole can be read as disclosing that prior to 1990, Oryx mismeasured gas because it used the less accurate chart recorder system. Contrary to Defendants' contentions, the article is simply informational. It contains no allegations of fraud and no language painting Oryx's pre–1990 measurement practices in a questioning light. Defendants also point to Exhibit 2, document 112, an article discussing in a factual manner the procedures actually used by Colorado Interstate Gas to analyze gas heating content. Nothing in the text, however, intimates that CIG is guilty of wrongdoing, or that the criteria it employs for gas analysis result in an improper Btu calculation.

In short, the materials in this category may have some bearing on Relator's status as an original source, if other documents in Exhibit 2 are sufficient to trigger the original source inquiry. However, the Special Master finds and concludes that the Educational and Instructional Materials do not constitute public disclosures of allegations and transactions, within the meaning of § 3730(e)(4)(A).

### 3. *Materials Concerning the Senate Investigation and Report*

In the 1980s, the United States Senate Select Committee on Indian Affairs was

charged with conducting "a comprehensive and intensive investigation of the entire spectrum of the federal government's relationship with American Indians." Exhibit 2, doc. 4, at JDPD 142. The Committee undertook an extensive investigation into all aspects of federal-Indian relations, including but not limited to health, housing, child sexual abuse in federal schools, corruption among local tribal officials, economic development, and Indian preference contracting. As part of the Committee's work, it hired a team of investigators, secured depositions and interviews from individuals with relevant information, and heard live testimony. It compiled and reviewed in excess of 488,000 documents. Exhibit 2, doc. 4, at JDPD 144–45.

A portion of the Committee's investigation related to allegations that the Department of Interior had failed to insure payment of the required royalties on oil and gas produced from Indian lands. Testimony was presented before the Committee indicating widespread theft through mismeasurement of oil and gas by purchasers of gas from wells on Indian lands. This testimony also identified various mismeasurement practices, such as the use of improperly sized orifice plates, incorrectly calibrated orifice meters, worn orifice plates, and improper integration of meter charts. Exhibit 2, doc. 5, at JDPD 166. Although the testimony before the Committee, the Senate Committee Reports, and the news media articles discussing the Committee's work referenced mismeasurement on a large scale and a vast opportunity for theft, *see* Exhibit 2, doc. 5, at JDPD 174, only one company, Koch Oil Company, was specifically named as engaging in a sophisticated scheme to steal crude oil from Indians through fraudulent mismeasuring and reporting, Exhibit 2, doc. 6, at

JDPD 204. The Committee's Final Report noted that information concerning other unnamed companies had been turned over to the Department of Justice. Exhibit 2, doc. 6, at JDPD 336.

Defendants tender 17 documents consisting of transcriptions of the hearings before the Senate Committee, the Senate Committee Reports, and news media articles concerning the Senate Committee's investigation and Reports (hereinafter referred to as the "Senate Committee Documents") as public disclosures of the allegations or transactions in Relator's 1997 *Qui Tam* Complaints. *See* Appendix C, attached hereto. They acknowledge that the only company actually identified by name and accused of wrongdoing in the Senate Committee Documents is Koch Oil, and that neither Koch nor any affiliate of Koch is presently a Defendant in Relator's 1997 *qui tam* cases.[8] Nevertheless, Defendants argue that because the Senate Committee Documents allege widespread fraudulent mismeasurement that could taint the entire gas transmission industry, they are sufficient to meet the public disclosure prong of § 3730(e)(4)(A) as to all Defendants sued in Relator's 1997 *qui tam* actions. They also asseverate that because the Senate Committee Documents reference certain specific Indian tribes, the particular leases involving those tribes and the companies measuring gas from the leases can be readily identified.

It is beyond peradventure that the Senate Committee Documents were publicly disclosed, and that they were from sources listed in § 3730(e)(4)(A). The key question, however, is whether they contain allegations or transactions upon which Relator's 1997 *qui tam* cases are based. The fact that these documents, while noting widespread fraud, specifically identify only

---

**8.** One of the 1997 *qui tam* cases filed by Relator did name Koch and its affiliates as Defendants. This case was dismissed by the court on first-to-file grounds.

one company is central to answering this query. The issue has been succinctly framed by the United States Court of Appeals for the Eleventh Circuit as follows: "[W]hen general allegations of widespread fraud in an industry are publicly disclosed, does the jurisdictional bar of the False Claims Act preclude a *qui tam* plaintiff from bringing suit for the same kind of fraud against a defendant who has not been specifically identified in the public disclosures?" *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 564 (11th Cir.1994).

There are several reported federal decisions that instruct on the question of how wrongdoer-specific an allegation of fraud must be in order to meet the public disclosure prong of § 3730(e)(4)(A). One of these comes from our own Circuit. In *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir.1995), Harold Fine brought a *qui tam* action in 1992 against Sandia Corporation, alleging that Sandia misappropriated nuclear waste funds in violation of the Nuclear Waste Policy Act (NWPA). Sandia was one of nine multi-program laboratories owned by the United States government and operated by private or university contractors under the administrative oversight of the Department of Energy. A 1990 General Accounting Office Report and a 1991 Congressional hearing disclosed that contractors operating the government's major multi-program laboratories were taxing nuclear waste funds for use in discretionary research in violation of the NWPA. The GAO Report actually identified two contractors who had allegedly engaged in this practice. Sandia was not specifically named as a wrongdoer in either the GAO report or the Congressional hearing.

The district court dismissed Fine's suit for lack of subject matter jurisdiction, concluding that the allegations in his 1992 *Qui Tam* Complaint had been publicly disclosed and that he was not an original source. The United States Court of Appeals for the Tenth Circuit affirmed. The appellate court rejected Fine's argument that no public disclosure had occurred because neither the GAO report nor the Congressional hearing materials specifically identified Sandia as a wrongdoer. The court pointed out that the disclosures in the GAO report and Congressional hearing detailed the mechanics of the allegedly wrongful practice, revealed that at least two of Sandia's eight sister laboratories were employing it, and indicated the DOE's acquiescence. Under these circumstances, concluded the court, the GAO report and Congressional hearing materials sufficiently alerted the government of the likelihood that Sandia was also taxing nuclear waste funds for use in discretionary research.

The second appellate decision providing insight on this issue is the District of Columbia Circuits' opinion in *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675 (D.C.Cir.1997), *cert. denied*, 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). Two relators brought a *qui tam* action alleging that government employees' clubs which earn revenue from vending services on federal property were violating the FCA by retaining moneys owed to the government. They learned of the circumstances underlying the suit while attending a conference to discuss a Bureau of Prisons request for proposals to service vending machines at the Federal Prison Camp–Boron. At the conclusion of the conference, the relators were handed a solicitation for services by the FPC–Boron Employees' Club regarding additional vending machines at FPC–Boron operated by the Club rather than the BOP. While the BOP paid for the utilities used to operate the machines, the Club retained 85% to 100% of the profits.

The relators submitted a bid for the contract to service the Club's vending machines, but were unsuccessful. Thereafter, relators filed their *qui tam* suit against all employees' clubs of the BOP that earn revenue from vending services. The employees' club at FPC–Boron was named as the representative defendant.

The district court dismissed the suit for lack of subject matter jurisdiction. It found that there were three public disclosures of relator's allegations. The first was a 1952 Comptroller General Opinion issued in connection with a GOA hearing concerning the propriety of post office employees' clubs retaining profits from vending machines on government premises. The Comptroller General determined that even though the legality of the arrangement was doubtful, there was no need to take steps to stop it. The issue again came up during the process of amending the Randolph–Sheppard Act, a statute giving blind vendors certain preferences. A Senate Report on the amendments recognized that federal employee welfare and recreation groups received income from vending machines on federal property and, thus, competed with blind vendors. Finally, a Federal Circuit decision in 1986 also discussed the tension between blind vendors in federal buildings and the practice of allowing federal employee organizations to utilize federal property free of charge for similar purposes and to retain the funds. The decision pointed out that despite their awareness of the dubious legality of the practice, neither the GAO nor Congress took any action. After determining that these met the criteria for the public disclosure prong of § 3730(e)(4)(A), the district court found that the relators were not original sources.

The United States Court of Appeals for the District of Columbia Circuit affirmed, rejecting the argument that none of the so-called public disclosures specifically named any particular government employee clubs. The appellate court noted that the disclosures: (a) stated that the allegedly wrongful practice occurred throughout the federal government; and (b) specifically identified the nature of the fraud as well as the nature of the federal employee clubs engaged in the activity. The court also rejected the relator's analogy to generic public allegations of government contractor fraud. Citing *Sandia*, the court stated: "Little similarity exists between combing through the myriad of transactions performed by the various defense contractors in search of fraud and finding easily identifiable federal employee organizations that provide vending services on federal property." *FPC–Boron*, 105 F.3d at 687.

The United States Court of Appeals for the Eleventh Circuit has also weighed in on the issue. *See Cooper*, 19 F.3d at 562. Cooper, an employee of the United States Census Bureau over the age of 65, was classified as a "working aged." As a result, he qualified for both Medicare and the Federal Employees Health Benefits Program administered by Blue Cross Blue Shield of Florida (BCBSF). In 1988, Cooper submitted medical bills to BCBSF for payment, but BCBSF either returned the claim with instructions that Medicare had to pay first, or paid a secondary amount after deducting what it said Medicare would be required to pay first. Cooper began researching his benefits and the law governing payment of his claims. He also contacted Congress and the Health Care Financing Administration to express his frustration. He learned that BCBSF should be his primary insurer. Although Cooper informed BCBSF several times of his status as a "working aged" and of BCBSF's obligation to act as his primary insurer, BCBSF continued to send claims back indicating that Medicare should pay

first. Medicare paid these claims, unaware that Cooper had primary insurance.

On August 17, 1990, Cooper instituted a *qui tam* action against BCBSF. BCBSF filed a motion to dismiss for lack of subject matter jurisdiction, asserting, *inter alia,* that Cooper's allegations had been publicly disclosed and that he was not an original source. The district court dismissed the Complaint. The United States Court of Appeals for the Eleventh Circuit vacated the order of dismissal and remanded. Addressing the question of public disclosure, the appellate court rejected BCBSF's argument that allegations of widespread MSP fraud in a 1988 GAO report, allegations of MSP fraud in OIG reports, newspaper articles, and a similar prior suit against Blue Cross Blue Shield of Georgia constituted public disclosures of Cooper's allegations. The court noted that, while the GAO report, the OIG reports, the newspaper articles, and the prior case named other insurance companies, none of them named or identified BCBSF. These materials, held the Court, were insufficient to constitute public disclosures of allegations against BCBSF: "Requiring that allegations specific to a particular defendant be publicly disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of specific fraud will be revealed." *Cooper,* 19 F.3d at 566. As for BCBSF's contention that such a rule would enable every insured to sue his insurance company after hearing that many insurance companies were committing fraud, the court pointed out that other legal principles, such as Fed.R.Civ.P. 9(b), provided relief to innocent actors against speculative fraud suits.

The Ninth Circuit has also considered the public disclosure issue in the context of disclosures that identify some, but not all of the parties later named in a *qui tam*

action. In *United States ex rel. Aflatooni v. Kitsap Physicians Servs.,* 163 F.3d 516 (9th Cir.1999), Kitsap Physicians Services (KSP), with approval of the Health Care Financing Administration, received a subcontract to administer Part B of the Medicare Program in certain areas of Washington state. Northwest Diagnostic Imaging (NDI) provided medical imaging services and Pathology Associates of Kitsap County (PAKC) provided pathology services. Dr. Alfred Aflatooni, a physician providing medical services to KPS brought a *qui tam* action against Kitsap, NDI, and PAKC, claiming that NDI and PAKC had engaged in fraudulent billing practices with respect to Medicare patients, and that KPS had facilitated and covered up the fraud. The district court dismissed the case under the public disclosure bar based on disclosures regarding the NDI defendants made by Aflatooni to the news media prior to the filing of his *qui tam* case. The disclosures in the news media did not refer to or name the PAKC defendants, but did refer to an overarching conspiracy.

The United States Court of Appeals for the Ninth Circuit framed the question as follows: "[T]he only question is whether the disclosure of the allegations against the NDI Defendants should trigger the public disclosure bar with respect to the PAKC Defendants." *Aflatooni,* 163 F.3d at 522. The appellate court answered the query in the negative, observing that "none of the articles published about NDI discussed PAKC's alleged involvement in a conspiracy to submit fraudulent Medicare claims. In fact, there is no mention of PAKC at all in the articles." *Id.* at 523.

In *United States ex rel. Harshman v. Alcan Elec. and Eng'g, Inc.,* 197 F.3d 1014 (9th Cir.1999), the Ninth Circuit again addressed the issue of public disclosures that identified some, but not all defendants in a *qui tam* action. Randy Harshman, a

member of Local 1547 of the International Brotherhood of Electrical Workers, filed a *qui tam* suit against 22 electrical contractors doing business in Alaska, alleging that they had conspired with the local union to violate the Davis–Bacon Act. Specifically, Harshman asserted that the local was deducting funds from members' wages and kicking them back to the contractors, despite the contractors' certification of wages paid pursuant to Davis–Bacon. Prior to filing his *qui tam* action, Harshman had filed a private suit for retaliation alleging the kickback scheme. The private suit named only one of the 22 defendants in the later filed *qui tam* suit, but did allege that the union had conspired with "local contractors." The district court dismissed the case for lack of jurisdiction, and Harshman appealed.

The United States Court of Appeals for the Ninth Circuit affirmed, holding that Harshman's prior Complaint in the private retaliation suit constituted a public disclosure as to all 22 defendants. Distinguishing *Aflatooni*, the court stated that Harshman's allegations against both the identified and non-identified defendants were the same, whereas in *Aflatooni*, the allegations against NDI and PAKC were distinct. The court also noted that the group of 22 defendants involved a narrow class of suspected wrongdoers working on federal projects over a 4–year period and filing certified payrolls with the government on a weekly basis. According to the court, they were readily identifiable by the government. In this regard, observed the appellate court, the circumstances of the public disclosure were quite similar to those in *Sandia*.

A footnote in a later Ninth Circuit case also bears mentioning. In *United States ex rel. Foundation Aiding the Elderly v. Horizon West, Inc.*, 265 F.3d 1011 (9th Cir.2001), *amended by*, 275 F.3d 1189, *cert.*

*denied*, 535 U.S. 1096, 122 S.Ct. 2292, 152 L.Ed.2d 1050 (2002), relator brought a *qui tam* action against numerous health care providers alleging that they defrauded Medicare by charging for services that were not rendered. The district court dismissed the case, relying on the public disclosure bar. The court of appeals reversed. Some of the public disclosures cited by defendants were newspaper articles that discussed general allegations of fraud against the nursing home industry. None of the defendants in the *qui tam* action were named in the articles. Citing *Cooper*, the appellate court concluded that a general allegation of widespread fraud in an industry is insufficient to constitute a public disclosure as to unidentified persons or entities. *Id.* at 1016 n. 5.

One reported district court decision is also of interest. In *Friedman v. Rite Aid Corp.*, 152 F.Supp.2d 766 (E.D.Pa.2001), Friedman filed a *qui tam* action against Rite Aid, claiming that it had submitted false statements to the government for the sale of prescription drugs to beneficiaries of federal health care programs. Rite Aid moved to dismiss pursuant to 31 U.S.C. § 3730(e)(4), asserting that Friedman's allegations had been publicly disclosed in numerous newspaper articles. The articles in question discussed nationwide unscrupulous activities by large pharmacy chains, specifically asserting that certain chains were billing the government for prescriptions that were ordered but never picked up. None of the articles mentioned Rite Aid or any wrongdoing on its part. In denying the motion, the district court distinguished *Sandia, FPC–Boron*, and *Harshman*, stating that these either dealt with fraud by government contractors or employees' clubs at government controlled and government owned installations (*Sandia* and *FPC–Boron* ), or fraud by a narrow class of wrongdoers who were required to file documents with the gov-

ernment on a weekly basis, making it easy for the government to identify them (*Harshman*). The court also noted that in *Harshman*, the disclosure specifically referenced a conspiracy among local contractors and a particular union in a specific locality. The court concluded that the case before it was more akin to *Cooper*, pointing out that any fraudulent acts committed by Rite Aid were not of the type that were easily discoverable from the alleged public disclosures.

*Cooper, Aflatooni, Horizon,* and *Friedman* teach that, generally speaking, public disclosure of widespread wrongdoing in an industry does not trigger the statutory public disclosure bar as to every industry member. Nor does the identification of one or a few defrauders in an industry operate as a public disclosure of unlawful conduct by other, unrelated companies. As the Eleventh Circuit noted in *Cooper*, such an approach encourages private citizen involvement. It is also consistent with the Tenth Circuit's view that the public disclosure prong of 31 U.S.C. § 3730(e)(4)(A) is intended to be a "quick trigger," *see, e.g., MK–Ferguson Co.*, 99 F.3d at 1545, for it eliminates the need to engage in speculation and surmise as to whether a *qui tam* defendant who is not named in the proffered public disclosure in fact can be identified from vague clues in the text of the document. Exceptions to this general rule, as recognized in *Sandia, FPC–Boron,* and *Harshman,* are limited to situations where the proposed public disclosure asserts fraud by a small group of businesses who are easily identifiable through information in the public domain and/or widespread fraud by a group of companies having unique and direct contractual relationships with the federal government that allow for substantial government oversight. As the *Sandia* court observed in distinguishing *Cooper:* "When attempting to identify individual

actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laboratories." *Sandia,* 70 F.3d at 572.

The Senate Committee Documents alleged widespread, but not universal fraud, in a large multi-faceted industry involving hundreds, if not thousands of companies. By and large, the purchasers of gas from federal and Indian lands who measure volume and heating content have no contractual relationship with the federal government. While the measurement process is governed to some extent by federal laws and regulations, and is subject to some government monitoring, the companies who conduct such measurements are not subject to the strict oversight applicable to government contractors operating at government owned facilities. Consequently, the Special Master finds and concludes that the status of the Senate Committee Documents as public disclosures of allegations or transactions upon which Relator's 1997 *qui tam* cases are based must be judged by the general rule enunciated in *Cooper, Aflatooni, Horizon,* and *Friedman,* and that the *Sandia* exception is inapplicable. The Senate Committee Documents operate as a public disclosure as to Koch Oil Company and perhaps Koch affiliates. However, the Special Master finds and concludes that the Senate Committee documents do not trigger the public disclosure bar against any of the current Defendants in Relator's 1997 *qui tam* cases.

### 4. *Relator's 1995* Qui Tam *Case*

█ Defendants rely upon Relator's Complaints and various pleadings in his 1995 *qui tam* action, Judge Hogan's Order dismissing the case, and several newspaper and media accounts of the litigation

(comprising 35 documents, and hereinafter referred to as the "1995 *Qui Tam* Action Documents") as public disclosures meeting the statutory requirements of 31 U.S.C. § 3730(e)(4)(A).[9] *See* Appendix D, attached hereto. They argue that the 1995 *Qui Tam* Action Documents trigger the original source inquiry as to all Defendants and all allegations in Relator's 1997 *Qui Tam* Complaints.

Relator disputes that the 1995 *Qui Tam* Action Documents constitute public disclosures of any of the allegations or transactions on which his 1997 *qui tam* cases are based. First, he asserts that the purposes underlying the FCA would be undermined by forcing a relator to meet the original source standard merely because he filed a previous *qui tam* case which was dismissed without prejudice. Next, Relator argues that the contents of 1995 *Qui Tam* Complaint and amendments thereto were too vague and imprecise to be deemed disclosures of "allegations or transactions," within the meaning of § 3730(e)(4)(A). Relator also invokes the doctrine of judicial estoppel, pointing out that many of the Defendants in the 1997 *qui tam* suits, who were also parties to the 1995 action, filed pleadings before Judge Hogan arguing that the lack of precision in the 1995 Complaints rendered them legally ineffective. The Special Master disagrees with each of these arguments.

There can be no doubt that Relator's 1995 *Qui Tam* Complaint, the Amended Complaint, and the Second Amended Complaint, as well as the various pleadings and orders entered in the 1995 *qui tam* action constitute "public disclosure[s] in a . . . civil . . . hearing," within the meaning of

31 U.S.C. § 3730(e)(4)(A). Indeed, every court of appeal to have addressed the question has held that any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure for purposes of § 3730(3)(4)(A). *Ramseyer*, 90 F.3d at 1519 n. 3; *United States v. Northrop Corp.*, 59 F.3d 953, 966 (9th Cir.1995), *cert. denied*, 518 U.S. 1018, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir.1994), *cert. denied*, 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). The newspaper and media articles discussing the 1995 *qui tam* case also qualify as public disclosures from one of the listed sources. It is clear that the 1995 *Qui Tam* Action Documents contain conclusory statements implying the existence of provable supporting facts, to the effect that the named defendants were intentionally mismeasuring the volume and heating content of gas and, therefore, were underpaying royalties to the federal government or were causing such an underpayment to occur. As a result, the 1995 *Qui Tam* Action Documents contain "allegations," within the meaning of § 3730(e)(4)(A). *See, e.g., Springfield*, 14 F.3d at 653–54.

 Relator asserts that treating the 1995 *qui tam* suit as a public disclosure of his present allegations would undermine the policies underlying the FCA. The Special Master disagrees. The fact that the 1995 *qui tam* suit and the 1997 *qui tam* actions were filed by the same individual does not alter the analysis. The United States Court of Appeals for the Tenth Circuit has held that a prior private suit by

---

**9.** The newspaper articles in the 1995 *Qui Tam* Action Documents are self-authenticating under Fed.R.Evid. 902(6). The pleadings and orders in the 1995 *qui tam* suit are capable of accurate and ready verification, and thus, the Special Master takes judicial notice of them,

*see* Fed.R.Evid. 201; *Green v. Nottingham*, 90 F.3d 415, 418 (10th Cir.1996), and considers them for purposes of the pending jurisdictional motions. *See, e.g., St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir.1979).

the relator himself qualifies as a public disclosure from one of the statutorily identified sources. *United States ex rel. King v. Hillcrest Health Ctr., Inc.,* 264 F.3d 1271 (10th Cir.2001), *cert. denied,* 535 U.S. 905, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002). Just as the public disclosure language of § 3730(e)(4)(A) affords no exception for prior private suits brought by the relator himself, it does not exclude public disclosures in the form of prior *qui tam* cases initiated by the same relator. ·

Likewise, the Special Master finds and concludes that the nature of the dismissal entered by Judge Hogan in the 1995 *qui tam* case has no bearing upon the question of whether the pleadings and orders entered therein constitute public disclosures of allegations or transactions under § 3730(e)(4)(A). There is nothing in § 3730(e)(4)(A) or in the case law construing it that would warrant exempting a relator from the original source inquiry simply because a prior *qui tam* action brought by the relator himself, which would otherwise clearly constitute a public disclosure, was dismissed without prejudice.[10]

In short, Relator's public policy arguments are misplaced. Congress is empowered to define the criteria qualifying a relator to sue on behalf of the United States. It would be entirely inappropriate to exempt by judicial fiat various documents that would otherwise fall within the express statutory criteria for a public disclosure simply because a court might view such an exemption as better serving the purposes of the FCA. Invitations to create such exceptions by judicial construction

have been routinely declined by the courts. *E.g., Kennard v. Comstock Res., Inc.,* 363 F.3d 1039 (10th Cir.2004) (previously filed Complaint treated as a public disclosure even though it was based on information obtained unethically), *petition for cert. denied,* 545 U.S. 1139, 125 S.Ct. 2957, 162 L.Ed.2d 887 (2005) (No. 04–165); *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984) (refusing to create an original source exception to the "information in the government's possession" bar in the pre–1986 version of FCA).

The Special Master rejects Relator's assertion that the 1995 *Qui Tam* Action Documents cannot be deemed public disclosures of allegations or transactions because they fail to link any of the defendants named in the 1995 *Qui Tam* Complaints with any particular mismeasurement technique. Relator's 1995 Complaints averred that each of the named defendants engaged in at least one of the 13 identified mismeasurement techniques. Judge Hogan's March 27, 1997 dismissal order concluded, *inter alia,* that the Complaints failed to meet the particularity requirement of Fed.R.Civ.P. 9(b) because a defendant could not determine from Relator's Complaint which of the 13 mismeasurement techniques it was accused of employing. Relator contends that this lack of specificity in his 1995 *Qui Tam* Complaints also defeats their status as public disclosures of allegations or transactions under 31 U.S.C. § 3730(e)(4)(A).

Relator incorrectly assumes that Fed. R.Civ.P. 9(b)'s technical requirements for

---

**10.** Contrary to Relator's argument, the phrase "without prejudice" does not protect a plaintiff in a subsequently filed suit from every adverse consequence resulting from having previously filed a similar action. *E.g., Wilson v. Grumman Ohio Corp.,* 815 F.2d 26, 27 (6th Cir.1987) (statute of limitations not impacted

by dismissal without prejudice). Rather, it is a term of art indicating that the disposition is not an adjudication on the merits and, therefore, does not bar a second action on the same claim. *Santana v. City of Tulsa,* 359 F.3d 1241, 1246 (10th Cir.2004).

pleading fraud with particularity also set the standard for what constitutes an "allegation or transaction" under § 3730(e)(4)(A). This assumption is unsupported by the case law and is at odds with the different purposes underlying Rule 9(b) and the public disclosure bar of the FCA. More importantly, as more fully discussed below, it is not the identification of each specific technique of mismeasurement, but rather the allegation that Defendants underpay royalties to the federal government by intentionally mismeasuring gas volume and heating content which operates as a "quick trigger" of § 3730(e)(4)(A)'s public disclosure bar.

■■■■ Relator's judicial estoppel argument fails for the same reasons. Judicial estoppel bars a party from adopting inconsistent positions in the same or related litigation. Given the differing purposes and standards underlying Rule 9(b) and § 3730(e)(4)(A), the arguments advanced in the 1995 *qui tam* suit regarding the sufficiency of Relator's Complaints under Rule 9(b) are not inconsistent with Defendants' contention that the 1995 *Qui Tam* Action Documents constitute public disclosures of allegations or transactions under § 3730(e)(4)(A).[11]

Having determined that the 1995 *Qui Tam* Action Documents are public disclosures of allegations or transactions from one of the sources listed in the FCA, we now turn to the question of whether and to what extent Relator's 1997 *qui tam* suits are based upon those public disclosures.

Defendants' position is simple—all of the allegations against all of the Defendants named in all of the 1997 *qui tam* suits are based upon the allegations in 1995 *Qui Tam* Complaints and pleadings, and the media articles discussing them.

Relator's argument is more complicated. He parses his 1997 *qui tam* suits into approximately 30 methods utilized to mismeasure gas and four distinct conclusions regarding Defendants' conduct: (a) at the point of purchase, Defendants routinely understate volume and heating content in more than 30 ways that are not allowed by federal law, federal regulations, and industry standards; (b) since federal royalties are based on point of purchase measurements, the 30 mismeasurement practices injure the government; (c) Defendants often measure gas differently at the point of sale than they do at the point of purchase; and (d) the use of different measurement practices at the point of purchase and the point of sale results in an understatement of federal royalties by over 20%.[12] At best, argues Relator, if the 1995 *qui tam* suit triggers the original source inquiry at all, it is only with respect to the 13 mismeasurement techniques and the 56 defendants common to both the 1995 and 1997 *qui tam* actions (hereinafter the "Overlapping Defendants").

■■■ Relator's contention that the 1995 *Qui Tam* Action Documents only constitute a public disclosure of the 13 mismeasurement methods expressly identified therein cannot be squared with the

---

11. In any event, the doctrine of judicial estoppel has little or no efficacy in this Circuit. *United States v. 162 Megamania Gambling Devices,* 231 F.3d 713, 726 (10th Cir.2000); *Webb v. ABF Freight Sys., Inc.,* 155 F.3d 1230, 1242 (10th Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999).

12. It is uncertain how Relator arrived at 30 as the number of mismeasurement practices identified in the 1997 *Qui Tam* Complaints. There are 20 paragraphs describing mismeasurement techniques common to all of the 1997 *Qui Tam* Complaints. Some of these have subparagraphs. Many of the Complaints also have additional paragraphs describing mismeasurement techniques specific to the Defendants named therein.

law in this Circuit. The United States Court of Appeals for the Tenth Circuit has adopted a restrictive interpretation of the "based upon" test, consistent with the FCA's dual purpose of: (a) encouraging private citizens with first-hand knowledge to expose fraud; and (b) avoiding civil suits by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud. *Precision I*, 971 F.2d at 552–53. The term "based upon," as used in 31 U.S.C. § 3730(e)(4)(A), means "supported by." *MK–Ferguson Co.*, 99 F.3d at 1545. It refers to the degree of similarity between the allegations or transactions that are set out in the *qui tam* Complaint and the allegations or transactions that have been publicly disclosed. In the Tenth Circuit, as in most other Circuits, the nexus necessary to fulfill the "based upon" requirement is "substantial identity" between a relator's Complaint and a public disclosure. *Hillcrest Health*, 264 F.3d at 1279. Under this test, even *qui tam* actions only partially based upon publicly disclosed allegations or transactions may be barred. *Praxair*, 389 F.3d at 1051. The Tenth Circuit has explained that the substantial identity test is designed to operate as a "quick trigger" for the more exacting original source inquiry. *Kennard*, 363 F.3d at 1042.

Relator's approach would require us to apply the substantial identity test by analyzing and comparing the 1995 *Qui Tam* Complaints and the 1997 *Qui Tam* Complaints paragraph by paragraph. Such a process is entirely inconsistent with the "quick trigger" concept employed by the Tenth Circuit. Additionally, Relator's position is inconsistent with the principle that a *qui tam* relator must meet the original source test if his or her Complaint is even partially based upon publicly disclosed allegations.

Finally, and most important, relator's argument is contrary to the Tenth Circuit's position that a *qui tam* suit is based upon a public disclosure if the allegations in the disclosure have already set the government squarely on the trail of the alleged fraud. *See Sandia*, 70 F.3d at 571. Under Relator's suggested approach, it is not sufficient if the allegations in the publicly disclosed document merely take the government to the right trailhead and point it in the correct direction. Rather, the publicly disclosed allegations must disclose precisely what the government will find at the trail's end.

The Special Master finds and concludes that if the gist of the fraudulent scheme has been publicly disclosed in a source listed in § 3730(e)(4)(A), a subsequent *qui tam* action alleging a substantially identical fraudulent scheme against the same or related defendants is barred unless the relator qualifies as an original source. This standard is consistent with the view taken by most other Circuits that a public disclosure exists when the critical elements exposing conduct as fraudulent are placed in the public domain through one of the statutory listed sources. *E.g., United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir.2003); *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512 (8th Cir.1994), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995); *Springfield*, 14 F.3d at 654. Furthermore, the Special Master finds and concludes that the fact that a relator's *qui tam* Complaint incorporates additional or somewhat different details does not defeat the public disclosure bar. *See, e.g., MK–Ferguson Co.*, 99 F.3d at 1546–47 (*qui tam* Complaint is based upon public disclosure even if it references specific transactions not mentioned in the publicly disclosed document).

Judged by these standards, the Special Master finds and concludes that, at least as to the 56 Overlapping Defendants, the 1997 *qui tam* cases are "based upon the 1995 *Qui Tam* Action Documents". A comparison of the allegations in the 1995 *Qui Tam* Complaints with those in the 1997 *Qui Tam* Complaints discloses differences in wording, modifications in the order of various sentences and paragraphs, and some additions and deletions. Nevertheless, as the following examples amply demonstrate, the substantive similarities are patent and striking:

The introductory paragraph to the 1995 *Qui Tam* Second Amended Complaint states that the purpose of the suit is to challenge "[d]efendants' ways of measuring the heating content and volume of natural gas, which have caused widespread underpayments of appropriate royalties to the United States." Exhibit 2, doc. 167 at JDPD 003344, ¶ 1. Likewise the Complaints in the 1997 *qui tam* cases define a substantially identical purpose: "This lawsuit challenges Defendants' mismeasurement of the volume and wrongful analysis of the heating content of natural gas, causing substantial underpayments of royalties to the United States." *See, e.g.,* Corrected Third Amended Complaint in *United States ex rel. Grynberg v. Questar Pipeline Co. et al.* (hereinafter *"Questar* Complaint"), Exhibit 18 at 2, ¶ 1.

Relator's 1995 *Qui Tam* Complaints and his 1997 *Qui Tam* Complaints use substantially identical language to describe the essential elements of his FCA claim. The 1995 *Qui Tam* Second Amended Complaint alleges that "[d]efendants have knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money in the form of full and appropriate royalties to the United States Government." Exhibit 2, doc. 167 at JDPD 03373, ¶ 96. In paragraph 54 of the 1997 *Questar* Complaint, Relator makes the virtually the same allegation: "Defendants have knowingly made, used, or caused to be made or used false records or statements to convert, conceal, avoid, or decrease an obligation to pay or transmit money for payment of royalties to the United States Government." *Questar* Complaint, Exhibit 18 at 33, ¶ 54.

Without further belaboring the point, the allegations in the publicly disclosed 1995 *Qui Tam* Second Amended Complaint track the allegations of the 1997 *Qui Tam* Complaints in numerous respects, including but not limited to

(a) the nature of the alleged fraud (knowingly employing various techniques that result in the mismeasurement of the volume and heating content of gas which, in turn, causes an undervaluation of the gas at the point of purchase);

(b) the motivation for engaging in the fraud (to purchase gas and assign it a certain volume and/or heating content at the point of purchase and then resell the same quantity of gas at a higher assigned volume and/or MMBTU);

(c) the circumstances providing the opportunity to commit the alleged fraud (contracts commonly used in the gas industry that give transmission companies and other purchasers of natural gas the responsibility for measuring the volume and MMBTU content of the natural gas which they buy);

(d) the proximate effect of the fraud on the federal government (the government has not been paid full and appropriate royalties due and owing for the production of natural gas from royalty properties);

(e) the nature of Relator's investigation of the alleged fraud; and

(f) the relief sought.

Judge Hogan's Order dismissing the 1995 *qui tam* action also constitutes a public disclosure of allegations from a civil hearing and, thus, meets the requirements of § 3730(e)(4)(A). In the Order, Judge Hogan describes the allegations in Relator's twice amended 1995 *Qui Tam* Complaints as follows: "Plaintiff's complaint accuses defendants of underrepresenting the volume and British thermal unit (Btu) content of natural gas that they harvested and carried from federal and Indian lands, and therefore of underpaying royalties due for that gas, in violation of a provision in the False Claims Act, 31 U.S.C. § 3729(a)(7)." Exhibit 2, doc. 349 at JDPD 008728. This statement also encapsulates the gist or essential elements of the fraudulent scheme alleged in each of Relator's 1997 *Qui Tam* Complaints.

The media accounts of the 1995 *qui tam* suit discuss Relator's allegations in language that would appropriately disclose the general nature of his 1997 *qui tam* actions as well. For example, a McGraw–Hill publication entitled "Inside F.E.R.C.," dated November 18, 1996, succinctly summarizes Relator's 1995 *qui tam* suit as "alleging that the defendants have purposely understated the heating value and/or volume of gas purchased from suppliers operating on federal and Indian lands. Pipelines have knowingly and intentionally mismeasured gas in many different ways, causing producers to underpay royalties they owe to the leaseholders." Exhibit 2, doc. 257 at JDPD 005996.

We now turn to the more difficult question of the impact of the 1995 *Qui Tam* Action Documents on Defendants in the 1997 *qui tam* cases who were not expressly named in the 1995 suit (hereinafter the "Unnamed Defendants"). Relator's answer to this query is that his 1997 claims against Unnamed Defendants are not af-

fected by the 1995 *Qui Tam* Action Documents. Defendants take a diametrically opposite position. They assert that the 1995 *qui tam* case constitutes a public disclosure of allegations against all of the Unnamed Defendants. Neither Relator nor Defendants are entirely correct. The Special Master finds and concludes that the 1997 *qui tam* cases are based upon the publicly disclosed allegations in the 1995 *Qui Tam* Complaints with respect to some, but not all of the Unnamed Defendants.

The analysis of this issue begins with the same case law discussed in some detail in Section II(A)(3) above: the *Sandia* case from the Tenth Circuit, as well as *Harshman, Aflatooni, FPC–Boron, Cooper, Horizon,* and *Friedman.* These cases instruct that, generally, public disclosure of widespread wrongdoing in an industry is insufficient to trigger the original source inquiry as to every industry member, and that the identification of one or a few alleged defrauders in an industry does not operate as a public disclosure of unlawful conduct by other companies. An exception to the general rule exists where the allegations in the publicly disclosed documents allow for easy identification of unnamed wrongdoers by the federal government from information in the public domain. The exception is simply a corollary to the axiom that a *qui tam* action is based upon the allegations in a prior public disclosure if the disclosure squarely places the government on the trail of the alleged fraud. *See Sandia,* 70 F.3d at 571; *see also United States ex rel. Ervin & Assocs. v. The Hamilton Sec. Group, Inc.,* 332 F.Supp.2d 1, 7 (D.D.C.2003); *United States ex rel. Johnson v. Shell Oil Co.,* 33 F.Supp.2d 528, 540 (E.D.Tex.1999).

■ In each 1997 *Qui Tam* Complaint naming more than one Defendant, Relator alleges that "Defendants are affiliated corporations whose business is conducted

through the same personnel. Defendants' inappropriate measurement techniques particularized below are undertaken in the same ways by the same employees. Accordingly, Defendants have acted in concert in the course of violating the False Claims Act as alleged below." *Questar* Complaint, Exhibit 18 at 5, ¶ 7. This averment frames the public disclosure issue as to all 1997 *qui tam* cases in which: (a) at least one of the Defendants was also a named defendant in the 1995 *qui tam* action; or (b) at least one of the Defendants is an affiliate of a named defendant in the 1995 *qui tam* action. Do the publicly disclosed allegations against the defendants in the 1995 *Qui Tam* Action Documents also constitute public disclosures of allegations as to affiliated corporations named as Defendants in the 1997 *qui tam* cases? Contrary to Relator's position, the Special Master finds and concludes that this query must be answered in the affirmative.

There is a dearth of case authority on the subject of whether a public disclosure of allegations against a named defendant also encompasses affiliated companies. However, a similar issue was considered by the United States Court of Appeals for the District of Columbia Circuit in the context of the FCA's "first-to-file" provision in 31 U.S.C. § 3730(b)(5). In *United States ex rel. Hampton v. Columbia/HCA Healthcare, Corp.*, 318 F.3d 214 (D.C.Cir. 2003), Randal Boston filed a *qui tam* action against Columbia/HCA Healthcare Corporation (HCA) in the Northern District of Texas, alleging that it had improperly billed the government under the Medicare program for home health services. Thereafter, Mary Hampton filed a *qui tam* suit in Georgia against HCA, Clinical Arts Comprehensive Services (Clinical Arts), several Clinical Arts employees, and others, asserting that they had engaged in improper billing of Medicare for home health care. Clinical Arts was a subsid-

iary of HCA. Hampton argued that her *qui tam* suit was not barred by the "first-to-file" rule because Boston only sued HCA, while Hampton not only sued HCA, but also Clinical Arts and employees of Clinical Arts. The District of Columbia Circuit rejected this argument, observing that "Hampton's naming Clinical Arts-a specific HCA subsidiary-and naming individual employees of Clinical Arts were merely variations on the fraud Boston's complaint described." *Id.* at 218.

Of course, as noted above, *Hampton* dealt with the "first-to-file" bar rather than the public disclosure bar. Nevertheless, the *Hampton* court itself pointed out that the purposes underlying § 3730(e)(4) and § 3730(b)(5) are quite similar. The fact that these statutory provisions serve similar objectives was also recognized by the United States District Court for the Eastern District of Pennsylvania in *United States ex rel. Merena v. Smithkline Beecham Corp.*, 114 F.Supp.2d 352, 364 (E.D.Pa.2000).

The rationale employed by the Court of Appeals for the District of Columbia Circuit in *Hampton* applies with equal or greater force to the circumstances presented here. The circumstances also closely track those which led the Tenth Circuit in *Sandia*, the District of Columbia Circuit in *FPC–Boron*, and the Ninth Circuit in *Harshman* to apply the public disclosure bar to companies not expressly named in the publicly disclosed documents. Here, the 1995 *Qui Tam* Complaint and amendments thereto not only detailed the alleged fraudulent conduct and named specific alleged wrongdoers, but also indicated that others might well be involved in similar conduct. *See* Exhibit 2, doc. 167 at JDPD 003356–57, ¶ 80. It further noted that affiliates of the named wrongdoers might also be playing a part in executing the fraudulent scheme. *Id.* at JDPD

003347–48, at ¶¶ 7–8. In those 1997 *qui tam* cases naming one or more Overlapping Defendants, Relator has simply added the affiliates allegedly acting in concert through the same personnel. In a few additional 1997 *qui tam* cases, Relator has not named an Overlapping Defendant, but has sued affiliates of one of the defendants named in the 1995 action. As Relator repeatedly acknowledged during his deposition, he determined that the affiliated companies might be involved in gas measurement by searching through public documents in the form of annual reports and 10–Ks. In short, as in *Sandia* and *FPC–Boron,* the affiliates of the defendants named in the 1995 *qui tam* case represent a small group (at most, a dozen as to each defendant named in the 1995 *qui tam* suit) of companies readily identifiable from easily accessible information. Given the suggestion in the 1995 *Qui Tam* Complaints that these affiliates might be implicated in the mismeasurement scheme, the trail revealed by the publicly disclosed allegations of fraud in the 1995 *Qui Tam* Action Documents undoubtedly would have led the government not only to each named defendant, but also to any parent, subsidiary, sister, or other member of the defendant's corporate family.

Thirty-seven of the MDL cases involve situations where: (a) an Overlapping Defendant is sued, along with affiliates allegedly acting in concert; or (b) at least one of the Defendants is an affiliate of a company named in the 1995 *qui tam* suit: 99 MD 1601;[13] 99 MD 1602, 99 MD 1603, 99 MD 1604, 99 MD 1605, 99 MD 1608, 99 MD 1609; 99 MD 1610, 99 MD 1611;[14] 99 MD 1612, 99 MD 1613, 99 MD 1614, 99 MD 1624;[15] 99 MD 1625, 99 MD 1628, 99 MD 1630;[16] 99 MD 1632, 99 MD 1633, 99 MD 1634, 99 MD 1636, 99 MD 1637, 99 MD 1639;[17] 99 MD 1641, 99 MD 1643, 99 MD 1644, 99 MD 1645, 99 MD 1649;[18] 99 MD 1650, 99 MD 1651, 99 MD 1652, 99 MD 1653, 99 MD 1654, 99 MD 1655; 99 MD 1656;[19] 99 MD 1668, 99 MD 1671, and 99 MD 1682.

The Special Master finds and concludes that these cases are based upon the public-

13. The Defendants in 99 MD 1601 (Pacific Interstate Offshore Co., Pacific Offshore Pipeline Co., and Southern California Gas Co.) were affiliates of Pacific Enterprises Corp., a defendant in the 1995 *qui tam* case, but not named as a Defendant in the 1997 *qui tam* suits.

14. The Defendants in 99 MD 1611 are all alleged to be affiliates of Peoples Natural Gas Company, one of the named defendants in the 1995 *qui tam* case. Peoples Natural Gas was originally a named Defendant in the 1997 *Qui Tam* Complaint, but was later voluntarily dismissed.

15. The sole Defendant in 99 MD 1624, Bridgeline Gas Distribution, LLC, was formerly known as Riverway Gas Pipeline Co., one of the Defendants in the 1995 suit. *See* Exhibit A–77.

16. Relator named Louisiana Intrastate Gas Corp. in his 1995 *Qui Tam* Complaint. It appears that Louisiana Intrastate Gas Corp. is in fact the same entity as Louisiana Interstate Gas L.L.C., one of the affiliated Defendants in 99 MD 1630.

17. As of 1995, two of the affiliated entities sued in 99 MD 1639 (LG & E Natural Gathering and Processing Co. and LG & E Natural Pipeline Company) were also affiliated with Llano, Inc., one of the named defendants in the 1995 *qui tam* case.

18. The Defendants in 99 MD 1649 were all affiliates of ANR Pipeline Company and Stingray Pipeline Company, each of which was a named defendant in the 1995 *qui tam* case and is named as a Defendant in one of the present *qui tam* actions (ANR Pipeline Co.—99 MD 1632; Stingray—99 MD 1668).

19. The Burlington Defendants in 99 MD 1656 were all affiliates of El Paso Natural Gas Co., one of the named defendants in the 1995 *qui tam* suit and in 99 MD 1609.

ly disclosed allegations in the 1995 *Qui Tam* Action Documents, and that in order to establish subject matter jurisdiction, Relator must demonstrate that he is an original source of the information as to each Defendant named therein.[20]

Defendants contend that 99 MD 1626, 99 MD 1627, 99 MD 1631, and 99 MD 1640 should be included in the list, because they also involve companies who are affiliated with one of the named defendants in the 1995 *qui tam* suits. The Special Master disagrees, because the record either affirmatively indicates that the affiliation postdated the allegations of misconduct contained in the 1995 *Qui Tam* Complaint (99 MD 1627, 99 MD 1631), or does not provide sufficient information to determine that an affiliation in fact exists (99 MD 1626, 99 MD 1640). The timing issue is important because the 1995 *Qui Tam* Complaint seeks damages in the amount of past royalties owed to the United States as a result of the wrongful conduct of the defendants named therein. The Special Master finds and concludes that the public disclosures relating to the 1995 *Qui Tam* Complaint would only put the government on the trail of affiliates who might have been responsible for part or all of these damages.

The final and perhaps the thorniest issue presented by the 1995 *Qui Tam* Action Documents concerns Defendants' argument that these materials trigger the public disclosure bar not only with regard to the defendants named in the 1995 case and their affiliated companies, but also with regard to all companies sued in the 1997 *Qui Tam* Complaints. In support of their position, Defendants assert that the 1995 *Qui Tam* Complaints alleged not merely widespread fraud, but rather universal fraud by all pipelines and other purchasers of gas from federal and Indian lands. Additionally, Defendants note that the media reports of the 1995 *qui tam* suit indicate that it is directed at the entire gas pipeline industry. Defendants contend that the potential difficulty faced by the government in identifying all of the individual actors engaged in widespread, but not industry-wide fraud, *see Cooper,* 19 F.3d at 566, does not present itself where the public disclosure alleges a universal fraudulent scheme encompassing everyone in a given industry. They argue that, faced with such an allegation, the government is in as good a position as the Relator to compile a comprehensive list of industry members and take appropriate action to bring the lot of them to justice.

The Special Master does not concur with Defendants' assertion that Relator's 1995 *Qui Tam* Complaints clearly allege universal fraud by all purchasers of gas from federal and Indian properties. The Complaints do not name all such purchasers as Defendants, nor does the actual claim for relief itself allege an industry-wide fraud. As Defendants accurately point out, Relator indicates that he "may later join as parties to this suit any other entities which have purchased natural gas produced from Royalty Properties and underreported the heating content and volume of the gas so purchased by means of one or more of the Practices described below...." Exhibit 2, doc. 167 at JDPD003356, ¶ 80. This threat of joinder, however, is limited to those purchasers who have underreported heating content and volume. Similarly, Defendants place unwarranted emphasis upon Relator's observation that all gas buyers have a motivation to understate the MMBTU content of gas when they purchase. *See id.* at 003361, ¶ 91. Such a generalized statement of motivation could

---

**20.** The Defendants in the 1997 *qui tam* cases to whom the public disclosure bar is applicable by virtue of this Finding and Conclusion are listed in Appendix E.

be applied with equal force to every type of business transaction between a buyer and seller. More importantly, the universality of the alleged motivation cannot reasonably be equated with a universality of improper conduct, nor does Relator suggest such a connection in his 1995 *Qui Tam* Complaint or the amendments thereto. Finally, Defendants' reliance on paragraph 7 of Relator's Second Amended Complaint in the 1995 *qui tam* action is misplaced. Paragraph 7 states that "[p]ipelines . . . and other purchasers of natural gas . . . have devised various techniques for selectively measuring the gas being purchased, resulting in widespread underreporting of that gas. . . ." *Id.* at 003347, ¶ 7. The generic reference to "[p]ipelines and other purchasers" cannot fairly be construed as an allegation of a universal fraud committed by every pipeline or purchaser, any more than a generalized statement that "government contractors" engage in a particular fraudulent practice can be interpreted as a condemnation of every government contractor.

Some of media reports included within the 1995 *Qui Tam* Action Document can be read as characterizing Relator's 1995 *qui tam* suit as an attack on the entire gas pipeline industry. *See, e.g.,* Exhibit 2, doc. 257 at JDPD 005996 ("Gas producer Jack Grynberg doesn't have a leg to stand on in his sweeping lawsuit charging essentially the entire pipeline industry with fraud in the way it measures gas produced and sold from federal and Indian lands, according to defendants."). Nevertheless, the media reports also point out that the 1995 *qui tam* case only names between 53 and 70 companies as defendants.

Even assuming, however, that Defendants have accurately construed the allegations in Relator's 1995 *Qui Tam* Complaints and the media descriptions of them as a condemnation of the entire universe of gas pipelines and purchasers, the Special Master finds and concludes that Defendants' legal conclusion is erroneous. Neither the case law nor the purposes underlying the public disclosure bar provide substantial assistance in resolving the issue. The Special Master has found no case in which allegations against specifically identified wrongdoers, accompanied by averments of universal fraud directed at such a large and multifaceted group as "gas purchasers," have been held to trigger the public disclosure bar against all group members. Cases dealing with similar, but not identical, generalized allegations of fraud against large industry groups have concluded that such allegations constitute public disclosures only as to those industry members specifically identified in the allegations. *E.g., Cooper,* 19 F.3d at 562 (health insurance companies); *Aflatooni,* 163 F.3d at 516 (Medicare providers); *Horizon,* 265 F.3d at 1011 (health care providers); *Friedman,* 152 F.Supp.2d at 766 (prescription drug retailers selling to beneficiaries of federal health care programs). Those few cases that extend the public disclosure bar to companies not expressly identified in the public disclosure itself involve very small groups of alleged wrongdoers and/or entities performing services at government owned and controlled facilities. *E.g., Sandia,* 70 F.3d at 568 (bar applied to seven companies not named in the public disclosure, all of whom performed services at government owned and controlled facilities); *FPC–Boron,* 105 F.3d at 675 (group of unnamed defendants were government employee clubs operating at government owned and controlled facilities); *Harshman,* 197 F.3d at 1014 (22 government contractors all located in one state).

One of the primary purposes for enacting the 1986 amendments to the FCA was to increase private citizen involvement in exposing specific instances of individual

fraud. *See False Claims Act Implementation: Hearing Before the Subcomm. on Admin. Law and Gov't Relations of the House Comm. on the Judiciary,* 101st Cong. 6 (1990) (statements of Sen. Grassley). This purpose is best served by applying the public disclosure bar only to those wrongdoers expressly identified in the publicly disclosed allegations, affiliates acting in concert with expressly identified wrongdoers, and groups of alleged wrongdoers who, although not individually named in the public disclosure, are quickly and easily identified because of the group's small size and/or the group's close connection to government owned and controlled facilities. This approach is also consistent with the Tenth Circuit's "quick trigger" test, for it obviates the need to analyze the nuances of a public disclosure to determine whether it alleges "universal" or merely "widespread" wrongdoing. It also eliminates the need to consider the ease and extent to which the allegations in the publicly disclosed document allow for identification of each unnamed member of a large expansive industry group.

Alternatively, Defendants argue that the 1995 *Qui Tam* Action Documents, in combination with a FOIA response in which the government produced to Relator disks containing lists of gas purchasers from federal and Indian leases, identify both the mismeasurement practices and those who measure gas from federal and Indian lands.[21] They contend that when viewed together, these two sets of documents publicly disclose allegations and/or transactions substantially identical to those in Relator's 1997 *Qui Tam* Complaints. The problem with Defendants' contention is two-fold. First, it is again premised on the assumption that the 1995 *Qui Tam*

Action Documents allege a universal fraud engaged in by every company that measures gas produced from federal and Indian lands. As the Special Master has previously determined, the 1995 *Qui Tam* Action documents cannot be read so broadly. Second, as discussed more fully above, except in limited situations where the *Sandia* exception applies, the fact that the government is able to identify all of the members of a very large multifaceted industry group does not place it on the trail of fraud allegedly committed by any specific member. This is true regardless of whether the publicly disclosed allegation references "industry-wide" fraud or simply "widespread" fraud within such an industry.

Like many of the questions posed by the public disclosure/original source bar of § 3730(e)(4), the issues raised by Defendants are very difficult and the answer certainly is not free from doubt. Persuasive arguments for and against Defendants' position can and have been made by the parties. Nevertheless, based on the limited case law touching the subject and the purposes underlying the 1986 amendments to the FCA, the Special Master finds and concludes that although the allegations in Relator's 1995 *Qui Tam* Complaints trigger the public disclosure bar of 31 U.S.C. § 3730(e)(4)(A) as to all Defendants named therein, as well as affiliated companies acting in concert with them, its reach does not extend to all unnamed purchasers of gas from federal and Indian lands throughout the United States.

### 5. Relator's Private Litigation

Defendants assert that numerous private lawsuits, arbitration proceedings, and administrative proceedings initiated by Relator prior to 1997 operate as public disclo-

---

**21.** The data from these disks is contained on the Exhibit Bs attached to each of Relator's 1997 *Qui Tam* Complaints.

sures of the allegations upon which his 1997 *qui tam* cases are based. The documents tendered in support of this contention consist of various pleadings, expert reports, discovery materials, exhibits, orders, and opinions from the following cases and arbitrations: *Grynberg et al. v. Rocky Mountain Natural Gas Co., Inc.*, 82–CV–117 (Moffat County, Colo.1982); *Questar Pipeline Co. v. Grynberg et al.*, 93–CV–0265 (D.Wyo.1993); *JJ–CC Limited v. Transwestern Pipeline and Amgas, Inc.* (Texas suit, arbitration, and proceedings in Texas Court of Appeals); *Pacific Enterprises Oil Co. (USA)(PEOC), Texcon Oil and Gas Company v. Grynberg et al.*, C–91–228 (Sweetwater County, Wyo.1991); *Grynberg et al. v. Texas Utilities Fuel Co. (TUFCO)*, Case 40623 (Parker County, Texas 1994); *Grynberg v. Rocky Mountain Natural Gas and KN Energy, Inc.*, 87 CV 165 (Moffat County, Colo.1987); *Grynberg v. Rocky Mountain Natural Gas Company, KN Energy, Inc., and John Does 1 through 20*, 90 CV 3868 (Jefferson County, Colo.1990); *Grynberg v. KN Energy, Inc., Rocky Mountain Natural Gas Co., and GASCO, Inc.*, 92 N 2000 (D.Colo. 1992); *Grynberg v. El Paso Natural Gas Co.*, 94–CV–3312 (Denver District Court 1994); *Grynberg v. Rocky Mountain Natural Gas Company*, GP91–8–001 (F.E.R.C. 1992); and *Rocky Mountain Natural Gas Co. v. Grynberg*, 96–CV–49 (Moffat County, Colo.1996) (hereinafter the "Grynberg Private Litigation Documents").[22] The Grynberg Private Litigation Documents are listed in Appendix F.

The Grynberg Private Litigation Documents present numerous issues regarding the scope and operation of the public disclosure bar. Several of the Grynberg Private Litigation Documents consist of transcripts of discovery depositions, deposition exhibits, expert reports, letters, and draft pleadings. There is nothing in the evidentiary record indicating that these materials were actually filed with the court in which the action was pending.[23] Although there is a split in the Circuits regarding the matter, the Tenth Circuit appears to have aligned itself with the view espoused by the District of Columbia Circuit and the Seventh Circuit that only discovery materials actually filed with the court clerk may qualify as public disclosures within the meaning of § 3730(e)(4)(A). *See Ramseyer*, 90 F.3d at 1519; *compare United States v. Bank of Farmington*, 166 F.3d 853, 858 (7th Cir.1999), *and Springfield*, 14 F.3d at 652–53, *with United States ex rel. Schumer v. Hughes Aircraft, Co.*, 63 F.3d 1512, 1519–20 (9th Cir.1995), *judgment vacated on other grounds*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Additionally, a few of the Grynberg Private Litigation Documents are letters between counsel for the parties that do not constitute public disclosures from statutory listed sources.[24]

While some of the Grynberg Private Litigation Documents do not qualify as public disclosures, many others do. For example, Defendants have included within Ex-

---

**22.** The Special Master will take judicial notice of those Grynberg Private Litigation Documents filed in a federal or state court, and will consider them for purposes of the instant jurisdictional motions. *See* footnote 9, *supra*.

**23.** Exhibit 2 documents on Appendix F that fall within this category include 136, 137 142, 143, 149, 150, 160, 164, 178, 179, 183, 184, 186, 191, 208, 210, 211, 218, 228, 241, 265, 267, 269, 273, 274, 285, 294, 295, 296, 297,

300, 303, 304, 325, 326, 329, 332 336, 340, 345, 348, 353, 354, 355, 359, 361, 374, 402, Supp. 3–27, Supp. 3–31, Supp. 3–32, Supp. 5–16, Supp. 5–17, Supp. 5–28, Supp. 5–29, Supp. 5–52, Supp. 5–53, and Supp. 5–56, and Supp. 5–60.

**24.** *See* Exhibit 2, documents 207, 209, Supp. 3–18, and Supp. 3–30.

hibit 2 pleadings, briefs, orders and opinions, and other materials filed with the clerks of the respective courts or administrative tribunals that clearly constitute documents publicly disclosed in civil or administrative hearings. These materials reveal the nature of Grynberg's private litigation, arbitrations, and administrative proceedings, including the allegations made in each of the cases identified above. Virtually all of Relator's private litigation included claims by him that the opposing parties had mismeasured gas volume and/or had improperly analyzed gas heating content by utilizing one or more of the same techniques enumerated in the 1997 *Qui Tam* Complaints. *See* Exhibit 2, doc. 138 (Order on Motion to Dismiss, *Questar v. Grynberg*, 82–CV–0265, indicating that Grynberg had alleged that Questar stole gas in Nitchie Gulch Field by, among other things, tampering with orifice plates); Exhibit 2, doc. 139 (Grynberg's Affidavit in *PEOC*, C–91–228, alleging that Questar measured gas in Nitchie Gas Field with poorly calibrated instruments); Exhibit 2, doc. 144 (Texas Court of Appeals decision in *JJ–CC Limited v. Transwestern Pipeline*, noting that Grynberg made claims of Btu and volume mismeasurement by Transwestern and Amgas in the Abo Gas Field); Exhibit 2, doc. 146 (First Amended Original Petition in *TUFCO*, Case 40623, alleging that TUFCO converted gas in the Brazos East Gas Field by fraudulent mismeasurement of gas resulting from the Joule Thompson effect); Exhibit 2, doc. 151 (First Amended Complaint in *Grynberg v. Rocky Mountain Natural Gas*, 82–CV–117, alleging that Rocky Mountain mismeasured gas in the Blue Gravel Field by failing to verify accuracy of meters, failing to properly maintain meters, and failing to properly integrate charts); Exhibit 2, doc. 153 (Verified Complaint in *Grynberg v. Rocky Mountain Natural Gas and KN Energy, Inc.*, 87–CV–165, alleging

that defendants failed to conduct Btu measurements on Fed. 1–25 well in the Blue Gravel Field); Exhibit 2, doc. 155 (Second Amended Complaint *Grynberg v. KN Energy and Rocky Mountain Natural Gas Co., Inc.*, 90–CV–3868, alleging that defendants failed to test accuracy of measuring equipment, improperly took gas for use in dehydrators and separators before metering, and applied incorrect temperature and pressure conversions); Exhibit 2, doc. 162 (Complaint in *Grynberg v. KN Energy, Inc., Rocky Mountain Natural Gas Co., and GASCO, Inc.*, 92–N–2000, alleging that defendants failed to properly measure Btu heating content, failed to account for gas taken to operate defendants' equipment, erroneously calibrated metering devices, and relied on "off-scale" meter measurements); Exhibit 2, doc. 170 (Complaint in *Grynberg v. El Paso*, 94–CV–3312, alleging El Paso used improper pressure and temperature in measuring volume and used gas to operate its compressors without paying for it).

As Relator correctly observes, there are differences between the allegations in Grynberg's private litigation and the averments in the 1997 *Qui Tam* Complaints. First and foremost, the totality of Grynberg's private litigation involves a handful of gas measurers, while the 1997 *Qui Tam* Complaints name as Defendants hundreds of alleged wrongdoers who are neither identified in the private cases nor affiliated with those who are identified. Additionally, the private suits are substantially more limited in terms of geographic area, time, and the alleged practices employed to accomplish mismeasurement than the 1997 *qui tam* actions. Finally, Grynberg's private cases do not expressly accuse the opposing party of underpaying royalties to the government, although some of the gas fields involved in the private suits may well have included federal leases.

As more fully discussed in Sections II(A)(3) and (4), *supra*, generally, allegations of gas mismeasurement may trigger the public disclosure bar only as to specifically identified wrongdoers or affiliates acting in concert with them. Certainly, the Grynberg Private Litigation Documents present a substantially weaker case for the application of the *Sandia* exception than do the 1995 *Qui Tam* Action Documents. Consequently, to the extent that the Grynberg Private Litigation Documents constitute public disclosures of allegations or transactions from a statutory listed source, they trigger the original source inquiry only as to a very limited number of companies. These include KN Energy, Inc., Rocky Mountain Natural Gas, Co., El Paso Natural Gas Company, GASCO, Transwestern Pipeline, AMGAS, Questar Pipeline Company, Texas Utilities Fuel Company, and possibly Pacific Enterprises Oil Company, as well as affiliates acting in concert with these entities. GASCO, AMGAS, and Texas Utilities Fuel Company are not Defendants in any of the 1997 *qui tam* cases. Thus, insofar as the public disclosure bar of § 3730(e)(4)(A) is concerned, the Grynberg Private Litigation Documents only have pertinence to KN Energy, Rocky Mountain, El Paso, Questar, Transwestern, Pacific Enterprises Oil Company,[25] and their affiliates.

In Section II(A)(4), *supra*, the Special Master found and concluded that the 1997 *qui tam* actions against KN Energy, Rocky Mountain, El Paso, Questar, Transwestern, Pacific Enterprises Oil Co., and their respective affiliated companies were based upon the publicly disclosed allegations in the 1995 *Qui Tam* Documents. As a result, the question of whether the Grynberg Private Litigation Docu-

ments also trigger the public disclosure bar as to these entities and their affiliates is of little or no consequence. Nevertheless, the Special Master finds and concludes that the gist of the fraud asserted against the Defendants in 99 MD 1601 (PEOC's affiliates), 99 MD 1603 (KN, Rocky Mountain, and their affiliates), 99 MD 1604 (Questar Pipeline Company and its affiliates); 99 MD 1608 (Transwestern and its affiliates), and 99 MD 1609 (El Paso Natural Gas Company and its affiliates) is at least partly based upon and substantially similar to the allegations against these companies in the Grynberg Private Litigation Documents. While Grynberg's private lawsuits alleged various breaches of contracts and settlement agreements, they also accused the opposing parties of stealing gas by mismeasuring volume and/or heating content through use of one or more of the same mismeasurement techniques discussed in 1997 *Qui Tam* Complaints. To be sure, the 1997 *qui tam* cases expand the allegations of fraud to encompass broader time frames and geographic areas, and enumerate many more details regarding the techniques used to accomplish the theft of gas by mismeasurement However, the core of the alleged wrongdoing—willful and intentional mismeasurement of gas volume and/or heating content-remains the same. Nor does it matter that the alleged victim of the wrongdoing alleged in Grynberg's private litigation (Grynberg and/or his companies) is different than the alleged victim of the fraud alleged in the 1997 *qui tam* actions (the United States). An allegation that a named purchaser of gas at the wellhead is underpaying because it intentionally mismeasures volume and heating content is sufficient to alert any-

---

25. Pacific Enterprises Oil Co. is not named in the 1997 cases, but affiliates of PEOC are named in 99 MD 1601.

one with a financial stake in gas acquired by the same purchaser that their interests are in jeopardy.

Relator relies heavily on *United States ex rel. Yannacopolous v. General Dynamics,* 315 F.Supp.2d 939 (N.D.Ill.2004) for the proposition that a document containing allegations or transactions from a statutory listed source does not trigger the public disclosure bar unless it identifies the federal government as the victim of the wrongful conduct. The Special Master finds and concludes that Relator's reliance upon *Yannacopolous* is misplaced. In *Yannacopolous,* the proffered public disclosures contained allegations of a fraudulent "bait-and-switch" scheme involving a contract for the sale of jet fighters by General Dynamics to the Greek government. Yannacopolous' *qui tam* suit was directed at fraudulent overbilling of the federal government (which assisted in financing the sale of the fighters) by General Dynamics and its successor Lockheed. The United States District Court for the Northern District of Illinois found that the "bait-and-switch" scheme which was the subject of the publicly disclosed documents was entirely separate and distinct from the subsequent overbilling of the federal government. Unlike the situation in *Yannacopolous,* to the extent that gas wells are located on federal or Indian lands, there is a direct relationship between the price received by sellers of gas and the royalties received by the federal government. Therefore, it is apparent that any allegation of wrongful mismeasurement by spe-cific gas purchasers from wells on federal or Indian lands, or even from private wells in fields that may include federal gas leases, would be of grave concern to the federal government, giving it reason to undertake further investigation.

### 6. Prior Litigation Not Involving Grynberg

In addition to the Grynberg Private Litigation Documents, Defendants have tendered various pleadings from 18 different lawsuits in which Grynberg was not a party (hereinafter the "Non–Grynberg Litigation Documents"), asserting that these contain publicly disclosed allegations or transactions upon which the 1997 *qui tam* cases are based.[26] A list of the Non–Grynberg Litigation Documents and the cases to which they relate is found in Appendix G.[27]

Some of what has been previously discussed in Section II(A)(5), *supra,* relating to the Grynberg Private Litigation Documents, applies equally to the Non–Grynberg Litigation Documents. The Non–Grynberg Litigation Documents consist of filed pleadings, orders, and decisions from civil hearings, thereby qualifying as public disclosures from a statutory listed source. Nevertheless, many Non–Grynberg Litigation Documents do little to advance the public disclosure inquiry. Some involve parties who are neither Defendants nor affiliates of named Defendants in the 1997 *qui tam* cases. *See* Exhibit 2, docs. 201, 404, Supp. 1–3. As the Special Master has

---

**26.** The Special Master takes judicial notice of these pleadings pursuant to Fed.R.Evid. 201. *See, supra,* at 1163 n. 9.

**27.** There are other documents tendered by Defendants that involve litigation to which Grynberg was not a party, but which have been grouped in other categories for ease of discussion. By way of example, JDPD 6 is a stipulation of facts in *Chevron et al. v. United States,* in the United States Claims Court. It is discussed in Section II(A)(8) of this Recommendation, along with a number of other Exhibit 2 documents consisting of administrative orders and judicial decisions involving the "wet rule" versus the "dry rule" for calculating gas heating content, as well as several newspaper articles and periodicals discussing these orders and decisions.

already determined in Sections II(A)(3) and (4), *supra*, the public disclosure bar only operates with respect to alleged wrongdoers named in the publicly disclosed document, affiliates of the alleged wrongdoer, or those who fall within the *Sandia* exception. The Special Master finds and concludes that the Non–Grynberg Litigation Documents comprising pleadings and rulings in *Funk v. Ladd Petroleum Corp. & Waterford Energy* (Exhibit 2, doc. 201) and *Ginther v. McCullough Gas Transmission Co.* (Exhibit 2, doc. Supp. 1–3) do not fall within any of these categories, and consequently, they do not constitute public disclosures of allegations or transactions as to any of the Defendants named in the 1997 *qui tam* actions.

Other Non–Grynberg Litigation Documents consist of pleadings, orders, and decisions in private litigation involving parties who are either named Defendants in both the 1997 *qui tam* cases and the 1995 *qui tam* action, or who are named Defendants in the 1997 *qui tam* cases and are affiliates of defendants in the 1995 *qui tam* suit. *See* Exhibit 2, doc. 177 (Trunkline Gas named in 1995 *qui tam* case and 99 MD 1610); Exhibit 2, doc. 202 (Williams Nat. Gas named in 1995 *qui tam* case and 99 MD 1614); Exhibit 2, doc. 234 (Delhi Gas Pipeline named in 1995 *qui tam* case and 99 MD 1645); Exhibit 2, doc. JDPD 17; (Colorado Interstate Gas named in 1995 *qui tam* case and 99 MD 1605); Exhibit 2, docs. JDPD 18–20 (Northern Nat. Gas named in 1995 *qui tam* case and 99 MD 1608); Exhibit 2, docs. JDPD 26, 30, 31, 32 (Arkansas Louisiana Gas named in 99 MD 1644, and is an affiliate of Louisiana Intrastate Gas Corp., named in the 1995 *qui tam* case); Exhibit 2, docs. JDPD 33–34 (Arkla Energy Resources named in 99 MD 1644, and is an affiliate of Louisiana Intrastate Gas Corp., named in the 1995 *qui tam* case); Exhibit 2, doc.

404 (Bridgeline Gas Distribution LLC named in 99 MD 1624 and formerly known as Riverway Gas Pipeline Co., named in the 1995 *qui tam* case). The Special Master has already concluded that the 1995 *Qui Tam* Action Documents trigger the public disclosure bar as to all the allegations in the 1997 *qui tam* cases against these companies. To the extent the Non–Grynberg Litigation Documents also operate as public disclosures of the allegations against these same entities, they are merely duplicative of the public disclosures in the 1995 *Qui Tam* Action Documents.

Two of the Non–Grynberg Litigation Documents pertain to *United States ex rel. Precision v. Koch.* Exhibit 2, docs. 132 and 239. While these documents may well constitute public disclosures of the allegations against the Koch entities, the point is moot because the 1997 *qui tam* case against the Koch companies has already been dismissed on other grounds.

■ The few remaining Non–Grynberg Litigation Documents must be analyzed individually. Two of the documents (Exhibit 2, docs. 133 and Supp. 5–51) are transcripts of portions of the trial testimony in *Studley Resources v. Exxon Corp. and Beothos.* Supp. 5–51 includes testimony in which the witness discusses the fact that flow computers are more accurate than chart recorders. The Special Master finds and concludes that these factual observations by the witness do not constitute "allegations or transactions," within the meaning of 31 U.S.C. § 3730(e)(4)(A). Document 133 is a transcript of testimony concerning a field audit of Exxon wells, during which the auditors observed, among other things, nicked and pitted orifice plates and improper orifice plate sizes. The witness indicated that he also observed the same deficiencies, as well as dirty orifice plates and improperly cali-

brated meters, all of which could ·cause under-measurement of gas. Although the witness does not expressly accuse Exxon of fraud or other wrongdoing, the testimony clearly places Exxon's gas measurement practices in a questioning light. As a result, document 133 constitutes a public disclosure of allegations or transactions. *See Advanced Sciences,* 99 F.3d at 1005.

The analysis of whether Relator's *qui tam* case against Exxon (99 MD 1621) is based upon the allegations or transactions contained in document 133 is the same as that employed with respect to the Grynberg Private Litigation Documents in Section II(A)(5), *supra.* Because the testimony found in document 133 questioned the propriety of Exxon's gas measurement practices, and pointed out that Exxon's practices could result in an under-measurement of gas volume, it would place the government on the trail of the similar, but expanded allegations of gas mismeasurement against Exxon in 99 MD 1621. Accordingly, the Special Master finds and concludes that 99 MD 1621 is at least based in part upon the publicly disclosed allegations and transactions in document 133 and, therefore, triggers the public disclosure bar.

A similar situation exists with respect to document 194 in Exhibit 2, a Petition in the 1995 case of *Anadarko Basin Production Service, Inc. et al. v. Transok, Inc., Transok Gas Co., Transok Gas Transmission Co., and Boyd Rosene Associates, Inc.,* filed in Oklahoma state court. The Petition accuses Transok Gas Transmission Company of failing to accurately measure gas produced from wells in Oklahoma in violation of the terms of certain transportation contracts. To be sure, the Petition is much narrower in scope than Relator's 1997 *Qui Tam* Complaints against the Transok entities in 99 MD 1626 and 99 MD 1640. It is also far less de-

tailed, and asserts a claim for breach of contract rather than fraud. Nevertheless, under Tenth Circuit law, none of these distinctions are pertinent to the public disclosure inquiry. Because the *Anadarko* Petition publicly discloses allegations of gas mismeasurement against Transok Transmission Company, it is sufficient to trigger the public disclosure bar against the Defendants in 99 MD 1626 and 99 MD 1640.

Documents 192 and 193 in Exhibit 2 are pleadings in *Hales v. Seeco, Inc., Arkansas Western Gas Co. and Southwestern Energy Co.* To be sure, documents 192 and 193, consisting of the Complaint and Amended Complaint, contain allegations of fraudulent conduct on the part of the defendants. However, the fraud alleged relates to a failure to enforce various contract provisions relating to price and volume of gas purchases. There are no allegations of wrongful gas mismeasurement similar to those in Relator's 1997 *qui tam* case against SEECO and its affiliates, 99 MD 1670. As a result, the Special Master finds and concludes that Relator's 1997 *qui tam* case against SEECO and affiliated companies is not based upon the publicly disclosed allegations in documents 192 and 193.

Exhibit 2, document 203 is a copy of findings of fact regarding class certification in *Bridenstine v. Kaiser–Francis Oil Co.* It presents a difficult public disclosure issue not yet addressed in this Recommendation. The findings of fact describe the class action complaint as essentially alleging a dispute over whether gathering, compression and dehydration fees are properly chargeable to the royalty interest. Additionally, the plaintiffs in *Bridenstine* contended that defendants failed to pay royalties on the value of gas condensate recovered from various points on the system. The gist of the wrongdoing al-

**1180**

leged in *Bridenstine* relates to improper accounting and payment practices, rather than gas mismeasurement. Yet, at least one of the allegations in the 1997 *qui tam* case against Kaiser–Francis Oil Co., 99 MD 1661, states that Kaiser–Francis has recovered condensate without paying royalties or reporting such condensate recovered to the lessee.

In short, there is a publicly disclosed allegation against Kaiser–Francis in *Bridenstine* that is similar to one averment included in 99 MD 1661, although the core fraudulent activities relating to mismeasurement of gas volume and heating content which form the basis for the *qui tam* suit against Kaiser–Francis are not implicated. The Special Master finds and concludes that the allegations in *Bridenstine,* as described in the publicly disclosed findings of fact contained in Exhibit 2, doc. 203, would not place the government on the trail of a fraudulent scheme to mismeasure gas volume and heating content. However, it would alert the government to wrongful conduct by Kaiser–Francis concerning a failure to report or pay for recovered condensate.

■■■ Consequently, the Special Master finds and concludes that to the extent that 99 MD 1661 alleges a wrongful scheme to withhold payment for recovered condensate, it is based on the publicly disclosed allegations in document 203. However, to the extent that 99 MD 1661 alleges a wrongful scheme to mismeasure gas volume and heating content, it is not based

upon the allegations described in document 203.[28]

Document JDPD–3 is a copy of Mobil Oil Corporation and Mobil Oil Exploration & Producing Southeast Inc.'s Supplemental Response to Defendants' First Set of Interrogatories and Request for Production of Documents in *Exxon et al. v. United States Dep't of Energy.* No other pleadings in this matter have been included in Defendants' voluminous production of public disclosure documents, and JDPD–3 itself does not clearly identify the issues involved in the case. It appears, however, that at least in part, the case concerned the validity of Ruling 1975–18 dealing with calculation of the cost of shrinkage (reduction in residue gas sales resulting from the reduction in volume and heating value of gas due to the extraction of liquids). After carefully reviewing the document, the Special Master finds and concludes that its relationship, if any, to the allegations in Relator's 1997 *Qui Tam* Complaints is unclear, and Defendants provide no explanation of its significance. Consequently, the Special Master finds and concludes that to the extent JDPD–3 contains any allegations or transactions, they cannot be deemed substantially similar as a matter of law to the allegations in Relator's 1997 *qui tam* cases.

### 7. *Notices of Incidents of Noncompliance*

Defendants tender a large number of BLM and MMS Notices of Incidents of Noncompliance (hereinafter the "Notices"),

---

**28.** Unlike the public disclosure documents that discuss some, but not all of the techniques identified by Relator in support of a fraudulent mismeasurement scheme, document 203 discusses one of two different wrongful schemes described in Relator's 1997 *qui* tam case against Kaiser–Francis. In this respect, the situation is similar to that presented in *Wang v. FMC Corp.,* 975 F.2d 1412 (9th Cir.1992), a *qui tam* case in which the complaint encompassed four separate fraudulent schemes involving four separate government contracts. The Ninth Circuit concluded that the allegations concerning one of the contracts had been publicly disclosed, but reached the opposite conclusion as to the allegations relating to the other three.

claiming that they are public disclosures from statutory listed sources of the allegations and transactions which form the basis for Relator's 1997 *qui tam* cases. A list of the Notices of Incidents of Noncompliance and related correspondence is contained in Appendix H. The Notices are written reports of well inspections conducted by BLM or MMS field inspectors finding violations of federal regulations. Many of the stated violations concern gas measurement equipment, procedures, and record keeping.

The Notices present a host of problems which render them virtually useless in the public disclosure analysis. Many of the Notices tendered by Defendants are largely unreadable. Those that are readable typically identify relatively minor violations that presumably were quickly corrected. It is debatable whether these petty defalcations noted on routine well inspection reports can be equated with the broad fraudulent scheme of intentional gas mismeasurement that forms the basis for Relator's 1997 *qui tam* cases. There is no need to resolve the issues presented by this debate, for the Special Master finds and concludes that there are other reasons why the Notices either do not qualify as public disclosures or are merely duplicative of materials that have already been deemed to trigger the public disclosure bar.

 The Notices are all directed to the lessees/operators of the affected wells. This makes perfect sense, since it is the lessees that ultimately are responsible for royalty payments to the federal government. However, the Notices do not disclose whether the lessee/operator is also the party responsible for measuring gas. As a result, it is impossible to determine whether the particular violation addressed on a Notice relates to a primary act or omission of the lessee/operator or to one

committed by a third party. If the act or omission was that of the lessee/operator to whom the Notice was sent, there is no indication that the Notice was disclosed to the public. *E.g., MK–Ferguson Co.,* 99 F.3d at 1545 (in order to qualify as public disclosure, document must have been disclosed to a third party who is a stranger to the fraud).

Defendants present two alternative arguments in support of their contention that the Notices have been publicly disclosed. First, they contend that under the fraudulent scheme alleged in Relator's 1997 *qui tam* cases, it is not the lessee/operators, but rather the gas pipelines and their affiliates who are guilty of mismeasuring gas volume and heating content. Under such a scheme, the lessee/operators, along with the federal government, are the victims. Hence, argue Defendants, when the BLM or MMS sent the Notices to the lessee/operators, they were publicly disclosed for purposes of § 3730(e)(4)(A). *See id.* (suggesting that victim is a "stranger to the fraud" for purposes of determining whether document has been publicly disclosed). As the Special Master has previously observed, the Notices do not reveal whether the defalcations were those of lessees/operators or whether the lessees/operations were victims of the acts or omissions of others. However, even if Defendants are correct in their assumption that the lessees/operators who received the Notices were victims, the Notices do not expressly identify the wrongdoers (presumably the gas purchasers or third party measurers). While the government may be able to discover their identities from information on the Notices (i.e. the name of the gas field or the well description), in most instances the Special Master cannot. Defendants have failed to point to any information in the factual record that would allow the Special Master to link most of the wells or

fields identified on the Notices to any particular Defendant or Defendant group in the 1997 *qui tam* cases. There are some exceptions, but these involve Defendants or Defendant groups that are already within the ambit of the public disclosure bar by virtue of other previously discussed documents.[29]

Second, Defendants point out that according to a government witness, Don Judice, the Notices are available to anyone making a FOIA request for them, and that FOIA requests for Notices have been received from time to time. The fact that Notices are potentially available pursuant to the FOIA does not satisfy the Tenth Circuit rule that actual disclosure is required under 31 U.S.C. § 3730(e)(4)(A). *Ramseyer*, 90 F.3d at 1519–20. Additionally, while Judice stated that occasional FOIA requests have been made, his testimony was general and did not identify any particular Notices. Consequently, even if some have been publicly disclosed, there is nothing in the factual record demonstrating that any of the Notices included in Exhibit 2, or for that matter any Notices involving Defendants in the 1997 *qui tam* cases or their affiliates, were ever provided pursuant to a FOIA request.

8. *Administrative Orders, Judicial Decisions, and Related News Articles and Periodicals Concerning FERC Orders 93 and 356 ("Wet" vs "Dry" Calculation of Maximum Lawful Price for Sale of Gas )*

Prior to the enactment of the Natural Gas Policy Act in 1978, the Federal Energy Regulatory Commission (the FERC.) measured the Btu content of natural gas for the purpose of making quality adjustments to the gas rates set by the Commission under the Natural Gas Act of 1938. The FERC had adopted a rule requiring Btu content of a gas stream to be determined on the basis of a test volume of gas saturated with water vapor at a specified, conveniently obtained temperature and pressure (60 degrees Fahrenheit and 30 inches of mercury). This rule was known as the "wet rule," because it required the gas sample to be saturated with water vapor at a temperature and pressure combination where the capacity of the gas to absorb water vapor is much higher than that existing at the temperature and pressure conditions under which most natural gas is sold. As a result, the "wet rule" tended to overstate water vapor content for gas as delivered, and consequently, understate Btus assumed to be in the test sample of natural gas.

The Natural Gas Policy Act (NGPA), among other things, established a detailed scheme of maximum ceiling prices for various categories of natural gas sold to pipelines and local distribution companies. In implementing the NGPA, the FERC abandoned the "wet rule" and adopted Order 93, which provided that the Btu content of natural gas should be determined at the conditions under which natural gas is actually delivered for first sales. Because natural gas contains less water vapor under actual delivery conditions than under the

---

**29.** For example, Exhibit 2, documents 57, 58, 59, 60, and 61 are Notices of Incidents of Noncompliance sent to Grynberg concerning wells in the Blue Gravel Field. From other documents, the Special Master is aware that the purchaser of gas from these wells was Rocky Mountain Natural Gas Co. Likewise, Exhibit 2, document 71 appears to concern the bypass issue in Nitchie Gulch, where the gas purchaser was Questar or an affiliate. It is possible that the Notices of Incidents of Noncompliance in Exhibit 2, document JDPD 36 relate to wells where the gas purchaser was Sunterra. However, all of these entities, as well as their affiliates were publicly disclosed by virtue of the 1995 *Qui Tam* Action Documents. *See, supra*, Section II(A)(4).

saturated "standard laboratory conditions" specified in the "wet rule," use of the "dry rule" increased the measured Btu content and, hence, the price paid by purchasers of natural gas.

Various pipelines, gas distributors, and their trade associations challenged the validity of Order 93 in the United States Court of Appeals for the District of Columbia Circuit. In 1983, the District of Columbia Circuit struck down the FERC's "dry rule," holding that it violated the NGPA's statutory pricing scheme by defining Btu content in a way unforeseen by Congress, thereby effectively raising the wellhead prices of natural gas above the maximum ceiling prices established in the Act. *Interstate Natural Gas Ass'n of America v. FERC*, 716 F.2d 1 (D.C.Cir. 1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984). In 1984, the FERC issued Order 356 which implemented the *Interstate Natural Gas* decision by returning to the "wet rule." Thereafter, additional administrative and judicial proceedings were instituted by gas purchasers claiming refunds for purchases made while Order 93 was in place.

Defendants tender 14 documents consisting of administrative orders and judicial decisions, as well as newspaper articles and periodicals relating to FERC Order 93, the *Interstate Natural Gas* case, FERC Order 356, and the refund proceedings (hereinafter the "FERC Order 93 Documents"). They contend that these documents constitute public disclosures of allegations relating to the "wet rule" versus "dry rule" found in Relator's 1997 *qui tam* cases. A list of the FERC Order 93 Documents is contained in Appendix I.

 Each of the FERC Order 93 Documents was publicly disclosed, and each either emanated from a source listed in § 3730(e)(4), or discusses material emanating from such a source. Nevertheless, the Special Master finds and concludes that the FERC Order 93 Documents fail to meet two other criteria necessary to activate the public disclosure bar. First, they do not place the conduct of any Defendant named in the 1997 *qui tam* cases, or any affiliate of such Defendant in a questioning light. Indeed, none of FERC Order 93 Documents contain allegations of wrongdoing directed at any purchaser or measurer of natural gas, nor do they describe transactions from which improper conduct by gas purchasers or measurers can be inferred.

Second, although the FERC Order 93 Documents discuss the "wet" versus "dry" methods of measuring Btu content, they do not deal with the same issue as the one raised in Relator's 1997 *Qui Tam* Complaints. Both the FERC Order 93 Documents and Relator's 1997 *Qui Tam* Complaints recognize that at certain pressures, the "wet rule" will result in a Btu measurement that is lower than the "dry rule." Additionally, both the FERC Order 93 Documents and Relator's 1997 *Qui Tam* Complaints quantify this discrepancy · in approximately the same range; namely 1.74% to 2%. *See* Exhibit 2, doc. 281 at JDPD 006390; *Questar* Complaint, Exhibit 18 at 26, ¶ 39. However, the 1997 *Qui Tam* Complaints allege that: (a) although chromatographs analyze Btu content on a "dry" basis, most gas contracts call for the purchase price to be calculated on a "wet" basis; and (b) Defendants adjust for the "wet" basis purchase price by multiplying the "dry" Btu content by 98%. Relator further avers that this 2% reduction in Btu is improper because at the flowing pressure in the gathering line, the "wet" versus "dry" analysis of Btu content should be virtually the same. *Questar* Complaint, Exhibit 18 at 26, ¶ 39.

In essence, Relator's 1997 *qui tam* cases allege that Defendants utilize the wrong

pressure value in the formula for converting the "dry" basis Btu calculation to the "wet" basis called for in most gas purchase contracts. No such allegation is contained in any of the FERC Order 93 Documents, nor can any such allegation of wrongdoing reasonably be inferred from the discussion of the "wet rule" versus "dry rule" in the FERC Order 93 Documents.

9. *Decisions of the Interior Board of Land Appeals (IBLA), Department of the Interior (DOI); Bureau of Indian Affairs (BIA); and MMS*

Exhibit 2 contains several opinions and decisions of the IBLA, DOI, BIA, and MMS in various adversary proceedings, all of which are proffered by Defendants as public disclosures of allegations and transactions substantially similar to those in Relator's 1997 *qui tam* cases (hereinafter "the Administrative Decisions Documents"). The Administrative Decisions Documents are listed in Appendix J.

All of the Administrative Decisions Documents were generated by sources falling within 31 U.S.C. § 3730(e)(4)(A), namely, federal administrative hearings. Further, it cannot be disputed that all of these materials were publicly disclosed. However, while many of the allegations and transactions in the Administrative Decisions Documents may concern gas mismeasurement, only seven involve companies named in the 1997 *Qui Tam* Complaints or their affiliated entities. Exhibit 2, doc. 21 (Arco); Exhibit 2, doc. 25 (Shell); Exhibit 2, doc. 28 (Williams Production f/k/a Northwest Pipeline); Exhibit 2, doc. 35 (Pacific Enterprises Oil); and Exhibit 2, docs. JDPD 10, JDPD 11, JDPD 12, and JDPD 13 (Mobil)

The remainder relate to companies that appear to have no connection to the 1997 *qui tam* action Defendants. Exhibit 2, doc. 22 (Mallon Oil); Exhibit 2, doc. 23 (Davis Oil); Exhibit 2, doc. 24 (Robert L. Bayless); Exhibit 2, doc. 26 (Celsius Energy); Exhibit 2, doc. 27 (AMOCO); Exhibit 2, doc. 29 (Cotton Petroleum); Exhibit 2, doc. 30 (C.C.Company); Exhibit 2, doc. 31 (Luff Exploration); Exhibit 2, doc 34 (Robert L. Bayless). No plausible argument can be made for application of the *Sandia* rule. The allegations and transactions in these documents would not have placed the government on the trail of the wrongdoing allegedly committed by the Defendant companies. For the reasons more fully discussed in Sections II(A)(3) and (4), *supra*, the Special Master finds and concludes that Relator's 1997 *qui tam* cases are not based upon allegations or transactions disclosed in documents 22, 23, 24, 26, 27, 29, 30, 31, and 34.

Exhibit 2 document 28 is a BIA decision on an appeal by Williams Production Company, f/k/n Northwest Pipeline Corp., of an MMS order concluding that Williams underpaid royalties for natural gas and condensate attributable to certain federal leases. On the one hand, the 1997 *qui tam* case against the Williams entities contains a similar allegation that they have recovered condensate without paying royalties or reporting such condensate recovery to the lessee. On the other hand, the gist of the allegations described in the BIA decision concern improprieties in accounting and payment procedures, rather than mismeasurement of gas volume and/or heating content. Therefore, Document 28 presents the same problem previous discussed in Section II(A)(6), *supra*, concerning Kaiser–Francis and Non–Grynberg Litigation Document 203. In any event, the Special Master has already found and concluded that Relator's 1997 *qui tam* allegations against Williams and its affiliates have been publicly disclosed by virtue of the 1995 *Qui Tam* Action Documents. Thus, to the extent that document 28 triggers

the public disclosure bar as to any of the allegations against Williams Production Company, Northwest Pipeline Corp., and/or their affiliates in case 99 MD 1614, it is merely duplicative.

■ Document 21 in Exhibit 2 is an IBLA decision affirming in part and reversing in part an MMS decision denying Arco's request for a deduction in its royalty payments for line losses attributed to gas consumed (fuel-gas) and gas lost in the transporter's pipeline system. One paragraph of the allegations in Relator's 1997 *Qui Tam* Complaint against Arco discusses the payment of royalties on "fuel-gas." Beyond that, however, there appears to be little or no commonality. Relator's allegation is essentially that Defendants fail to measure, account for, report, or pay royalties on "fuel-gas." The IBLA decision strongly suggests that Natural Gas Pipeline of America (NGPA), the transporter of Arco's gas from the subject leases, does indeed measure, account for, and report "fuel-gas." At issue is Arco's request to deduct the value of this measured, accounted for, and reported "fuel-gas." There are no allegations or transactions referenced in document 21 that would suggest wrongdoing or impropriety on the part of either Arco or NGPA, or place either company in a questioning light. The Special Master finds and concludes that to the extent document 21 contains any allegations or transactions falling within the scope of § 3730(e)(4)(A), Relator's 1997 *Qui Tam* Complaints are not based upon them.

■ Exhibit 2 document 25 is a decision of the MMS on an appeal by Shell Oil Co. of an MMS order which, among other things, required Shell to perform a restructured accounting to correct its royalty payments relating to "lease-use gas." The transactions on which the MMS order was based concerned Shell's failure to pay roy-

alties on gas removed from its leases and not sold, but rather returned to the leases and used on the leased premises as fuel to facilitate further production. The appellate decision reverses the MMS order, concluding that no royalties were due on gas beneficially used on the lease. As previously discussed in connection with document 21, Relator' 1997 *Qui Tam* Complaints contain an allegation of impropriety regarding failure to measure and pay royalties on "fuel gas" used off of the leased premises. That is not the issue or the allegation discussed in document 25. Accordingly, the Special Master finds and concludes that the allegations and transactions referenced in document 25 are not substantially similar to any of those in Relator's 1997 *qui tam* cases.

Finally, four documents (JDPD 10, JDPD 11, JDPD 12, JDPD 13) are IBLA decisions relating to various Mobil entities. JDPD 10 concerns royalty payments on carbon dioxide. Although Relator's 1997 *Qui Tam* Complaints contained allegations of carbon dioxide mismeasurement, the Special Master has previously issued a Recommendation that Relator's carbon dioxide claims against Mobil should be dismissed under the "first-to-file" rule. As a result, neither the jurisdictional discovery nor Defendants' current motions to dismiss targeted the carbon dioxide claims. There are no allegations or transactions referenced in JDPD 10 that are substantially identical to any part of the non-carbon dioxide allegations in Relator's 1997 *Qui Tam* Complaint against the Mobil entities.

JDPD 11 and 12 contain allegations that Mobil miscalculated a manufacturing allowance on liquids extracted from gas. No such allegation appears in Relator's 1997 *Qui Tam* Complaint against Mobil Exploration & Producing U.S., Inc. in case 99 MD 1618. While Relator asserts that Mobil failed to pay royalties on fuel gas used

off-lease, it does not take issue with the way in which Mobil calculated a government authorized manufacturing allowance.

JDPD 13 is an IBLA decision that considers whether Mobil should be required to pay interest and late charges on an error made in reporting condensate. Relator's allegations against Mobil include an averment that Mobil did not pay royalties on condensate, or that it caused others not to pay such royalties. However, that is not the allegation or transaction discussed in JDPD 13. The only wrongdoing referenced in JDPD 13 is Mobil's reporting error.

In sum, none of the IBLA decisions contain allegations or discuss transactions that are substantially identical the non-carbon dioxide allegations in Relator's 1997 *Qui Tam* Complaint in 99 MD 1618. Consequently, the Special Master finds and concludes that Relator's 1997 *Qui Tam* Complaint in 99 MD 1618 is not based upon any publicly disclosed allegations or transactions in JDPD 10, 11, 12, or 13.

### 10. *Government Audits and Investigations*

Another category of Exhibit 2 public disclosure documents tendered by the Defendants is comprised of materials relating to federal and state audits and investigations of specific companies (hereinafter the "Audit and Investigation Documents"). The materials include audit notices, correspondence, documentation provided by the subject company as part of the audit or investigation, and audit results. The Audit and Investigation Documents are listed on Appendix K, attached hereto. The Audit and Investigation Documents raise a host of difficult public disclosure issues including, but not limited to: (a) whether several of the documents have been properly authenticated; (b) whether state audits and investigations can qualify as public disclosures under § 3730(e)(4); [30] and (c) whether the materials have been publicly disclosed. With the exception of two of the Audit and Investigation Documents, there is no need to address these questions. Documents 276, 308, 309, 364, 370, 380, 381, 387, Supp 3–23, Supp. 3–29, and Supp. 4–1 in Exhibit 2 all concern KN Energy and/or its affiliates. Whether any of these trigger the public disclosure bar is largely immaterial, because the Special Master has already determined that both the 1995 *Qui Tam* Action Documents and many of the Grynberg Private Litigation Documents publicly disclose the allegations in Relator's 1997 *Qui Tam* case against all of the KN Defendants (99 MD 1603).

Documents 8 (Texaco), Supp. 1–15 (Anadarko), and Supp. 4–2 (Northern Michigan Exploration Company) in Exhibit 2 do not reference any Defendant named in the 1997 *qui tam* cases, or any affiliate thereof. Therefore, for the reasons discussed in Sections II(A)(3) and (4), *supra*, these documents do not constitute public disclosures of the allegations in Relator's 1997 *Qui Tam* Complaints.

 Documents 74 and 75 require further analysis because they involve a 1996 MMS audit of Southwestern Energy Pro-

---

**30.** Several of the Audit and Investigation Documents concern state audits and investigations. *E.g.*, Exhibit 2, docs. 308, 309, 387, Supp. 1–15. The law is not well settled on the question of whether state audits and investigations fall within the sources listed in 31 U.S.C. § 3730(e)(4)(A). The Third Circuit has answered the query in the negative. *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 745 (3d Cir.1997). The Eighth Circuit has come to a contrary conclusion, at least where the state audit involves a cooperative federal-state program. *Hays v. Hoffman*, 325 F.3d 982, 988 (8th Cir.2003), *cert. denied*, 540 U.S. 877, 124 S.Ct. 277, 157 L.Ed.2d 139 (2003).

duction Co., one of the Defendants in 97 MD 1670. Both items comprise correspondence between the MMS and Southwestern Energy, the subject of the audit. They do not refer to any other company. The only arguable wrongdoer was also the only apparent recipient of documents 74 and 75. Thus, while these documents may contain allegations and transactions, they do not meet the criteria of § 3730(e)(4)(A) because there is nothing in the factual record establishing that they were publicly disclosed to a third party who was a stranger to the questioned conduct. *See Holmes,* 318 F.3d at 1205; *Ramseyer,* 90 F.3d at 1520–21.

### 11. *Proposed BLM and MMS Rules, and Industry Comments*

Fifteen of Defendants' public disclosure documents consist of proposed BLM or MMS Rules concerning gas measurement, and comments on the proposed Rules by industry members and trade associations (hereinafter the "BLM/MMS Rules and Comments Documents"). The BLM/MMS Rules and Comments Documents are listed in Appendix L.

■ The Special Master finds and concludes that the proposed Rules are "administrative reports," within the meaning of 31 U.S.C. § 3730(e)(4)(A), because (a) they constitute official federal government action; and (b) they provide notification and information. *United States ex rel. Reagan v. East Texas Med. Ctr. Reg'l Healthcare Sys.,* 384 F.3d 168, 176 (5th Cir.2004); *United States ex rel. Mistick PBT v. Housing Auth.,* 186 F.3d 376, 389 (3d Cir. 1999), *cert. denied,* 529 U.S. 1018, 120 S.Ct. 1418, 146 L.Ed.2d 310 (2000). Also, to the extent that the industry comments disclose the contents of the proposed Rules, they emanate from the same statutory listed

source. The Special Master will assume for purposes of discussion that all of the BLM/MMS Rules and Comments Documents have been publicly disclosed.[31]

■ Despite their status as public disclosures from statutory listed sources, the BLM/MMS Rules and Comments Documents are disqualified from operating as triggers of the public disclosure bar. None of these documents contain any allegations of wrongdoing, nor do they cast any particular company's measurement practices in a questioning light. Indeed, most of these documents do not identify by name or description any gas producers, gas purchasers, gas pipelines, or gas measurers. *See* Documents 11, 12, 14, 16, 19, 20. Some company comments do discuss the impracticality of various measurement rules sought to be imposed, and one might speculate from such discussions that the companies' current or past practices did not conform to the proposed rule changes. However, the Special Master finds and concludes that the BLM/MMS Rules and Comments Documents do not disclose the actual measurement practices of specific companies with sufficient clarity to meet the $X + Y = Z$ test enunciated in *Springfield,* 14 F.3d at 654, or to otherwise constitute public disclosures of allegations or transactions.

### 12. *BLM and MMS Correspondence*

The documents tendered by Defendants in Exhibit 2 contain a multitude of correspondence: (a) from the BLM or MMS to the gas industry or specific members thereof; (b) from gas producers, transporters, and purchasers to the BLM or MMS; and (c) between employees of the BLM or MMS relating to gas measurement issues (hereinafter the "BLM and

---

**31.** For the most part, Relator has not interposed objection to the BLM/MMS Rules and

Comments Documents on the ground of authenticity.

MMS Correspondence Documents"). The BLM and MMS Correspondence Documents are listed on Appendix M.

We may dispense with detailed analysis of several of the BLM and MMS Correspondence Documents because even assuming that they contain publicly disclosed allegations of gas mismeasurement emanating from statutory listed sources, they bring no additional 1997 *qui tam* cases or Defendants within the ambit of the public disclosure bar. Documents 53, Supp. 6–140, Supp. 6–141, Supp. 6–142 in Exhibit 2 concern companies that are not Defendants in the 1997 *qui tam* actions. Also, documents 44, 317, 318, 366, 367, 378, 382, 383, 384, 385, 406, Supp. 1–12, Supp. 1–13, Supp. 3–15, Supp. 3–16, Supp. 3–21, and Supp. 3–26 relate directly or indirectly to companies whose alleged wrongdoing has already been deemed to have been publicly disclosed by the 1995 *Qui Tam* Action Documents, the Grynberg Private Litigation Documents, and/or the Non–Grynberg Private Litigation Documents.

All of the remaining BLM and MMS Correspondence Documents may meet one or more of the criteria established in § 3730(e)(4)(A). However, with a few exceptions, each fails to meet some critical element of the statutory public disclosure test. For example, documents 45, 46, 47, 48, 49, 52, 53, 56, 240, and Supp. 1–4 in Exhibit 2 are informational letters and notices from the BLM, MMS or the Alberta Utilities Board sent to lessees, operators and/or royalty payors discussing various policy and administrative matters relating to gas measurement. Virtually all of these materials probably qualify as "administrative reports" within the meaning of § 3730(e)(4)(A),[32] but they do not contain

allegations or transactions. They are informational rather than accusatory in content, and do not place the government on the trail of wrongdoing committed by any identifiable company or group of companies.

Additionally, as to some of the BLM and MMS Correspondence Documents, and particularly those that consist of internal communications between government personnel, there is nothing in the factual record indicating that they were ever publicly disclosed. *See* Documents 54, 246, and JDPD 7. The same lack of evidence demonstrating public disclosure applies to documents 44 and Supp. 3–9, 73, 195 (letters from the BLM to specific companies regarding gas measurement).

Finally, documents Supp. 6–141, Supp. 6–142, Supp. 6–143, Supp. 6–144, and JDPD 16 do not contain "allegations or transactions." Furthermore, there is no indication that JDPD 16 was publicly disclosed, and it does not appear that Supp. 6–141 and Supp. 6–143, consisting of correspondence from private companies to the MMS, discuss public disclosures from sources listed in § 3730(e)(4)(A).

13. *State Government Correspondence and Memoranda*

Included in Exhibit 2 are several letters to and from various state agencies, as well as some internal memoranda and correspondence generated by state agency employees (hereinafter the "State Government Correspondence and Memoranda Documents"). These items are listed in Appendix N.

All of the State Government Correspondence and Memoranda Documents relate

---

**32.** Document 49, an informational notice from the Alberta Utilities Board, does not emanate from one of the sources listed in the FCA. *See Yannacopolous,* 315 F.Supp.2d at 948–49 (statutory listed sources do not include foreign administrative action or proceedings).

to gas measurement issues. With the exception of four items (Exhibit 2, documents 224, 315, 386 and Supp. 1–1), the entire set of State Government Correspondence and Memoranda Documents consists either of correspondence between Grynberg, Rocky Mountain Natural Gas Company, the Colorado Board of Land Commissioners (CBLC), and/or the Colorado Attorney General's office regarding gas measurement problems in the Blue Gravel Field, or memoranda of CBLC employees memorializing the results of Blue Gravel meter inspections. At best, these documents (documents 39, 310, 311, 312, 313, 314, 379, JDPD 8, JDPD 24, and JDPD 25) may constitute public disclosures of allegations or transactions affecting Rocky Mountain Natural Gas and its affiliates. Document 315 relates primarily to Rocky Mountain Natural Gas, but also references a gas measurement issue in New Mexico involving Transwestern. Because the Special Master has already found that the allegations in Relator's 1997 *qui tam* cases against the KN and Transwestern entities (97 MD 1603 and 97 MD 1608) were publicly disclosed by other Exhibit 2 materials, there is no need to engage in further analysis of this subset of State Government Correspondence and Memoranda Documents.

 Document 224 is a letter from Chevron to the County Commissioners of Webb County, Texas and Judge Mercurio Martinez regarding the Martinez A–1 lease. It responds to a fax by Grynberg alleging that Coastal Flow Measurement was mismeasuring Btu content, thereby shortchanging Judge Martinez, a royalty owner. Although the letter does not specifically address the matter, it appears that Chevron was the operator and Valero was responsible for gas measurement on the subject lease. The document certainly contains publicly disclosed allegations of

gas mismeasurement. However, it does not constitute an administrative report, nor is it there anything in the record indicating that it was sent in connection with an administrative investigation or audit. In short, whatever allegations it may contain do not appear to have their genesis in one of the sources listed in § 3730(e)(4)(A).

Document 386 is a 1996 letter from the Colorado Board of Land Commissioners to the Idaho Department of Lands indicating that Grynberg's 1995 *qui tam* action should be a subject of discussion at an upcoming meeting. For the reasons discussed below in connection with document Supp. 1–1, the phrase "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation," as contained in § 3730(e)(4)(A), does not include reports from non-federal sources. Further, even if state administrative reports do fall within the ambit of § 3730(e)(4)(A), it is doubtful that document 386 would qualify as a "report," since it does not constitute an official action of an administrative agency. In any event, even assuming that document 386 triggers the public disclosure bar, its scope is limited to the 1995 *qui tam* case and the defendants named therein or their affiliates. Thus, it would add nothing in terms of scope to the public disclosure bar triggered by the 1995 *Qui Tam* Action Documents. *See* Section II(A)(4), *supra.*

The final item in the set of State Correspondence and Memoranda is document Supp. 1–1. It is a letter from the State Oil and Gas Board of Alabama to Braxton Comer Counts III, attaching a comprehensive State Oil and Gas Board report entitled "Evaluation of Metering and Sampling Techniques for the Sale of Offshore Natural Gas Production from Alabama State Lands" (the "Evaluation Report"). The Evaluation Report indicates that it was prepared for the State Lands Division of

the Alabama Department of Conservation and Natural Resources. It contains a detailed analysis of gas measurement procedures utilized by specified companies, including Mobil Oil Exploration & Producing Southeast, Inc., Shell, Exxon, Offshore Group, Inc., Callon Petroleum, Legacy Resources Co., Scana Petroleum Resources, Mobile Gas Company, and Transcontinental Gas Pipeline. In addition to the explanation of the measurement techniques employed by these companies, the Evaluation Report also discusses many of the gas measurement issues raised in Relator's 1997 *Qui Tam* Complaints, such as metering and chart integration, use of filters, upstream vs. downstream sampling, "wet" vs. "dry" Btu calculations, and the Joule Thompson effect. Although the Evaluation Report does not contain allegations of wrongdoing, it does discuss the gas measurement techniques utilized by specific companies, and along with other documents, such as Relator's 1995 *Qui Tam* Complaints, may arguably disclose "transactions," from which wrongdoing can be inferred. *See Praxair*, 389 F.3d at 1051; *Springfield*, 14 F.3d at 654. While it is not entirely clear that the Evaluation Report was publicly disclosed, its submission to Braxton Comer Counts, who appears to be a stranger to the fraud, would fulfill this element of § 3730(e)(4)(A).

Several of the companies identified in Supp. 1–1 are not involved in the 1997 *qui tam* cases (Callon Petroleum, Offshore Group, Inc., Legacy Resources Co., and Scana Petroleum Resources, Mobile Gas Company). Two others are already covered by other public disclosures that the Special Master has determined meet the criteria of 31 U.S.C. § 3730(e)(4)(A) (Exxon and Transcontinental). There are two additional entities discussed in the Evaluation Report that do not fall within either of these categories. Mobil Oil Exploration and Producing Southeast, Inc., and Shell (a) are either named as Defendants in 1997 *qui tam* cases or are affiliates of named Defendants (97 MD 1616 and 97 MD 1629); and (b) are not the subject of previously analyzed documents that have been held to trigger the public disclosure bar. As to these entities, the difficult question remaining is whether the Evaluation Report emanates from one of the sources listed in the FCA.[33]

There is no reported decision from the Tenth Circuit squarely addressing the issue of whether a state administrative report falls within 31 U.S.C. § 3730(e)(4)(A). *Ramseyer* analyzed the public disclosure issue in the context of a state audit, but concluded that the audit had never been publicly disclosed. As a result, the opinion contains no discussion of whether the state audit document was an "administrative audit," within the meaning of § 3730(e)(4)(A).

The case law on the subject is exceedingly sparse. The United States Court of Appeals for the Third Circuit, and a decision from the United States District Court for the Northern District of California have expressly held that state administrative reports and investigations do not qualify as public disclosures from any of the statutory listed sources. *Dunleavy*, 123 F.3d at 745; *United States ex rel. Hansen v. Cargill, Inc.*, 107 F.Supp.2d 1172, 1180 (N.D.Cal.2000). The United States Court of Appeals for the Eighth Circuit has rejected *Dunleavy* as being unduly restrictive, and has held that state reports and state administrative investigations are derived from statutory listed sources, at least where they involve a cooperative state-federal program. *Hays*, 325 F.3d at 988.

The law clearly provides that the list of sources contained in 31 U.S.C.

---

**33.** The issue was previously noted, but not resolved. *See, supra*, at 1186 n. 30.

§ 3730(e)(4)(A) is exhaustive. *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499–1500 (11th Cir.1991); *United States ex rel. LeBlanc v. Raytheon Co., Inc.*, 913 F.2d 17, 20 (1st Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991). Thus, in order for the Evaluation Report to qualify as a public disclosure bar trigger, it must be deemed "a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation. . . ." 31 U.S.C. § 3730(e)(4)(A). While the question is by no means free from doubt, the Special Master finds and concludes that the rationale of *Dunleavy* and *Cargill* is persuasive. The word "administrative" is sandwiched between "congressional" and "Government Accounting Office reports," both of which obviously refer to federal governmental entities. The doctrine of *noscitur a sociis* dictates that the word "administrative" should likewise be read as referring to federal, as opposed to state sources. This construction is also consistent with the policy underlying the *qui tam* provisions of the FCA. The public disclosure bar is designed to preclude private parties from suing on behalf of the federal government when the government has already been placed on notice of fraudulent activities impacting the federal fisc. Reports generated by the myriad of state, county, and local administrative agencies that do not relate to joint state-federal programs are unlikely candidates to fulfill the notice function.

Accordingly, the Special Master finds and concludes that document Supp. 1–1 is not derived from a listed source and, therefore, cannot trigger the public disclosure bar.

### 14. *BLM Audit and Inspection Procedures Documents*

Three documents (50, 51, and 55) in Exhibit 2 relate to the BLM's procedures for conducting well inspections and audits. Document 50 is a letter from the BLM to field personnel discussing the establishment of manual and handbook guidance for oil and gas inspection and enforcement strategy. Document 51 is a BLM Inspection and Enforcement Strategy Manual outlining the procedures to be utilized by field personnel when performing well inspections, meter calibration checks, chart verifications, and other gas measurement monitoring functions. Document 55 is an audit of the Inspector General reviewing the BLM's inspection and enforcement program. It notes serious problems in insuring accurate reporting and recommends development of a production and sales volume verification program, as well as better training of inspectors.

 Although all three of these documents were generated to assist the BLM in developing better procedures to uncover and correct instances of gas mismeasurement, none of them qualify as a trigger of the public disclosure bar. There is no indication that the three BLM Audit and Inspection Procedures Documents were disclosed to third parties outside of the Department of the Interior. More importantly, none of the documents contain allegations directed at any identifiable wrongdoer, nor do they discuss transactions from which one might infer that a particular company or group of companies had mismeasured the volume or heating content of gas produced from wells on federal or Indian lands.

### 15. *Inter–Company and Intra–Company Correspondence*

Defendants have included within Exhibit 2 correspondence between companies in the gas industry, as well as correspondence between personnel of the same company, discussing gas measurement issues

(hereinafter the "Inter–Company and Intra–Company Correspondence Documents"). A list of the Inter–Company and Intra–Company Correspondence Documents is contained in Appendix O.

 None of the Inter–Company and Intra–Company Correspondence Documents meet the statutory criteria of § 3730(e)(4)(A). With two exceptions, all of the documents in this category consist of: (a) letters from Grynberg Petroleum to Rocky Mountain Natural Gas or KN Energy regarding gas measurement issues; (b) Grynberg Petroleum internal memoranda concerning gas measurement by Rocky Mountain, KN, or Florida Gas Transmission Company; or (c) Rocky Mountain interoffice memoranda concerning gas measurement problems in the Blue Gravel Field and Grynberg's allegations of gas mismeasurement. Although many of these documents contain or discuss allegations of under-measurement of gas volume and heating content, none of them emanate from one of the sources listed in § 3730(e)(4)(A). Additionally, a few of the Inter–Company and Intra–Company Correspondence Documents post-date the filing of the 1997 *qui tam* cases (*see* documents 124 and 362).

Document Supp. 6–142 is a letter from Chevron U.S.A. Production Company to Union Pacific Resources Company requesting that Union Pacific become "Operators' Representative" for the injectors delivering production to the Bayou Black Reseparation Facility. The document was not generated by, and does not discuss anything originating from a statutory listed source.

Document 319 is a letter from Grynberg to a legal assistant at a law firm in Texas stating that Grynberg will testify regarding Btu analysis based on work done by him and Dr. Lee. The letter does not identify the legal action, but it appears to concern the *TUFCO* case. There is no indication that the letter was filed in any court proceeding, nor does the letter discuss the contents of any document that may have been filed with the clerk of a court. Like the other Inter–Company and Intra–Company Correspondence Documents, document 319 does not contain public disclosures from one of the statutory listed sources.

Even if one or more of the Inter–Company and Intra–Company Correspondence Documents were legally capable of triggering the public disclosure bar, the only potential perpetrators named in them or identifiable by implication are Rocky Mountain Natural Gas, KN Energy, Florida Gas Transmission Company, and perhaps TUFCO and Union Pacific Resources. Neither TUFCO, nor Union Pacific Resources, nor any of their respective affiliates are involved in the 1997 *qui tam* cases. Each of the remaining entities (Rocky Mountain, KN Energy, Florida Gas Transmission Co.) was a named defendant in the 1995 *qui tam* action. The Special Master has already concluded that, as to the cases involving these companies (97 MD 1603 and 97 MD 1625), Relator must establish that he is an original source. Consequently, even assuming that the Inter–Company and Intra–Company Correspondence Documents constitute public disclosures from listed sources of allegations and transactions substantially similar to those alleged by Relator, they would not bring any additional Defendants or cases within the ambit of the public disclosure bar.

16. *Newspaper Articles Relating to Michigan State Investigation of Underpayments of State Gas Royalties*

In May of 1997, several articles appeared in Michigan newspapers concerning

audits conducted by the state attorney general and the state auditor (hereinafter the "Michigan Audit Articles"). A list of the Michigan Audit Articles is contained in Appendix P. The audits revealed that the state of Michigan was being shortchanged by millions of dollars on gas royalties. Most the articles discussed the auditors' allegations that Terra Energy Ltd. cheated Michigan on royalty payments by selling gas at reduced price to one of its affiliates who, in turn, resold the gas to Michigan Consolidated Gas at a significantly higher price. Although this price manipulation scheme was the primary focus of the audits, the articles also described problems with meter equipment and calibration that were responsible for underpayment of royalties. Finally, a few of the articles noted that gas companies were still deducting post-production costs from amounts owed to private mineral owners.

All of the Michigan Audit Articles were generated by the news media, one of the sources listed in the FCA. They contain allegations that were obviously publicly disseminated. It is a debatable whether the allegations in Relator's 1997 *Qui Tam* Complaints are substantially similar to those in the Michigan Audit Articles. Relator's pleadings do not address the matter of price manipulation through transactions with affiliates. Nevertheless, the Michigan Audit Articles contain some allegations relating to gas mismeasurement and, thus, may arguably trigger the public disclosure bar under the Tenth Circuit's "based in any part" rule. *See Precision I,* 971 F.2d at 552 (the public disclosure trigger is pulled if the *qui tam* action is based in any part upon publicly disclosed allegations or transactions).

The only companies actually identified in the Michigan Audit Articles are Terra Energy Ltd., two affiliates of Terra (CMS-NOMECO Oil and Gas Co., and Energy Acquisitions Operating Corp.), Howard Energy Company, and Michigan Consolidated Gas Company. Energy Acquisitions Operating Corp. and Howard Energy Co. are not parties to the 1997 *qui tam* cases. CMS–NOMECO, Terra Energy, Ltd., and Michigan Consolidated Gas Co. are named Defendants in the 1997 *qui tam* actions (99 MD 1633 and 99 MD 1634), but allegations of gas mismeasurement concerning these entities were publicly disclosed in Relator's 1995 *Qui Tam* Complaints. Consequently, like many other categories of documents previously discussed, even assuming the Michigan Audit Articles operate to trigger the public disclosure bar, they do not expand the reach of the bar to any additional Defendants named in the 1997 *qui tam* suits.

### 17. *Miscellaneous Documents*

In addition to the 16 categories of public disclosure documents discussed above, Exhibit 2 includes a variety of miscellaneous documents which: (a) do not qualify as triggers of the public disclosure bar; (b) arguably contain allegations or transactions concerning companies not named in the 1997 *qui tam* cases; or (c) concern companies whose alleged misconduct has already been deemed to have been publicly disclosed.

1. Documents 232 and 233 are Reports of the Comptroller General of the United States on oil and gas royalty collections and accounting. They point to a number of deficiencies in the government's inspection and auditing process that have resulted in millions of dollars of unpaid or underpaid royalties. By implication, the Reports certainly suggest that royalty payors and/or gas measurers have not complied with their obligations to the federal government. However, neither of these documents identifies nor otherwise

places the government on the trail of any particular wrongdoers. As a result, these two documents suffer from the same deficiency as do the Senate Committee Documents discussed in Section II(A)(3), and cannot qualify as triggers of the public disclosure bar.

2. Documents 229, 405, Supp. 6–145, and Supp. 6–146 are not identified by author, caption or date. Without such information, the Special Master cannot conduct an analysis to determine if they operate to trigger the public disclosure bar. It does not appear, however, that any of these documents were generated by a statutory listed source or that they were publicly disclosed.

3. Documents 225, 278, 301, 333, and JDPD 15 are privately generated inspection reports, measurement verification audits, gas analysis reports, and analyses of company financial statements. None of them emanate or discuss information from a statutory listed source and, with respect to documents 225, 278, 301, and JDPD 15, there is no indication that they were publicly disclosed.

4. Document 168 is a transcript of a presentation made by Grynberg at a Zapata, Texas County Commissioner's Court meeting on February 21, 1997, regarding gas mismeasurement. It appears that the purpose of the presentation was to convince the County to hire an investigator and, if underreporting were found, to have Grynberg pursue collection claims on the County's behalf. At the end of the meeting, a vote was taken to approve Grynberg's proposal. Although the point is debatable and the case law on the matter is exceedingly sparse, the term "administrative hearing," as used in 31 U.S.C. § 3730(e)(4)(A), has been construed broadly to include all administrative proceedings. *A–1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243–44 (9th Cir.

2000), *cert. denied*, 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000). It also appears that in Texas, the County Commissioner's Court is deemed to be at least in part administrative in nature. *San Antonio v. City of Boerne*, 61 S.W.3d 571, 578 (Tex.App.2001), *rev'd on other grounds*, 111 S.W.3d 22 (Tex.2003). Document 168 includes numerous publicly disclosed allegations and transactions involving gas mismeasurement.

■ The Special Master finds and concludes that document 168 triggers the public disclosure bar as to any 1997 *qui tam* Defendants or affiliates of Defendants who are expressly or by implication identified therein. The only gas measurers expressly identified in the Zapata County transcript are Questar, KN Energy, and Enron, all of whom are subjects of other publicly disclosed allegations triggering the public disclosure bar. Additionally, Grynberg's Zapata County presentation includes a discussion of his 1995 *qui tam* case, but this discussion can have no broader reach, in terms of operating as a public disclosure bar trigger, than the 1995 *Qui Tam* Action Documents themselves. *See, supra*, Section II(A)(4). Consequently, while document 168 presents some interesting legal questions, it adds nothing new to the public disclosure inquiry.

5. Document JDPD 35 are Findings of Fact that appear to be issued by the Minnesota Public Utilities Commission relating to Minnegasco, one of the Defendants in 99 MD 1644. The Special Master has already determined that Relator's allegations in 99 MD 1644 were publicly disclosed by the 1995 *Qui Tam* Action Documents. Hence, even if JDPD 35 qualifies as a public disclosure of Relator's allegations, it does not trigger the public disclosure bar as to any new Defendants or Defendant groups.

6. Documents 40, 250, 251, 352, and 356 are newspaper articles and correspondence discussing Relator's 1997 *qui tam* cases. They post-date the filing of most of the 1997 *qui tam* actions. It is apodictic that such post-filing disclosures cannot operate as triggers of the public disclosure bar.

7. Documents Supp. 3–1, Supp. 3–2, Supp. 3–3, Supp. 3–4, Supp. 3–5, Supp. 3–6, Supp. 5–21, Supp. 5–22, Supp. 5–23, Supp. 5–24, and Supp. 5–26 are materials filed by Blue Dolphin Pipeline Company in response to a FERC Notice of Inquiry. The documents describe Blue Dolphin's business and pipeline system. Defendants provide no elucidation as to how these materials are related to the allegations in Relator's 1997 *Qui Tam* Complaints. The Special Master finds and concludes that viewing the evidence in the light most favorable to Relator, the allegations in the 1997 *Qui Tam* Complaints are not based upon any allegations or transactions contained in Supp. 3–1, Supp. 3–2, Supp. 3–3, Supp. 3–4, Supp. 3–5, Supp. 5–21, Supp. 5–22, Supp. 5–23, Supp. 5–24, and Supp. 5–26.[34]

8. Supp. 1–11 and 1–14 are correspondence between Grynberg and the BLM relating to two of Grynberg's FOIA requests. Supp. 1–11 is a letter from the BLM acknowledging Grynberg's FOIA request for a copy of an agreement between the government, Rhone Paulenc, and/or Stauffer. A copy of Grynberg's FOIA request is attached. Supp. 1–14 is a copy of Grynberg's FOIA request for documents concerning bypasses in the Nitchie Gulch Field. Although the government's response to a FOIA request is a public disclosure from one of the sources listed in the FCA, *see Praxair*, 389 F.3d at 1051, the FOIA request itself may not be. In

any event, Supp. 1–11 and 1–14, at best, relate only to Rhone Paulenc and Stauffer, neither of which are Defendants in the 1997 *qui tam* cases, and Questar, which is the subject of numerous other documents already determined to be public disclosures of allegations and transactions substantially similar to those in Grynberg's 1997 *Qui Tam* Complaint in 97 MD 1604.

9. Documents Supp. 4–6 and Supp. 4–7 are BLM well inspection reports, indicating that the inspection activities included looking for bypasses, checking meter calibration, measuring the length of upstream pipe, and calculating beta ratios. The Special Master finds and concludes that there is nothing in the factual record indicating that these well inspection reports were publicly disclosed.

10. Document 368 is a confidential attorney memorandum prepared by Vinson & Elkins discussing the claims and legal proceedings in Grynberg's private litigation against Rocky Mountain Natural Gas Co. in 87–CV–165 (Moffat County, Colorado) and the decision of the Colorado Court of Appeals in the same matter. There is nothing in the factual record suggesting that this confidential attorney work-product document was publicly disclosed.

18. *Public Disclosure Summary*

Based on the foregoing analysis, the Special Master finds and concludes that each of the following documents in Exhibit 2 constitute public disclosures emanating from a source listed in 31 U.S.C. § 3730(e)(4)(A) and containing allegations or transactions upon which one or more of the 1997 *qui tam* actions are based. Consequently, each of the following documents

---

**34.** In any event, the Special Master has already found and concluded that the 1995 *Qui Tam* Action Documents trigger the public dis-

closure bar as to Blue Dolphin. *See, supra,* Section II(A)(4).

triggers the public disclosure bar as to the cases and issues set forth below:

| | Document Number | Case and Defendants Affected |
|---|---|---|
| 1 | The 1995 *Qui Tam* Action Documents (see Appendix D)(41, 42, 106, 107, 108, 109, 110, 111, 131, 163, 166, 167, 169, 187, 188, 189, 249, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 321, 327, 349, 388, 403, Supp. 3–12, Supp. 3–14, Supp. 5–30, SD–2) | All Defendants in cases 99 MD 1601; 99 MD 1602, 99 MD 1603, 99 MD 1604, 99 MD 1605, 99 MD 1608, 99 MD 1609, 99 MD 1610, 99 MD 1611; 99 MD 1612, 99 MD 1613, 99 MD 1614, 99 MD 1624, 99 MD 1625, 99 MD 1628, 99 MD 1630, 99 MD 1632, 99 MD 1633, 99 MD 1634, 99 MD 1636, 99 MD 1637, 99 MD 1639, 99 MD 1641, 99 MD 1643, 99 MD 1644, 99 MD 1645, 99 MD 1649, 99 MD 1650, 99 MD 1651, 99 MD 1652, 99 MD 1653, 99 MD 1654, 99 MD 1655, 99 MD 1656, 99 MD 1668, 99 MD 1671, 99 MD 1682 |
| 2 | 138 | All Defendants in 99 MD 1604 |
| 3 | 139 | All Defendants in 99 MD 1604 |
| 4 | 144 | All Defendants in 99 MD 1608 |
| 5 | 151 | All Defendants in 99 MD 1603 |
| 6 | 153 | All Defendants in 99 MD 1603 |
| 7 | 155 | All Defendants in 99 MD 1603 |
| 8 | 162 | All Defendants in 99 MD 1603 |
| 9 | 170 | All Defendants in 99 MD 1609 |
| 10 | 133 | All Defendants in 99 MD 1621 |
| 12 | 194 | All Defendants in 99 MD 1626 and 99 MD 1640 |
| 13 | 203 | All Defendants in 99 MD 1661, but only as to allegation relating to failure to report or pay for recovered condensate |
| 14 | 168 | All Defendants in the cases listed in row 1 above |

As previously noted, there are many other documents in Exhibit 2 that may meet the criteria in 31 U.S.C. § 3730(e)(4)(A), but they were not fully analyzed because they would not bring additional Defendants or cases within the public disclosure bar.

### B. Original Source

Defendants have failed to come forward with a showing that the following cases are based upon public disclosures of allegations or transactions from statutory listed sources: 99 MD 1607, 99 MD 1615, 99 MD 1616, 99 MD 1617, 99 MD 1618, 99 MD 1619, 99 MD 1622, 99 MD 1623, 99 MD 1627, 99 MD 1629, 99 MD 1631, 99 MD 1635, 99 MD 1638, 99 MD 1642, 99 MD 1646, 99 MD 1647, 99 MD 1648, 99 MD 1657, 99 MD 1658, 99 MD 1659, 99 MD 1660, 99 MD 1662, 99 MD 1663, 99 MD 1664, 99 MD 1665, 99 MD 1666, 99 MD 1667, 99 MD 1669, 99 MD 1670, 99 MD 1672, 99 MD 1673, and 04 MD 1684. Under Tenth Circuit law, there is no need to consider whether Relator qualifies as an original source of the information underlying the Complaints in these cases. *E.g., Advanced Sciences,* 99 F.3d at 1004. Accordingly, the Special Master finds and concludes that, as to these cases, there is no issue of material fact in dispute, and Relator meets the jurisdictional requirements of 31 U.S.C. § 3730(e)(4) as a matter of law.

As to all of the remaining 1997 *qui tam* cases except for 99 MD 1661, Relator can survive Defendants' § 3730(e)(4) motions only if he demonstrates either that: (a) as a matter of law, he is an original source of the information underlying his *Qui Tam* Complaints; or (b) there are at least triable issues of material fact regarding his status as an original source. With respect to 99 MD 1661, Relator has met the jurisdictional requirements for his gas mismeasurement allegations. However, as to his averment that Kaiser–Francis Oil Co. failed to report or pay for recovered condensate, Relator must demonstrate that he is an original source.

### 1. Governing Legal Principles

#### a. Direct and Independent Knowledge

The FCA defines an "original source" as "an individual who has direct and independent knowledge of the infor-

mation on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Under Tenth Circuit law, the word "allegations" in § 3730(e)(4)(B) refers to the allegations in a relator's *qui tam* complaint rather than the allegations in the public disclosure. *E.g., United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 800 (10th Cir.2002); *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir.1999).[35] Knowledge is "direct and independent" if it is "marked by an absence of an intervening agency ... [and] unmediated by anything but the relator's own labor." *MK–Ferguson*, 99 F.3d at 1547. Stated differently, an "original source," is one who discovers the information on which the allegations of the *qui tam* complaint are based through his or her own efforts, and his or her information was not derivative of the information of others. *Hafter*, 190 F.3d at 1162. Once the public disclosure bar has been raised, a relator can hurdle it only by alleging and proving specific facts, as opposed to mere conclusions, showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint. *Id.* Also, a relator cannot achieve original source status by basing allegations on speculation or surmise. *Aflatooni*, 163 F.3d at 526.

 Under the Tenth Circuit view of original source, the inquiry focuses on the source of a relator's knowledge—where and how the relator obtained the information on which his or her allegations

are based. However, the phrase employed by Tenth Circuit cases to describe sources that are acceptable—those "marked by an absence of an intervening agency ... [and] unmediated by anything but the relator's own labor"—does not provide much guidance. Fortunately, there is a substantial body of case law in the Tenth Circuit and elsewhere that assists in defining the parameters of the "direct and independent knowledge" requirement. For example, a relator's ability to recognize the legal consequences of a publicly disclosed transaction and label it fraudulent does not qualify him or her as an original source. *FPC–Boron*, 105 F.3d at 688. The fact that a relator has background information or unique expertise allowing him or her to understand the significance of publicly disclosed allegations and transactions is also insufficient. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1159 (3d Cir.1991). Generally speaking, the relator must have acquired knowledge by seeing the fraud with his own eyes or by learning of the fraud through his own labor. *Praxair*, 389 F.3d at 1053; *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 (9th Cir.1996), *cert. denied*, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996). A plaintiff who provides only speculation, second-hand information, background information, or collateral research does not qualify as an original source. *Hafter*, 190 F.3d at 1162–63.

 As Relator correctly observes, it is not necessary to have knowledge of the actual fraudulent submissions to the government in order to secure original

---

**35.** The Circuits are deeply divided on the question of whether the word "allegations" in § 3730(e)(4)(B) refers to the allegations in a relator's complaint (the Third, Ninth and Tenth Circuits adopt this view) or to the allegations in the public disclosure (the Fourth,

Fifth, Sixth, Eighth and D.C. Circuits espouse this view). For a good discussion of this division in the Circuits, see *United States ex rel. Laird v. Lockheed Martin Eng'g and Sci. Servs. Co.*, 336 F.3d 346, 353–54 (5th Cir. 2003).

source status. *Kennard*, 363 F.3d at 1044. Furthermore, contrary to the position advanced by the Defendants, a relator is not required to have direct and independent knowledge of information supporting all of the material elements of the alleged fraud. Rather, a relator may qualify as an original source by having direct and independent knowledge of any essential element of the underlying fraud transaction (i.e. either the true state of facts or the misrepresented stated of facts). *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050 (8th Cir.2002) ("If the relator has direct knowledge of the true state of the facts, it can be an original source even though its knowledge of the misrepresentation is not firsthand."), *cert denied*, 537 U.S. 944, 123 S.Ct. 345, 154 L.Ed.2d 252 (2002); *Springfield*, 14 F.3d at 657.

The paradigmatic original source is a whistle-blowing insider who is a willing or unwilling participant in the fraud or who discovers the fraudulent scheme while performing his or her job duties. *E.g., Stone*, 282 F.3d at 800–01; *Sandia*, 70 F.3d at 571 ("The FCA's jurisdictional scheme seeks 'the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.' "). Such corporate insiders present few difficult original source issues because the information on which they base their allegations is usually first-hand and not derivative of the efforts of others. However, once we leave the realm of "whistle-blowing insiders," the waters become murky. Victims of fraudulent activity, public employees and officials charged with investigating fraud as part of their job duties, and opportunistic third parties having little or no connection with the fraud but seeking the financial rewards offered by the FCA have all met with mixed success in achieving original source status.

Perhaps the most difficult scenario from an analytical standpoint is where, as here, a relator claims original source status based upon information derived from an independent investigation, rather than from information obtained as a company insider. Most Circuits, including the Tenth Circuit, have declined to establish a *per se* rule that a relator cannot be an original source when the information supporting his or her *qui tam* complaint is gathered through an independent investigation. *See Kennard*, 363 F.3d at 1044–45; *see also Springfield*, 14 F.3d at 655; *Stinson*, 944 F.2d at 1161; *Yannacopolous*, 315 F.Supp.2d at 953–54. No litmus test has been established that definitively instructs on when an independent investigation will suffice to qualify a relator as an original source and when it will not. Indeed, the reported cases provide little in the way of generally accepted meaningful guidelines to aid in deciding on which side of the line a particular fact scenario may fall. Even within our own Circuit, the case law is confusing. *Compare Kennard v. Comstock Res., Inc.*, 363 F.3d 1039 (10th Cir.2004) (Relator Kennard found to be an original source based on his investigation of innocuous documents in the public domain), *with Praxair*, 389 F.3d at 1038 (independent investigation cannot meet original source requirement where material elements of the fraud are already in the public domain).

The Special Master finds and concludes that the same two primary factors control the direct and independent knowledge requirement, regardless of whether the relator claims original source status as a result of an independent investigation, as a corporate insider, as a victim of the alleged fraudulent activity, or on some other basis. The first of these factors is the source of

the relator's knowledge regarding the information supporting his allegations (hereinafter the "Source of Knowledge Factor"). The Source of Knowledge Factor is derived from the express language of § 3730(e)(4)(B), which focuses squarely on how and where the relator's knowledge is obtained ("direct and independent knowledge of the information. . . ."). It is also the linchpin of the original source analysis under Tenth Circuit law. *E.g., Hafter,* 190 F.3d at 1162 (direct and independent knowledge is knowledge "marked by the absence of an intervening agency . . . [and] unmediated by anything but the relator's own labor;" quoting *MK–Ferguson,* 99 F.3d at 1547).

The application of the Source of Knowledge Factor clearly is more complicated when a relator claims original source status based upon an independent investigation. This is because the investigation typically will rely, at least to some degree, on non-original source material, such as a review of public records. On the one hand, *Kennard* teaches that reliance upon some non-original source information is not a disqualifier. On the other hand, where a relator's reliance upon non-original source information is extensive, his role as a source of important knowledge becomes subordinated to his role as a mere compiler of the knowledge of others. The case law draws no bright line to guide in the application of the Source of Knowledge Factor.

The second factor is the extent to which the information supporting relator's allegations was already in the public domain (hereinafter the "Public Information Factor"). Regardless of where or how the relator obtained knowledge of the information supporting the allegations of fraud, the efforts are for naught if the material elements of the alleged fraud are already in the public domain. *See Praxair,* 389 F.3d at 1054; *Kennard,* 363 F.3d at 1045; *see also Springfield,* 14 F.3d at 655 ("Thus, a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator comes forward with additional evidence incriminating the defendant."). In the context of an independent investigation, the public information factor assures that the relator brings something of real value to the table. The relator must be the one who ferreted out the fraud by being the first to uncover either the true state of facts or the misrepresented facts, which together comprise the fraudulent scheme. *Kennard,* 363 F.3d at 1046.

The Public Information Factor of the original source inquiry is separate and distinct from the public disclosure bar set forth in § 3730(e)(4)(A). If this were not so, the public disclosure and original source inquiries would conflate in a manner at odds with the statutory language and intent. *See Precision I,* 971 F.2d at 552 n. 2. Much of the information in the public domain does not qualify to trigger the public disclosure bar because it does not meet one or more of the technical requirements of 31 U.S.C. § 3730(e)(4)(A). For example, it may not contain "allegations or transactions," or it may not be derived from one of the statutory listed sources. Yet, to the extent that all the information underlying the *qui tam* allegations is already available to the public in general, the relator has not provided the requisite benefit to justify the rewards afforded by the FCA. Additionally, while a relator's own prior allegations may trigger the public disclosure bar, they should not be considered as "public domain" information for purposes of the original source analysis. A contrary result would defeat the purpose for including the original source exception in the 1986 amendments

to the FCA. *See FPC–Boron,* 105 F.3d at 679–81 (discussing the history of the FCA's *qui tam* jurisdictional provisions and Congress' intention that the 1986 amendments legislatively overrule the decision in *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984)).

Relator asserts that where original source status is claimed based upon an independent investigation, both the Source of Knowledge Factor and the Public Information Factor give way. He asseverates that the only relevant inquiry in such a situation is whether the relator was the first to uncover the fraudulent scheme. According to Relator, if the answer to this query is in the affirmative, then original source status is achieved even though all of the material elements of the fraud are contained in publicly available information, and the investigation consists of simply obtaining second-hand knowledge from reviewing public documents and interviewing third parties. Relator claims that the Court of Appeals for the Tenth Circuit adopted his position in *Kennard.*[36]

*Kennard* involved two relators. The Tenth Circuit's decision indicates that Relator Wright

did not refer to, examine, or rely on any public records. He relied exclusively on his own personal, private royalty records and statements from Comstock [the de-

fendant] and other oil companies. He noticed that when Comstock took over the lease on one of his properties, his royalty payments dropped dramatically.

*Kennard,* 363 F.3d at 1046. Based on the court's description, Relator Wright's source of knowledge met the classic Tenth Circuit test. Wright's knowledge came solely from his own private records that he personally reviewed.[37] It was marked by the absence of an intervening agency and unmediated by anything but the relator's own labor. Relator Kennard did examine public records in the course of his independent investigation. Yet, the appellate court took pains to point out that collectively Wright and Kennard "sorted through relatively obscure public documents and, together with personal royalty records, used these documents to discover and support their claim of alleged fraud." *Id.* at 1046.

According to the court of appeals, the following key factors qualified Wright and Kennard as original sources: First, the suspicion of fraud originated with them, and this suspicion was derived from Wright's own personal records. Second, at least one of the relators relied exclusively on his own private records and nonpublic royalty statements. Third, other than Wright's own personal royalty records, the only information relied upon by

36. There is some limited support for Relator's argument by way of dictum in at least one decision from another Circuit. The Seventh Circuit has suggested that in an exceptionally complex allegation of fraud, a perspicacious relator might attain original source status even though every isolated element of the fraud is based upon information in the public domain. *Mathews,* 166 F.3d at 864.

37. Relator contends that neither Wright nor Kennard had any first hand knowledge and both relied solely on public information. In support of his position, Relator refers to materials filed with the *Kennard* Petition for Cer-

tiorari to the United States Supreme Court, and provides Exhibit KK to his Sur–Reply Brief that purports to summarize these materials. In essence, the summary suggests that the Court of Appeals at least partially mischaracterized the evidentiary record in its opinion. The Special Master finds and concludes that the analysis contained in the Tenth Circuit's decision in *Kennard* must be viewed solely in light of the facts as summarized therein. This is true even if a review of the entire evidentiary record in *Kennard* might indicate that the Tenth Circuit's factual summary is inaccurate.

Wright and Kennard to construct their fraud claim was innocuous information in obscure public documents. In short, the fraud claim was originated and constructed solely by Wright and Kennard, and their knowledge was derived solely from reviewing Wright's own records and public documents that did not disclose the fraud.

The latest decision from the United States Court of Appeals for the Tenth Circuit, *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038 (10th Cir. 2004) also sheds light on the validity of Relator's reading of *Kennard.* The *Praxair* court's extended discussion of *Kennard* points out that: (a) Wright did not refer to, examine, or rely on any public records; (b) while Kennard did rely on public records in the course of his independent investigation, he did more than compile statistics; (c) no government report disclosed the alleged fraud; and (d) the relators ferreted out the alleged fraud. It is particularly noteworthy that the *Praxair* court found nothing in *Kennard* that materially altered the two fundamental principles which have traditionally driven Tenth Circuit decisional analysis of original source issues; namely, that direct and independent knowledge cannot be derivative of the information or labors of others, and that a relator cannot be an original source if all material elements of the alleged fraud are already in the public domain.

In sum, the Special Master finds and concludes that contrary to Relator's argument, *Kennard* does not reject either the Source of Knowledge or the Public Information factor. Thus, in order to demonstrate original source status based upon an independent investigation, a relator must show that: (a) a substantial amount of the knowledge of the key information underlying the allegations in the complaint is first-hand, and not derived from the knowledge or labors of others; and (b) he or she was the first to uncover a material element of the fraud (*i.e.*, either the true state of facts or the misrepresented facts) that had not previously been in the public domain.

*b. Voluntary Disclosure to the Government*

Part and parcel of the original source test is the statutory mandate that prior to filing suit, a relator must voluntarily provide information to the government. As the express language of the § 3730(e)(4)(B) makes clear, the direct and independent knowledge and voluntary disclosure to the government elements of original source are inextricably interrelated. In the very same sentence, the statute identifies the type of information that a relator must have to qualify as an original source (i.e. information derived from the relator's "direct and independent knowledge"), and requires that "the information" be voluntarily provided to the government before filing a *qui tam* suit.

There is a dearth of authority in the Tenth Circuit and elsewhere discussing the voluntary disclosure branch of the original source requirement. As noted in *King,* 264 F.3d at 1280: "[T]he courts have not settled on what it means to have 'voluntarily provided the information to the Government before filing an action.'" (quoting 31 U.S.C. § 3730(e)(4)(B)). The *King* court determined that what must be provided to the government prior to filing suit are "the essential elements or information on which the *qui tam* allegations are based." *Id.* The court also recognized the interrelationship between the voluntary disclosure branch and the direct and independent knowledge branch of original source: "In order to avoid the jurisdictional bar created by 'public disclosure,' a relator must have direct and independent knowledge of the information on which the *qui tam* alle-

gations are based and must have provided the same information to the government before filing the *qui tam* action." *Id.* (emphasis added).

Other cases also suggest that a relationship exists between the direct and independent knowledge requirement and the voluntary disclosure requirement. For example, in *United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F.Supp. 1010 (E.D.Va.1995), the United States District Court for the Eastern District of Virginia concluded that a relator's showing of direct and independent knowledge is not limited to the information contained in the written disclosure statement submitted pursuant to 31 U.S.C. § 3730(b)(2). Rather, the Court noted that for purposes of § 3730(e)(4)(B), "the assessment of relator status should take into account all of the information that the putative relator has communicated to the government prior to the filing of the action." *Detrick*, 909 F.Supp. at 1017. The court then concluded that "the sum total of direct and independent knowledge Detrick imparted to the various government agents with whom he discussed the rebilling scheme should be considered in evaluating whether he is an 'original source' of the allegations." *Id.*

■ The Special Master concurs in *Detrick's* conclusion that in assessing whether a relator has "direct and independent knowledge of the information" on which his allegations are based, the "information" to be considered is that which was voluntarily provided to the government prior to the filing of the *qui tam* case. A relator may utilize any information voluntarily disclosed to the government before filing suit in order to demonstrate direct and independent knowledge of the information on which the allegations in the *qui tam* complaint are based. Conversely, however, a relator is precluded from attempting to establish that he or she is an

original source by proffering information that was not submitted to the government in accordance with § 3730(e)(4)(B). In short, if a relator does not deem information important enough to voluntarily disclose it to the government before filing suit, he should not be allowed to later rely upon it to establish his status as an original source.

■ Unlike the disclosure provision in 31 U.S.C. § 3730(b)(2), there is no requirement in § 3730(e)(4)(B) that information be served on the government in accordance with Fed.R.Civ.P. 4. As a result, the information may be provided to the Department of Justice, a United States Attorney, the FBI, some other suitable law enforcement agency, or to the agency or official responsible for the particular claim in question. *See Mathews*, 166 F.3d at 865. Additionally, there is no limitation on the manner in which information may be provided to the government. Voluntary oral as well as written disclosures prior to filing suit qualify under 31 U.S.C. § 3730(b)(2). The only temporal restriction is that the information must be given to the government before filing suit. It appears that any voluntary disclosures before suit is filed will qualify, whether they are contained in one comprehensive submission or are provided piecemeal.

■ Although a relator is afforded considerable leeway in voluntarily providing his information to the government, his proof of compliance must comport with the evidentiary standard established by the Tenth Circuit in *Hafter*: Voluntary disclosure to the government must be demonstrated by specific facts indicating what was disclosed, when and to whom the disclosure was made, and what information was imparted. *Hafter*, 190 F.3d at 1162–63. Conclusory assertions that "everything was provided," or that "we discussed

everything," or that "I gave them everything they asked for," are insufficient.

### 2. *Relator's Independent Investigation*

Viewed in the light most favorable to Relator, the following paragraphs summarize the factual record regarding Relator's independent investigation.

The 1997 *qui tam* cases can be traced back to Relator's personal litigation with Questar that commenced in approximately 1992. Prior to that time, Relator was not well versed in gas measurement issues.[38] During the course of the Questar litigation, Relator learned through discovery that a BLM employee had observed several gas meter bypasses constructed by Questar in the Nitchie Gulch Field. Relator believed that the bypasses disclosed through discovery enabled Questar to take gas without paying for it. Although Relator attempted to recover damages based on the Questar bypasses, the court ruled that his evidence of damages was not sufficiently reliable.

The knowledge of the Questar bypasses obtained from the discovery in Relator's private litigation caused him to suspect that there might be other ways in which natural gas pipeline companies were cheating gas producers, royalty owners, the United States, and state and local governments. As a result, he began to investigate the ways in which natural gas pipeline companies measure volume and analyze the heating content of gas. His investigation consisted of: (i) obtaining information from consultants who were former gas pipeline company employees, former government employees, and professors of natural gas engineering; (ii) interviewing representatives of natural gas pipeline companies, industry representatives, pumpers in the field, representatives of laboratories that analyze heating content, and manufacturers of various instruments used to measure gas volume and analyze gas heating content; (iii) reviewing public documents; (iv) studying federal statutes, regulations, and industry standards; (v) inspecting well sites; (vi) conducting tests and analyzing formulas; and (vii) reviewing and analyzing documents from Relator's business records. Each of these aspects of Relator's investigation will be discussed in more detail below.

#### i. *Information obtained from consultants*

Relator retained M.L. Williams, James Shaw, and Dr. Robert Lee as consultants. Williams was a former gas company executive who had participated in drafting some of the industry standards for gas measurement. Shaw was the former Assistant Director for Royalty Management at the MMS. Relator called upon Mr. Williams' knowledge of the industry to learn how pipeline companies measure gas. For example, Williams informed Relator that virtually every company engaged in the practice of taking gas samples some distance away from the wellhead. He also learned from M.L. Williams that pipelines were not using proper beta factors, and that, typically, gas samples were not being heated prior to placing them in the chromatograph for analysis. Also after studying

---

**38.** Although Relator claims to have little or no knowledge of gas measurement procedures prior to the independent investigation triggered by the revelation of the Questar bypasses, he made various gas measurement allegations in private litigation going back as early as 1982. *See, e.g.,* Exhibit 2, doc. 151 (First Amended Complaint in *Rocky Mountain Natural Gas*, 82–CV–117, alleging that Rocky Mountain mismeasured gas in the Blue Gravel Field by failing to verify accuracy of meters, failing to properly maintain meters, and failing to properly integrate charts).

super-compressibility formulas in various manuals and books, Relator confirmed his understanding of the formulas with Williams. Williams told Relator that pipeline companies generally had not adopted the new formulas in the 1992 AGA Report No. 8 until 1994 or 1995.

### ii. Third party interviews

A vast amount of Relator's knowledge of pipeline industry measurement practices was derived from interviews of third parties conducted by Relator and his staff. Relator and his staff interviewed representatives of many gas pipeline companies, including a large number of the companies named as Defendants in the 1997 *qui tam* cases, to confirm that they took gas samples downstream of the orifice. During these interviews, company representatives were also asked whether they used mechanical or electronic meters, whether they utilized continuous samplers, whether they employed portable chromatographs, and whether their probes took samples from the middle of the gas stream.

In addition to the general telephone interviews of many of the Defendant companies, Bob Knight and Cal Tennyson at GMP Gas Corp. told Relator that GPM measured gas only to C6+. Tom Garberg at El Paso told Relator that El Paso never uses straightening vanes. Tom Vengler, an employee of Grynberg Petroleum, interviewed Questar personnel and learned that Questar buys gas based on samples taken downstream of the orifice, but sells gas based on samples taken upstream of the sales meter. Other pipeline company representatives informed Relator that they were still using outdated formulas for calculating gas volume. During his deposition, Relator testified that he obtained information from a number of pumpers and company personnel whom he encountered at various well sites, although he had no specific recollection of the names, locations, or dates on which these interviews took place.

Additional information on how gas is measured was obtained by Relator and his staff through interviews of industry representatives. Relator learned from discussions with colleagues that orifices are seldom changed and meters are seldom recalibrated. Collis Chandler, Bob Box, David Myrick, Greg Marion, and Doug Burton told Relator that pipelines were unilaterally and artificially subtracting an amount from their payments for gas that they do not use. Industry representatives that Relator met at conventions told him that pipeline companies generally strip the condensate and do not pay for it. Relator also interviewed executives of pipeline companies in Canada, Britain, and France, who informed him that in those countries, all gas samples are taken upstream of the meter. Emily Miller, an Amoco employee, informed Relator that she had checked numerous KN meter charts and found discrepancies on 800 wells.

Relator and his staff interviewed many laboratories around the country that analyzed the heating content of natural gas. Burl McEndree of Empact Lab told Relator that all of the gas samples he received were collected in steel containers rather than floating piston cylinders. Other laboratories told him the same thing. He learned from McEndree and Evelyn Swanson that gas samples were not being heated properly prior to entering them in the chromatograph. Swanson informed him that she had just started heating samples in 1998. Laboratory employees also told Relator that they only conducted Btu analyses to C6 (hexane), and then made conservative assumptions concerning the amount of heavier hydrocarbons. This information actually dispelled a misconcep-

tion that Relator had that analysis to C6+ meant analyzing all hydrocarbons, including those above C6. Relator learned of the adverse affect of filters from Burl McEndree. During an interview with Art Savage of Southern Petroleum Company, Savage told Relator that laboratory personnel took samples from Michcon wells downstream of the meter. He also learned from Savage that Michcon used a filter and a simple cylinder bottle instead of a floating piston cylinder.

Relator personally interviewed various manufacturers of measurement instruments. For example, Relator obtained his information regarding the benefits of continuous sampling from Tom Welker, the developer of the Welker Continuous Sampler. He also talked to the manufacturer of the Burton digital meter, who informed him that very few digital meters had been sold in Colorado. A corporate officer of Burton told Relator that the industry was not diligent in calibrating meters.

Finally, Relator and/or his staff conducted other miscellaneous interviews. Many local distribution company representatives were questioned to determine how gas was measured at the sales end. Interviews with government employees also contributed to Relator's information bank. Ken Vogel, an employee at MMS, indicated that pipeline companies usually subtract fuel gas even though the gas is used off of the lease premises.

### iii. Review of government documents and written materials in the public domain

Relator reviewed a plethora of government documents, including tariffs, FERC filings, and materials provided to him by the government pursuant to FOIA requests. Relator relied upon rather stale computerized data obtained from a FOIA request showing purchasers of gas produced from federal and Indian lands to help support his selection of Defendants to be included in the 1997 *Qui Tam* Complaints. This apparently was done in an effort to cure the lack of particularity that rendered Relator's 1995 *Qui Tam* Complaint deficient under Fed.R.Civ.P. 9(b).

Part of Relator's investigation consisted of reviewing a diverse amount of written information compiled from materials in the public domain. He studied pipeline maps to assist him in determining what companies should be included as Defendants in the 1997 *Qui Tam* Complaints. He and his staff also reviewed all of the available publicly filed 10–Ks and annual reports in order to compile a list of affiliated entities that should be named as Defendants in each *qui tam* case. Relator studied various manuals, articles, and treatises to become fully familiar with the science of gas measurement. He indicated that he learned about super-compressibility formulas from his study of such manuals and books. In addition, part of Relator's knowledge concerning the proper methodology for gas measurement was derived from his study of prevailing industry standards and government regulations. He determined the proper approach to heating gas samples from American Gas Association publications. Relator also concluded that no adjustment was required for wet versus dry Btu by calculations that utilized the Gas Processors Association formula.

### iv. Well inspections

Relator testified that he inspected a large number of well sites. From these inspections he was able to determine that: (a) at all of the sites, the sample probe was located downstream of the meter; (b) at many of the well sites, such as those in Nitchie Gulch, Pine Canyon, Buffalo Valley, and LaBarge, the lines were zigzagged, indicating that no straightening

vanes were used; (c) at most of the sites where he was able to view the meters, mechanical, rather than digital meters were being utilized; and (d) at some wells where gas was being purchased by Natural Gas Pipeline Co. and El Paso, there were pipe taps instead of flange taps. His well site inspection also aided in identifying potential Defendants for the *qui tam* cases, because frequently there were signs on the properties disclosing the name of the owner of the metering facility.

### v. Testing and analyses

During the course of his investigation, Relator had tests conducted to see if the way in which pipeline companies measure gas had any impact upon volume and/or Btu content. Relator requested M.L. Williams to study the accuracy of Transwestern meter charts relating to wells in the Pecos Slope (Abo) Field. Williams found problems with 90% of them. Relator suspected that only analyzing heating content to C6+ produced lower Btus than would be shown by a full analysis. He confirmed this by having his own analyses done of gas from Pecos Slope (Abo) Field and the Blue Gravel Field. Also, Relator asked Dr. Lee to run tests to confirm that the Btu content of gas from a particular field does not vary materially over short to moderate periods of time.

Relator believed that gas samples taken a short distance downstream from the orifice would exhibit lower Btus than samples taken upstream of the orifice. He confirmed this by taking his own samples upstream of the orifice in the Pecos Slope (Abo) Field and comparing the results with the analysis of samples taken downstream of the orifice that were provided to him by Transwestern. Also, Relator had gas samples from Pecos Slope (Abo) Field analyzed by two different laboratories; Precision Gas Measurement and Empact

Analytical Systems. The Empact results showed higher Btus than the Precision results. It was through this test and discussions with Burl McEndree at Empact that Relator developed his allegations that the use of filters produces artificially low Btus.

Additionally, Relator theorized that under-measurement of gas by pipeline companies could be demonstrated by company reports showing more gas sold than gas purchased. This led him to perform an analysis of FERC Form 16s filed by Questar, KN, Transwestern, CIG, and El Paso. From this analysis, Relator concluded that Transwestern and Questar were stealing gas from the system.

### vi. Relator's business records

Relator's own well files and business records disclosed information concerning the gas measurement practices of companies with whom Relator had done business. Statements that he received from Transwestern, Questar and El Paso indicated that these companies analyzed heating content to C6+. Relator also knew from his bills that Inexco was artificially deducting for gathering charges. He knew that he was not being paid on condensate by Enron, Kerr McGee, Snyder, and Amerada Hess, and he never received a royalty check from Questar for liquids stripped in one of their gas liquids plants. Statements and other reports provided to Relator by KN, Questar, and Transwestern showed large variations in Btu measurements over time. These led Relator to install his own digital meters on various wells in the Blue Gravel Field, and to conduct tests to determine the effect of taking samples downstream of the orifice. According to Relator, they also raised a red flag because he believed that Btu should remain relatively constant, which

led to the testing described in subparagraph (v) above.

Relator asserts that three other matters also bear on his status as an original source. The first of these is Relator's expertise gained from his involvement in the gas industry. Relator started his own gas exploration and production company approximately 40 years ago. Much of the gas produced by his business was sold to large natural gas pipeline companies. However, the factual record does not specify exactly how this expertise and experience impacted Relator's investigation. Indeed, Relator indicated on several occasions that until he began his investigation in approximately 1992 or 1993, he knew little about gas measurement.

The second is Relator's business relationships with many of the Defendants named in the 1997 *qui tam* cases. Relator indicated that during his 40–year career in the gas exploration and production, he had business relations with 41 of the 73 Defendant groups. However, other than the information from his business records described above, and the statement in his Affidavit that he has learned that natural gas pipelines bully small producers into making concessions not warranted by the terms of any contract, little in the way of specifics is provided regarding pertinent knowledge gained by Relator through his business dealings.

The third matter is Relator's long history of personal litigation with a few of the Defendant groups named in the 1997 *qui tam* cases. He has been engaged in multiple lawsuits over many years with Rocky Mountain Natural Gas Company, KN Energy, and other KN entities. He has also litigated with Questar, Transwestern, El Paso, and PEOC. As noted above, it was material produced in discovery in a case involving Questar that caused Relator to embark on his independent investigation.

An affidavit provided by a former KN employee obtained for use in one of Relator's private suits against KN accused the company of stealing condensate. Other than these and perhaps a few other specific examples, Relator provides little in the way of helpful elucidation on how his litigation history with various Defendants contributed to his knowledge of the information on which his current *qui tam* allegations are based.

### 3. Relator's Pre–Filing Disclosures to the Government

Relator's voluntary disclosures to the government before filing the 1997 *Qui Tam* Complaints are comprised of: (a) a set of documents submitted to the government in connection with his 1995 *qui tam* case; (b) correspondence with government personnel, often enclosing additional documentation, between the filing of the 1995 case and the filing of the 1997 cases; (c) meetings and site visits with government representatives; (d) oral communications with government personnel; and (e) review and copying of files by government representatives at Relator's offices. The documents in categories (a) and (b) above are part of the evidentiary record. Whatever information is available concerning categories (c), (d), and (e) comes from the deposition testimony of Relator and a few of the government representatives.

The record leaves no doubt that Relator had numerous meetings and oral communications with government personnel. Relator has also testified that at various times, government representatives came to the offices of Grynberg Petroleum to review documents, and that they were given free access to all files. As noted in Section II(B)(1)(b) above, the voluntary disclosure to the government requirement of § 3730(e)(4)(B) can be satisfied through oral as well as written disclosures. Never-

theless, a relator must demonstrate compliance with the voluntary disclosure mandate by producing specific and detailed evidence of exactly what information was orally communicated to the government. Relator's evidentiary showing falls woefully short of this standard. Relator asserts that he disclosed everything to the government; that he discussed all of the Defendants with government representatives; and that government personnel made copies of whatever they wanted from his files. However, he has repeatedly testified that he cannot recall the specifics of any conversation with government representatives, nor can he describe any document that government personnel may have seen or copied during the course of their file reviews. There is simply no evidence in the record that would allow the Special Master to take into account either Relator's oral communications with government employees or documents that may have been copied by government representatives during their reviews of Relator's files.

Because of the insufficiencies in Relator's deposition testimony regarding oral communications and document inspections, his compliance with the voluntary disclosure to the government mandate of § 3730(e)(4)(B) hinges upon two categories of documents contained in the evidentiary record. The first is a set of materials that he provided to the government in connection with his 1995 *qui tam* cases (exhibits A–1 through A–83 to the Coordinated Defendants Memorandum in Support of their Motion to Dismiss Based on the Disclosure and Seal Requirements of the False Claims Act).[39] *See* Appendix Q attached hereto. The second is Relator's written correspondence with the government between the filing of the 1995 case and the 1997 suits (portions of the E series of exhibits to Relator's Opposition Brief).[40]

### a. *The A series of exhibits*

Viewed in the light most favorable to Relator, he voluntarily provided the government with a set of 83 documents prior to filing his 1995 *Qui Tam* Complaint, or at least prior to the time he commenced filing the 1997 *Qui Tam* Complaints. Some of these have little significance to the original source inquiry. For example, Exhibits A–1, A–2 and A–25 are the resumes of Jack Grynberg, Dr. Robert Lee, and M.L. Williams, respectively. While a few cases from other jurisdictions have suggested that the expertise of a relator and/or his consultants may have bearing on the original source inquiry, *e.g., United States ex rel. Wright v. Agip Petroleum,* 5:03–CV–264–DF (E.D.Tex., Jan. 5, 2005) (order of Judge David Folsom on jurisdictional motions), this does not appear to comport with the law in the Tenth Circuit. *See Hafter,* 190 F.3d at 1163. Many other documents in are from the public domain, and thus, do not demonstrate any firsthand knowledge on the part of Relator.[41]

---

**39.** There is some dispute, or at least uncertainty, as to whether all 83 documents in the A series were actually given to the government before Relator filed his 1997 *Qui Tam* Complaints. To the extent that this creates a disputed issue of fact, it must be resolved in favor of Relator for purposes of the instant motions.

**40.** These two sets of government disclosure documents are collectively referred to in this Report and Recommendation as "the A and E series of exhibits."

**41.** The following A series documents fall within this category: Exhibit A–3 (NCPA Publication entitled "Physical Constants of Parafin Hydrocarbons and Other Components of Natural Gas;") A–8 (blank FERC Form 16); A–9 (instructions for filling out FERC form 16); A–22 (North American Pipeline Map); A–26 (MMS Report); A–32 (photographs of differential pressure recorders apparently taken from a book); A–33 (pages from a book or article discussing chart recorders); A–34 (brochure from Daniel Flow Products); A–36

Relator has failed to explain the significance of several other series A documents or to tie these documents to the allegations in any of the 1997 *Qui Tam* Complaints.[42] Consequently, these items are of no assistance to the Special Master in resolving the original source issue.

Exhibits A–23 and A–77 together consist of over 100 pages of notes taken during telephone interviews of gas pipeline companies conducted by Relator and his staff. The primary focus of each interview was on whether the company measured gas, and, if so, whether its sample probes were located upstream or downstream of the orifice. Other inquiries were also made during the telephonic interviews, such as whether the company utilized continuous samplers, whether it employed mechanical or electronic meters, whether its probes collected samples from the middle of the gas stream, and whether it used portable chromatographs. The sole reference in the entire A series of exhibits to 89 of the Defendants in the 1997 *Qui Tam* Complaints is contained in the A–23 and A–77 interview notes. Over 200 of the Defendants in the 1997 *Qui Tam* Complaints are not referenced by name in any A series documents.

Like the interview notes, other materials in the A series of documents provided to the government appear to reflect second-hand information imparted to Relator or his staff by third parties. *See* A–57 (Affidavit of Jewell Busch indicating that KN reported the wrong orifice size and stole condensate); A–58 (deposition of Larry Connolly in Grynberg's private litigation with Questar explaining line 6 of the FERC Form 16s); A–73 (excerpt from deposition of Ronald Horinek from Grynberg's private litigation with KN in Colorado federal court indicating that KN takes samples downstream of the orifice).

The final category of series A documents is of more significance because these materials arguably contain information bearing on Relator's direct and independent knowledge of at least some aspects of his allegations. It consists of documents from Relator's business records, charts and calculations prepared by Relator, his staff, or his consultants, and Btu analyses conducted at Relator's request. Many of the items appear to have been designated as exhibits in Relator's private litigation with Questar, KN, and Transwestern. Most of the documents contain information identifying specific companies named as Defendants in the 1997 *Qui Tam* Complaints, although a few deal generally with mismeasurement tech-

---

(chart from Natural Gas Supply Men's Ass'n entitled "Flange Taps–Basic Orifice Factors"); and A–41 (letter from KN to its customers).

**42.** A–18 (Enron–Transwestern Meter Gas Volume Statements for Dec. 1994); A–19 (Empact Analytical Systems natural gas analysis for various wells); A–27 (gas purchase contract between Grynberg and Rocky Mountain); A–45 (Empact Analytical Systems Inc. gas analysis for Con–Camp State # 1 well); A–52 (chart of Btus over time for Boise Southern Well); A–55 (judgment in a South Dakota case brought by Grynberg against Citation Oil & Gas. Co.); A–56 (decision of Colorado Court of Appeals on issues in Jefferson County litigation between Grynberg and

KN that do not appear to be related to gas measurement); A–59 (picture of Relator making a donation to Colorado School of Mines); A–74 (jury verdict forms in Questar v. Grynberg (D.Wyo.) containing no discussion of measurement issues); A–75 (letter to Janet Reno advising of the filing of the 1995 Complaint and enclosing various documents which are not included as part of the exhibit); A–80 (Amendatory Gas Purchase Agreement between Terra resources and Mountain Fuel Supply Co.); A–81 (appears to be a portion of a draft complaint); A–82 (diagram and notes of Dr. Lee dealing with retrograde condensate); A–83 (index of the first 77 A series exhibits).

niques alleged in the Complaints without reference to any particular company.

Documents A–7, A–13, A–14, A–15, A–28, A–38, A–39, A–50, A–60, A–61, A–63, A–64 and A–76 are graphs prepared by Relator from data apparently derived from his business dealings with KN, Questar, Transwestern, TUFCO, and perhaps Marathon, an affidavit of Jack Grynberg in his private litigation with Questar, and two reports from Dr. Lee, all of which concern the allegation common to all 1997 Complaints that "[d]efendants have failed to examine the reported heating content values for gas from a given well to determine whether and why they vary inappropriately over time." *See Questar* Complaint, Exhibit 18 at 27, ¶ 40.

Similarly, documents A–6, A–20, A–35, A–51, A–54, and A–68 are gas analyses on wells in the Nitchie Gulch, Blue Gravel, and Pecos Slope (Abo) Fields, where gas is purchased by Questar, KN, and Transwestern respectively. All of these appear to concern the common allegation that "[d]efendants compound the wrong by analyzing the heating content of lighter weight (lower BTU) hydrocarbons." *See Questar* Complaint, Exhibit 18 at 24, ¶ 36. The Questar bypass issue raised in paragraph 52 of the *Questar* Complaint is the subject of documents A–30, A–31, A–40, A–42, and A–43. Documents A–16 and A–17 are charts showing Btu analyses performed at Grynberg's request on samples taken upstream of the meter in the Pecos Slope (Abo) Field as compared with Transwestern's reported Btu results on samples taken downstream of the meter. Likewise, document A–29 is a report by Dr. Lee comparing Btu measurements taken upstream and downstream of the orifice. These items relate to the common allegation that "[d]efendants routinely place the BTU Extraction Points approximately 5 pipe diameters downstream of the orifice

in any and all circumstances at the point of purchase or intake. This causes the gas's heating content to be underreported." *Questar* Complaint, Exhibit 18 at 19, ¶ 32(b). Other materials in the A series deal with Relator's allegations concerning the deficiencies of mechanical meters and chart integration, and the benefits of digital meters (A–5, A–24, A–69, and A–71), the impropriety of reducing dry Btus by approximately 2% to calculate wet Btus (A–4, A–78), KN's use of different pressures to measure volume and heating content (A–62), KN's allegedly improper use of plug valves in the Blue Gravel Field (A–70), KN's improper measure of heating content (A–72), and the effect of utilizing filters where gas enters the chromatograph (A–53).

Finally, a large number of documents in the A series of exhibits pertain to Relator's theory that the shrinkage and company use figures reported on line 6 of FERC Form 16s demonstrate that a theft of gas is occurring, and that the government is being shortchanged on gas royalties. Included in this category are A–10, A–11, A–12, A–21, A–37, A–44, A–46, A–47, A–48, A–49, A–65, A–66, and A–67.

### b. The E series of exhibits

The E series of exhibits to Relator's Opposition Brief is comprised of Relator's correspondence with various government representatives. Some of the correspondence in the E series predates the filing of the 1997 *Qui Tam* Complaints and, therefore, qualifies for consideration as potential voluntary disclosures to the government under § 3730(e)(4)(B). A few contain no substantive information regarding Relator's allegations or his independent investigation. *See* Exhibits E–010, E–032, and E–040. The remaining pre-filing correspondence provides additional elucidation of the factual basis for

Relator's allegations and the source of Relator's knowledge. The correspondence discusses many aspects of Relator's independent investigation, including the following:

(a) the Btu analysis conducted at Relator's direction on gas taken upstream and downstream of the orifice, and Relator's conclusions regarding the effect of locating sample probes downstream of the orifice (E–003, E–047);

(b) the extended Btu analysis performed at Relator's direction and the comparison of the results with the C6+ analysis performed by Transwestern (E–003);

(c) the comparison of Transwestern's analysis to C6+ and a C6+ analysis performed at Relator's direction on wells in Pecos Slope (Abo) Field (E–004);

(d) the analysis of FERC Form 16 reports of shrinkage and company use of gas (E–004, E–047);

(e) KN's use of different pressures for calculating volume and Btu (E–015, E–016, E–018, E–031);

(f) the comparison of KN's gas sample analysis results with an analysis performed at Relator's direction on gas from wells in the Blue Gravel Field (E–021);

(g) the comparison of the results of Relator's digital meter readings from wells in the Blue Gravel Field with KN's mechanical meter results (E–034, E–042, E–043);

(h) the differing Btu results of Precision Gas Measurement and Empact Analytical Systems on samples taken from the same wells in the Abo Field, leading to Relator's allegations regarding the improper use of filters (E–026, E–033);

(i) KN's alleged use of a plug valve rather than a ball valve on a master sales meter in the Blue Gravel Field (E–028, E–029);

(j) Questar's alleged practice of measuring gas bought downstream of the meter and measuring gas sold upstream of the sales meter (E–022, E–023);

(k) KN's alleged practice of not paying royalties on gas used to operate dehydrators and separators (E–039);

(*l*) deficiencies in mechanical meters and in the integration of meter charts (E–004, E–035, E–036, E–041, E–047);

(m) the benefits of using straightening vanes (E–044, E–048);

(n) the Questar gas meter bypasses in Nitchie Gulch and Emigrant Springs (E–047, E–048);

(o) KN's alleged use of an improper orifice size in the Blue Gravel Field (E–047);

(p) the effect of failing to heat gas samples (E–047);

(q) Relator's calculations of "wet" versus "dry" Btu supporting his allegation that Defendants make improper adjustments when converting from "dry" to "wet" (E–047, E–052);

(r) Arkansas–Oklahoma's alleged use of an arbitrary cut-off of payments for Btus in excess of 1100 (E–047, E–048);

(s) KN's alleged practice of buying gas from itself during summer months, storing it, and then reselling it in winter months for a higher price (E–063);

(t) KN's alleged failure to take gas samples on a regular basis and its alleged use of fictitious Btu numbers (E–047, E–063).

*4. Application of the Law to the Facts*

The Special Master begins the process of applying the law to the facts with a discussion of the legal effectiveness of Relator's voluntary disclosures to the government. This is a threshold issue in the original source analysis for two reasons. First, a failure to voluntarily provide the government with "the essential elements

or information on which the *qui tam* allegations are based" *ipso facto* defeats a relator's claim to original source status. *King,* 264 F.3d at 1280. Additionally, as indicated in Sections II(B)(1)(b) and II(B)(3), *supra,* even if Relator has complied with the voluntary disclosure to the government mandate, the only information that will be considered by the Special Master in determining whether Relator has met the direct and independent knowledge branch of the original source test is that which he voluntarily provided to the government prior to filing the 1997 *qui tam* suits. Furthermore, as previously discussed in Section II(B)(3), *supra,* the Special Master will not consider any of Relator's alleged oral disclosures or any of the materials allegedly copied at the government's request during the course of reviewing Relator's files, because the evidentiary record fails to reveal the specific content of any of these discussions with government personnel or to identify the materials that might have been copied.

The Special Master finds and concludes that the information and materials contained in the A and E series of exhibits discussed in Section II(B)(3) above is sufficient to satisfy Relator's threshold obligation under 31 U.S.C. § 3730(e)(4)(B) to provide the essential elements or information on which the *qui tam* allegations are based to the government before filing suit. With two exceptions that will be discussed shortly, the series A and E documents submitted to the government prior to the filing of the 1997 *Qui Tam* Complaints revealed the general nature and scope of Relator's independent investigation, much of the supportive documentation, and many of the sources of Relator's knowledge. A number of the alleged mismeasurement techniques listed in the 1997 *Qui Tam* Complaints are at least generally touched upon in these written materials. In short, the information was provided voluntarily and was sufficient to enable the government to investigate Relator's allegations, and to assess whether Relator has sufficient direct and independent knowledge to qualify as an original source. *See United States ex rel. Ervin & Assocs., Inc. v. The Hamilton Sec. Group, Inc.,* 332 F.Supp.2d 1, 10 (D.D.C.2003) (one of the purpose for voluntary disclosure requirement is to limit rewards to those who voluntarily cooperate with the government); *United States ex rel. Ackley v. IBM Corp.,* 76 F.Supp.2d 654, 667 (D.Md.1999) (a purpose for the voluntary disclosure provision is to allow the government to begin investigating relator's claims as early as possible).

Relator's legally cognizable voluntary disclosures to the government, consisting of the documents in the A and E series of exhibits, omitted at least two important parts of his independent investigation; no mention is made of either Relator's well inspections or the interviews of laboratory personnel conducted by Relator and his staff.[43] When viewed in the context of the written information actually disclosed to the government in the A and E series of documents discussed above, the omission of any reference to Relator's well inspections and/or laboratory interviews is not sufficiently serious to automatically defeat his status as an original source. Nevertheless, Relator's failure to demonstrate that he disclosed his well inspections and/or laboratory interviews to the government before filing suit precludes the Special Master from considering these two

---

43. Perhaps these aspects of Relator's investigation were orally discussed with government personnel, but, as previously noted, Relator failed to describe these discussions with suffi-

cient specificity to allow the Special Master to making any findings regarding the information conveyed.

aspects of his independent investigation in assessing whether Relator possessed direct and independent knowledge of the information supporting his allegations.[44]

For the most part, it is not a difficult task to categorize Relator's knowledge of the information on which his allegations are based as either "direct and independent" or "second-hand." For example, a substantial portion of Relator's knowledge of how companies measure gas volume and heating content was gained from the interviews conducted by Relator and his staff of pipeline company officers and employees, manufacturers of measuring devices, government representatives, and members of the natural gas industry. Indeed, Relator's only source of information concerning the gas measurement practices of many of the Defendant groups was derived solely from these interviews. This knowledge clearly does not qualify as "direct and independent," for it is merely a compilation of knowledge and information provided by others. Likewise, information obtained by Relator through interviewing consultants, such as M.L. Williams and James Shaw, does not qualify as "direct and independent." The Special Master concurs with Relator that he need not conduct the entire independent investigation himself. A relator may be deemed the original source of information obtained by his staff and consultants in the course of an independent investigation. However, there is a difference between retaining a consultant to assist in an investigation and simply extracting information already existing in the consultant's bank of pertinent knowledge.

Another category of source information for Relator's allegations is that obtained by Relator through his private litigation. To the extent that such knowledge is the product of information learned from discovery, or from the pleadings or testimony of others, it cannot be deemed "direct and independent." *Devlin*, 84 F.3d at 362–63; *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1159 (2d Cir.1993), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993).

Because Relator conducted business with several of the Defendants, his knowledge of whether these companies measure gas or cause gas to be measured is probably first-hand. However, with respect to the large number of Defendants with whom he has done no business, Relator cannot be credited with being an original source of information as to which of them might measure gas produced from federal or Indian lands or might cause such gas to be measured. He obtained that knowledge largely from annual reports, 10–Ks, pipeline maps, or government databases provided pursuant to FOIA requests. Relator contends that by utilizing his expertise and experience, he was able to ferret out the names of those who measure gas or cause it to be measured from these publicly available documents. Defendants assert that all Relator employed to extract companies responsible for gas measurement from the annual reports, 10–Ks, pipeline maps and government databases was a

---

**44.** Even if the Special Master were to consider it, the information obtained by Relator from laboratory interviews and well inspections may not provide any assistance to him in his effort to qualify as an original source. Information from interviews of laboratory personnel was clearly second-hand and merely a compilation of the knowledge of others.

Also, as Relator concedes, the well sites inspected were on public land. Whatever Relator observed during his field visits was equally observable by the public at large. *See Praxair*, 389 F.3d at 1054 (suggesting that pictures taken from a public road do not meet the "direct and independent knowledge" test under 31 U.S.C. § 3730(e)(4)(B)).

healthy dose of speculation. Accepting Relator's contention for purposes of discussion, the case law rejects the notion that a Relator can become an original source merely by bringing his or her expertise to bear on information already in the public domain. *E.g., FPC–Boron,* 105 F.3d at 688; *Springfield,* 14 F.3d at 655; *Stinson,* 944 F.2d at 1160.

There are other aspects of Relator's independent investigation that did provide him with direct and independent knowledge. Included in this category is information derived from the tests and analyses conducted by Relator or by others at his direction. Also qualifying as "direct and independent" is information that Relator obtained from his own business records regarding the measurement practices of a few of the Defendants, such as Questar, KN, Transwestern.

The Special Master finds and concludes that from a quantitative standpoint, a majority of Relator's knowledge of the information on which he relies to support the allegations in his 1997 *Qui Tam* Complaints is second-hand or comes from publicly available sources. However, as Relator correctly notes, the quality of a relator's discovery and investigation is probably more significant. The qualitative aspect of the original source inquiry calls into play not only the Source of Knowledge Factor, but also the Public Information Factor. It focuses on the extent to which a relator's first-hand knowledge, possibly aided to some degree by deductions drawn from innocuous public information, was instrumental in allowing him or her to uncover the material elements of the alleged fraud and to complete the fraud equation.

The initial step in this analysis is to identify each of the components and subcomponents of the equation. All of Relator's FCA cases are based upon the following proposition: Each of the Defendants named in a particular 1997 *Qui Tam* Complaint either mismeasured natural gas volume and improperly calculated natural gas heating content, or caused such mismeasurement and miscalculation, in all of the ways identified in the Complaint, resulting in undervaluations that were utilized for the payment of royalties on gas produced from federal and Indian lands. According to Relator, the misrepresented facts consist of the valuations and the corresponding royalty reports and payments submitted to the government. The true facts, as alleged in the Complaints, are that the valuations at the wellhead were not accurate, but rather were the product of all of the more than 20 specified improper measurement techniques employed by each of the named Defendants to intentionally or recklessly produce artificially low volume and heating content determinations. The combination of the represented facts and the true facts leads to the conclusion that each of the Defendants engaged in conduct that caused false royalty reports to be filed and fraudulently deprived the federal government of the royalties to which it was entitled by law.

The components of the represented state of facts consist of the amount of royalties due as reflected on royalty reports, the amount of royalties paid, and the valuations utilized for the payment of federal royalties. Relator readily concedes that he does not have access to most of the documentary evidence showing what in fact was reported to the federal government for royalty purposes. Consistent with this concession, the information Relator voluntarily provided to the government before filing his 1997 cases includes none of the documents containing the actual false records or statements that are the subject of his FCA claims. However, as previously pointed out in Section

II(B)(1)(a), *supra,* Relator's lack of knowledge regarding the represented state of facts is of little consequence in the original source inquiry. The Tenth Circuit and most other Circuits have concluded that knowledge of the actual documents containing the misrepresented state of facts is not an essential ingredient in the original source recipe.

Of more significance to the original source inquiry is Relator's knowledge of the true state of facts. Here, the components of the true state of facts consist of: (a) the rules, regulations, standards, and science that allow one to understand how gas should be measured and to assess whether a particular measurement technique is improper and produces an artificially low volume and/or heating content; and (b) information linking the named Defendants in a particular Complaint with the improper measurement practices identified therein. This linkage requires information that enables Relator to know which companies measured gas produced from federal or Indian lands, or caused such gas to be measured, and the measurement practices of each company. In other words, the Relator has knowledge of the true state of facts if he knows who measures gas from federal or Indian lands, how it is measured, and whether the measurement techniques actually employed by a particular company are proper or improper from a scientific and/or legal standpoint. In order to qualify as an original source, at least some significant portion of this knowledge must be "direct and independent."

Relator cannot legitimately take credit for discovering the proper methods for measuring gas. With a few exceptions, the discussion of the appropriate procedures for gas measurement, as contained in the 1995 and 1997 *Qui Tam* Complaints, reiterates information already in the public domain. Much of this is contained in industry standards, federal statutes, and federal regulations, all of which are published and widely disseminated. Additionally, the science of gas measurement and the proper procedures for measuring gas volume and analyzing heating content have been the subject of innumerable scholarly articles, texts, treatises, and industry publications. For example, the fact that sampling probes should be located away from obstructions and flow disturbing devices such as orifice plates, a subject raised in each of Relator's 1997 *Qui Tam* Complaints, was clearly a matter of public knowledge long before Relator filed his 1995 *qui tam* case. Among the various articles discussing this matter and predating Relator's 1995 *qui tam* case is a 1994 publication entitled "Hydrocarbon Processing," publicly disseminated by Information Access Company. The article cautions that sample points should be located in a section of pipeline at least five, but ideally 20–pipe diameters downstream of meter tubes, orifice plates, and other devices creating flow turbulence. *See* Exhibit 2, doc. 306 at JDPD 007431. The fact that Relator performed independent tests confirming this well established gas measurement principle does not advance his claim to original source status. *See Springfield,* 14 F.3d at 655 ("[A] *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator comes forward with additional evidence incriminating the defendant.").

Additionally, several of the improper methods of gas measurement identified in Relator's 1995 and/or 1997 *Qui Tam* Complaints were well recognized as inappropriate measurement procedures by the gas industry and government regulators long before Relator began his investigation. Relator's observation that it is improper to deduct for fuel gas used off the leased premises merely echoes federal law set

forth in regulations that substantially pre-date both the 1995 and 1997 *Qui Tam* Complaints. *See* Exhibit 2, doc. 46 at JDPD 000875 (1992 BLM informational bulletin discussing 30 C.F.R. § 202.150(b)(1) dealing with royalty payments on gas used off-lease); *see also* Exhibit 2, doc. 23 at JDPD 000664 (1993 MMS appellate decision noting that royalties must be paid on gas used off-lease).

Further examples of periodicals and government publications presaging the mismeasurement practices listed in Relator's 1995 and 1997 *Qui Tam* Complaints include:

(a) Exhibit 2, doc. 94 at JDPD 000445 (article entitled "Standard Cylinders vs. Constant Pressure Cylinders," published in Jan. 1994 edition of *Gas Industries),* discussing problems of depressurization of gas samples, as alleged in paragraph 34 of Relator's 1997 *Qui Tam* Complaints;

(b) Exhibit 2, doc. 236 at JDPD 005809 (article entitled "Obtaining Natural Gas Samples for Analysis by Gas Chromatography," published by the Gas Processors Ass'n in 1986), explaining the consequences of testing gas at an inappropriate temperature, as alleged in paragraph 38 of Relator's 1997 *Qui Tam* Complaints;

(c) Exhibit 2, doc. 200, at JDPD 004727 (article entitled "How Flow Measurement Standard ISO–567 Compares with AGA Report No. 3," published in Sept. 3, 1984 edition of *Oil & Gas Journal*), pointing out the continued use of the outdated $F_b$ formula component, which is the subject of paragraph 47 of Relator's 1997 *Qui Tam* Complaints;

(d) Exhibit 2, doc. Supp. 1–4 (MMS Informational Bulletin to Offshore Operators and Payors, dated Feb. 5, 1995), pointing out the requirement that royalties must be paid on recovered condensate, which is the subject of paragraph 48 of Relator's 1997 *Qui Tam* Complaints.

Without further belaboring the point, most of the mismeasurement techniques described in Relator's 1995 and 1997 *qui tam* cases can be quickly extracted from widely disseminated articles, educational tomes, governmental position papers, federal regulations and administrative decisions, and other publicly available materials that predate the filing of the 1997 Complaints. Additionally, Relator's knowledge of many other mismeasurement practices alleged in 1997 *Qui Tam* Complaints was imparted to him by third parties. Relator learned of the benefits of floating piston cylinders from discussions with Tom Welker. Burl McEndree, M.L. Williams, and Evelyn Swanson made him aware of the fact that laboratories often do not heat gas samples properly before performing analyses. Relator was first informed of the existence of the Questar bypasses in Nitchie Gulch by deposition testimony in his private litigation. He learned that KN utilized the wrong size orifice from Jewell Busch during Relator's private litigation against KN and Rocky Mountain in the United States District Court for the District of Colorado. Relator's knowledge that many companies were utilizing improper beta factors and were not complying the AGA Report #8 was derived from M.L. Williams. Knowledge that KN had used a plug valve in the Blue Gravel Field was imparted to him by Ed Pringle.[45]

---

45. There are many other mismeasurement techniques listed in Relator's Complaints that were likely revealed in prior public domain materials. Many of these materials were submitted by the Defendants as part of Exhibit 2, but were not properly authenticated, and cannot be deemed self-authenticating periodicals. Nevertheless, there is an absence of evidence in the factual record suggesting that Relator was the originator of the concepts that contin-

There are a handful of mismeasurement techniques that: (a) were not harbingered by information already in the public domain; and (b) appear to have been derived by Relator through his own labors or the labors of his staff and consultants acting at his direction. Relator's allegation that no adjustment need be made in converting "dry" Btus to "wet" Btus, discussed in paragraph 39 of his 1997 *Qui Tam* Complaints, seems to be the product of his own calculations and analysis. Likewise, Relator's conclusion that the heating content of gas from a particular well should remain relatively constant over time, which forms the basis for his allegation in paragraph 40 of the 1997 *Qui Tam* Complaints, was derived from studies conducted at Relator's direction. Also, at least the initial impetus for the allegation that filters improperly remove heavier weight hydrocarbons, as contained in paragraph 37 of the Complaints, was Relator's observation that the analysis of gas samples from the same well by two different laboratories produced inconsistent results.

The fact that most of the mismeasurement techniques listed in the 1997 *Qui Tam* Complaints were either presaged by information already in the public domain or were based upon the knowledge of third parties is not fatal to Relator's claim of original source status. Relator's ability to link the alleged mismeasurement practices to specific Defendants or at least to Defendant groups by means of direct and independent knowledge is of more significance in completing the equation than identifying the theoretical practices themselves. To the extent Relator has direct and independent knowledge that a particular Defen-

dant group's gas measurement practices conform to substantially all of the mismeasurement techniques alleged in the pertinent 1997 *Qui Tam* Complaint, he may be able to complete, or at least significantly advance the process of completing the equation demonstrating fraud.

Relator claims credit for being the first to determine that virtually all of the mismeasurement techniques identified in the 1997 *Qui Tam* Complaints were being employed ubiquitously. Contrary to Relator's claim, there are public reports regarding the widespread use of certain practices identified in Relator's Complaints. However, with respect to others, there is nothing in the public domain suggesting they were being utilized by most or all gas measurers. For example, while there is ample literature on the temperature parameters at which heating content should be analyzed, there is little indicating that testing of gas at inappropriate temperatures is a common practice, as is alleged in paragraph 38 of the 1997 Complaints. Nevertheless, all of Relator's knowledge concerning the alleged widespread failure to properly heat gas samples is based on information obtained from third party interviews. The same is true of the allegation in paragraph 34 of the 1997 *Qui Tam* Complaints, relating to the use of steel cylinder sample containers. Relator's knowledge of the widespread use of steel sample containers was gained through interviews with laboratory personnel, including Burl McEndree at Empact Lab. Yet another example is Relator's knowledge of the information supporting the allegation in paragraph 45 of the 1997

uous sampling produces better results than spot sampling (paragraph 41); that mechanically operated meters can be inaccurate (paragraph 43); that improperly calibrated equipment will not produce accurate measurements (paragraph 44); that use of incor-

rect beta ratios will adversely affect accuracy (paragraph 46); that mismeasurement can result from a failure to utilize straightening vanes (paragraph 48); or that damaged or mis-sized orifice plates will not measure gas properly (paragraph 50).

Complaints (widespread use of outdated super-compressibility formula), which was imparted to him by M.L. Williams, Evelyn Swanson, chart integrators, members of the American Gas Association subcommittee involved with AGA Report 8, and through studying books and manuals. In fact, a careful review of the A and E series of documents, comprising the totality of legally cognizable information provided to the government prior to filing suit, discloses that Relator's conclusions regarding the widespread use of his alleged mismeasurement practices were based almost entirely on information from third parties.

More importantly, Relator's conclusion that a particular mismeasurement practice was widespread or ubiquitous, whether based upon direct and independent information or upon second-hand information provided by third parties, was insufficient to either complete the equation or substantially advance the process. The fact that a fraudulent practice is widespread does not, in itself, support an allegation that any particular company or even any particular family of companies engages in the practice. *A fortiori*, it does not support an allegation that all of the companies named in one of the 1997 *Qui Tam* Complaints engage or cause others to engage in all of the mismeasurement practices identified therein. If it were otherwise, the Senate Committee documents would publicly disclose precisely the same fraud as that alleged by Relator. As discussed at length in Section II(A) above, generally a public disclosure of widespread gas mismeasurement practices does not equate to an allegation of fraud against specific companies, because the equation is incomplete without some basis, other than speculation, for identifying the wrongdoers. Similarly, a Relator's allegation of fraud made by merely speculatively attributing a widespread practice to a particular company or family of companies is not based on direct

and independent knowledge. *See, e.g., Aflatooni,* 163 F.3d at 526.

The sole reference in the A and E series of exhibits to many of the Defendant groups named in the 1997 *Qui Tam* Complaints is found in A–23 and A–77, the notes of interviews conducted by Relator and/or his staff. As to these Defendant groups, Relator melded three categories of information to arrive at his allegation that all of the named Defendants in each of the 1997 *Qui Tam* Complaints engaged or caused others to engage in all of the identified mismeasurement techniques. The first was Relator's conclusion that use of each of the mismeasurement practices was widespread. Second, as to some companies with whom he done business, Relator may have had knowledge that they were involved in measuring gas from federal and/or Indian lands. Relator culled out names of other companies that might have been involved in measuring gas produced from federal and Indian lands by examining generally available public documents. Finally, Relator obtained second-hand information from interviews of company personnel linking many of the Defendant groups with some of the over 20 mismeasurement techniques common to all of the 1997 *Qui Tam* Complaints.

The Special Master finds and concludes that this combination of speculation, information derived from publicly available materials, and second-hand knowledge compiled from third party interviews is not sufficiently "direct and independent" under the Tenth Circuit case law to qualify Relator as an original source. Relator's business dealings might have disclosed that some of these Defendant groups measure gas. However, unaccompanied by any specific direct and independent information regarding the group's gas measurement practices, this single bit of first hand-knowledge was not particularly significant.

Consequently, as to the following cases, involving Defendant groups who were either not mentioned at all in the A or E series of exhibits or were referenced only in the interview notes comprising Exhibits A–23 and A–77, Relator has failed to establish that the Court has jurisdiction over the subject matter: 99 MD 1601, 99 MD 1602, 99 MD 1605, 99 MD 1610, 99 MD 1611, 99 MD 1612; 99 MD 1613, 99 MD 1614, 99 MD 1621, 99 MD 1624, 99 MD 1625, 99 MD 1626; 99 MD 1628, 99 MD 1630, 99 MD 1632, 99 MD 1633, 99 MD 1636, 99 MD 1637; 99 MD 1639, 99 MD 1640, 99 MD 1641, 99 MD 1643, 99 MD 1644, 99 MD 1649; 99 MD 1650, 99 MD 1651, 99 MD 1652, 99 MD 1653, 99 MD 1654, 99 MD 1655; 99 MD 1656, 99 MD 1661 (only as to claim for failure to pay for condensate); 99 MD 1668; and 99 MD 1682.

In four other cases, one member of the Defendant group is not only referenced in the interview notes comprising Exhibits A–23 and A–77, but is also briefly mentioned elsewhere in the A and E series of exhibits: 99 MD 1609 (El Paso); 99 MD 1634 (Michigan Consolidated Gas Co.); 99 MD 1645 (Marathon); 99 MD 1671 (Arkansas Oklahoma Gas Corp.). Relator has stated under oath that he had business dealings with one or more of the El Paso, Marathon, and Arkansas Oklahoma Gas Defendants. However, there is nothing in his pre-filing disclosures to the government that reveals the precise nature of his business relationships with these entities or, more importantly, what knowledge Relator derived from the relationships that supports the allegations in the *Qui Tam* Complaints. Aside from the interview notes included in A–23 and A–77, the few passing references to these groups of Defendants in the A and E series of exhibits are as follows:

(a) *El Paso:* In addition to a single reference to El Paso in the A–23 interview notes, El Paso is mentioned in two other documents in the A and E series of exhibits. A–46 is a chart showing FERC Form 16, line six figures for shrinkage and company gas use from 1980 to 1992 for Transwestern and El Paso, adjusted for size of the company. No explanation of the significance of this document is provided in any of the A series of exhibits. However, there is an additional reference to El Paso in Exhibit E–003, a letter from Grynberg to Senator Jeff Bingaman dated January 12, 1995, that does seem to expound upon the importance of A–46. It indicates that Relator prepared the chart to compare the amount of gas Transwestern moved through its pipeline to the amount moved by El Paso in order to demonstrate that Transwestern was stealing gas from the system. In other words, the references to El Paso in Exhibits A–46 and E–003 do not suggest any wrongdoing on El Paso's part, nor was that Relator's apparent purpose for including them in his voluntary disclosures to the government.

(b) *Michigan Consolidated Gas Co.:* Michigan Consolidated Gas is referenced in the A–77 company interview notes. Additionally, E–060, a letter from Relator to Ken Vogel (a government representative) on September 6, 1996 indicates that if Michigan Gas buys gas on an MCF basis and then retrieves more gas than it buys as a result of mismeasurement or additional gas generated in a storage area, it owes royalty to the federal government. The import of this information is not readily apparent. It does not seem to match up with any of the mismeasurement techniques listed in 99 MD 1634. Furthermore, Relator has stated that he had no business dealings with Michigan Consolidated Gas or with the other Defendants named in 99 MD 1634. Thus, to the extent the letter actually provides any enlighten-

ment concerning Michigan Consolidated Gas's measurement practices, the information likely did not come from Relator's business records or other first-hand sources.

(c) *Marathon:* An alleged affiliate of Marathon and a co-Defendant in 99 MD 1645 (Delhi Gas Pipeline Co.) is referred to in the A–23 interview notes, but Marathon is not. The only mention of Marathon in any of the legally cognizable pre-filing disclosures to the government is found in A–61. One of the documents in A–61 is a plot of Btus over time for the Powell C–1 well. The document bears a caption "Jack J. Grynberg vs. Texas Oil Gas Corp., Succeeded by Marathon Oil Company and Shazi Petroleum, Inc. et al." The second document in A–61 is an Empact Analytical Systems, Inc. Btu analysis for a sample from the Powell–C Master Meter. There is no elucidation in any of the materials provided to the government of the significance of these items. The Special Master cannot determine what the documents were intended to show, or to which, if any, of the mismeasurement allegations against Marathon they might relate.

(d) *Arkansas Oklahoma Gas Corp.:* Neither Arkansas Oklahoma Gas nor the other affiliated Defendants named in 99 MD 1671 are referenced in the A–23 or A–77 interview notes. Arkansas Oklahoma Gas is discussed in two of the series E documents, E–047 and E–048. In both instances, Relator informs the government that Arkansas Oklahoma does not pay for Btu content above 1100, regardless of what the actual value of the heating content may be. In E–047, he discloses to the government that he received this information from Arkansas Oklahoma.

None of few additional references to El Paso, Michigan Consolidated Gas, Mara-

thon or Arkansas Oklahoma Gas suffice to place them in a different position than the Defendant groups who are mentioned only in the interview notes provided to the government. The reference to El Paso in A–46 and E–003 does not form the basis for any of the allegations in 99 MD 1609. The information provided to the government concerning Michigan Consolidated Gas and Arkansas Oklahoma Gas likely is second-hand. It is unclear if or how the reference to Marathon in A–61 supports Relator's allegations against the Defendants in 99 MD 1645. Like those Defendant groups discussed only in the A–23 and A–77 interview notes, Relator's knowledge of gas measurement practices of the Defendants in 99 MD 1609, 99 MD 1634, 99 MD 1645, and 99 MD 1671, as revealed by the specific information he voluntarily disclosed to the government before filing the 1997 *Qui Tam* Complaints, is based upon a combination of speculation, data from publicly available documents, and second-hand information. Because his knowledge of the gas measurement practices of these companies is not "direct and independent," he does not qualify as an original source. Cases 99 MD 1609, 99 MD 1634, 99 MD 1645, and 99 MD 1671 should be dismissed for lack of subject matter jurisdiction.

Relator's claim of original source status is strongest with respect to the *qui tam* cases against the Transwestern, Questar, and KN groups (99 MD 1608, 99 MD 1604, and 99 MD 1603 respectively). In each of these cases, Relator is not only the originator of a few of the general theories of mismeasurement,[46] but he also has direct and independent knowledge that each Defendant group measures gas and, more importantly, direct and independent knowledge of at least some of the group's measurement practices. The key question is whether Relator's direct and indepen-

---

**46.** These have previously been discussed, *supra,* at 1217.

dent knowledge of how these Defendant groups measure gas sufficient to complete, or at least significantly assist in completing the equation of fraud that Relator has posited in his Complaints against them.

Relator's allegations that Transwestern mismeasured gas by taking samples downstream of the orifice instead of where gas exits the dehydrator before entering the meter (paragraphs 32 and 33) are supported by his own testing and analysis. *See* A–17, E–003, E–047. This is also true of Relator's allegation that Transwestern has Btu content analyzed only to $C6+$, resulting in a lower valuation (paragraph 36). *See* A–20; A–54; E–003; E–047. Additionally, Relator's allegation that the Transwestern Defendants failed to examine reported heating content values to determine why they vary inappropriately over time (paragraph 40) is derived from his own analysis of reported Btus and testing conducted at his direction. *See* A–14; A–28. Further, the allegation that the Transwestern Defendants mismeasure gas by utilizing inaccurate mechanical meters (paragraph 43) is supported by his own spot check of Transwestern meter charts in the Pecos Slope (Abo) Field. *See* E–047. The impetus for Relator's allegations regarding the improper use of filters (paragraph 37) comes from his discovery of inconsistencies between an analysis performed at his direction by Precision Gas Measurement (the laboratory that conducted analyses for Transwestern) on gas samples from the Pecos Slope (Abo) Field (where Transwestern was the gas purchaser), and a comparable Btu analysis performed at Relator's request by Empact Analytical Systems. *See* A–53; E–026; E–033. Finally, Relator's theory that the Transwestern Defendants' mismeasurement and/or theft of gas can be established from their FERC Form 16 reports is based upon his study of Transwestern reports covering many years. *See* A–21; A–47; A–49; E–003; E–047.

With respect to the *Questar* case, 97 MD 1604, Relator may legitimately be credited as having direct and independent knowledge that one or more members of the Questar Defendant group employ some of the alleged mismeasurement techniques. Viewing the evidence in the light most favorable to Relator, his personal business records disclose that the Questar Defendants analyzed gas only to $C6+$. *See* A–6; E–047. As is the case with Transwestern, the allegation that the Btu analyses performed at the direction of the Questar Defendants showed improper variations over time is based on Relator's review of his own business records. *See* A–7; A–39; A–63. Relator's knowledge that at least one of the Questar family members stripped condensate without paying for it also is derived from his business records. Relator utilized Questar FERC Form 16s in his analysis of shrinkage and company use of gas, leading to his theory that the FERC Form 16s demonstrate mismeasurement or theft of gas by Questar. *See* A–10; A–11, A–35; A–44; A–48; A–66; and E–047.

A similar situation exists with respect to the KN Defendants in 99 MD 1603. The A and E series of exhibits indicate that Relator performed his own tests and utilized information in his business records to support the allegations that: (a) KN's Btu reports showed significant and improper variations over time (A–13; A–50; A–063); (b) KN used different pressures to measure volume and Btu content, resulting in an undervaluation (A–62; E–015; E–016; E–018; E–031; E–047); (c) KN's use of mechanical meters produced a less accurate measurement of volume than that derived from digital meters (A–69; E–034); KN's measurement of Btu from samples taken downstream of the meter produced a

lower heating content than if samples were taken upstream of the meter (E–020; E–021); and (e) KN directed its laboratories to measure heating content to C6+, which resulted in lower Btus than would have been shown by an extended analysis (E–047). There are also materials in the A and E series of exhibits demonstrating that Relator's knowledge regarding other alleged KN mismeasurement practices is second-hand. *See* Exhibit A–57 (information that KN reported the wrong size orifice and stole condensate came from Jewell Busch); Exhibits E–028 and E–029 (information that KN used a plug valve rather than a ball valve on a master sales meter came from Ed Pringle); E–041 and E–047 (information that KN improperly integrated charts came from Emily Miller of Amoco and from discovery in one of his private suits against Rocky Mountain).

Essentially the same conclusions can be drawn regarding Relator's independent investigation of the allegations against the Transwestern Defendants, the Questar Defendants, and the KN Defendants. The materials voluntarily provided to the government before suit was filed cabin the legally cognizable information that Relator may rely on to demonstrate his direct and independent knowledge. A review of these materials reveals that on the one hand, Relator has first hand knowledge of information linking each of these Defendant groups to some of the mismeasurement practices forming the basis for his Complaints in 99 MD 1603, 99 MD 1604, and 99 MD 1608. On the other hand, the A and E series of exhibits disclose that Relator employed second-hand knowledge derived from third parties to tie the Transwestern, Questar, and KN Defendant groups to other mismeasurement practices alleged in the Complaints. Finally, there are a number of mismeasurement practices alleged in 99 MD 1603, 99 MD 1604, and 99 MD 1608 that are simply not specif-

ically linked to these Defendant groups at all by any of the materials in the A and/or E series of exhibits. *E.g.,* Complaint ¶¶ 33 (steel sample containers instead of floating piston cylinders), 35 (depressurization of gas samples), 38 (gas analyzed at improper temperatures), 41 (spot versus continuous sampling), 45 (super-compressibility), 46 (improper beta ratios), 47 (use of outdated formula for calculating gas volume), 48 (failure to use straightening vanes), 51 (use of portable chromatographs).

The question of whether Relator has sufficient direct and independent knowledge to be deemed an original source of the allegations in 99 MD 1603, 99 MD 1604, and 99 MD 1608 is a difficult one. Little guidance is provided by the case law. Relator's ability to complete the equation posited in his 1997 *Qui Tam* Complaints against the Transwestern, Questar, and KN groups hinges on knowledge that enables him to link specific Defendants, or at least specific Defendant groups, to the alleged mismeasurement practices. As previously noted, he can successfully link each of these Defendant groups with a few mismeasurement techniques by direct and independent knowledge. He can link an equal or greater number of the alleged mismeasurement practices to these groups with second-hand information compiled during his independent investigation. Still others can be linked only by assuming that because the practices are widespread, the Transwestern, Questar, and KN groups must have employed them.

The above described scenario suggests a number of alternative approaches to resolve the original source inquiry. One such approach is to require Relator to fully complete the precise equation propounded by him in his 1997 *Qui Tam* Complaints against the Transwestern, Questar, and KN groups—that each named Defendant

mismeasures gas or causes gas to be mismeasured in each of the ways alleged in the Complaint—by direct and independent knowledge. It is clear that if this "all or nothing" approach is adopted, 99 MD 1603, 99 MD 1604, and 99 MD 1608 must be dismissed for lack of jurisdiction over the subject matter, for Relator cannot fully complete the equation posited by him in his 1997 *Qui Tam* Complaints against the Transwestern, Questar, and KN groups in a way which satisfies the original source test in § 3730(e)(4)(B). Yet this standard would make it difficult for any Relator to sustain a *qui tam* suit, and would appear to be inconsistent with the reasoning and result in *Kennard*.

A second approach is to recognize Relator as an original source of the allegations in a Complaint if he is able to link at least one mismeasurement practice with the Defendant group named therein. Under such a "bare minimum" approach, Relator's cases against the Transwestern, Questar, and KN Defendants would survive jurisdictional challenge. However, if the "all or nothing" approach discussed above is too restrictive of jurisdiction, the "bare minimum" approach is too liberal, for it would allow opportunistic relators having a small amount of first-hand knowledge to bring large and multifaceted *qui tam* suits that are almost entirely based on second-hand information derived from third parties and/or public sources.

A third approach is to eliminate those allegations premised on speculation, second-hand knowledge, and/or information entirely from the public domain, and then allow Relator to proceed as to those mismeasurement practices that he can specifically link to the Transwestern, Questar, and/or KN Defendants through direct and independent knowledge. While this "pick and choose" approach might have some logical appeal, it would require the Court

to engage in the inordinately time consuming task of parsing and redrafting Complaints. Furthermore, the Special Master is not aware of any case in which a court has engaged in such a process on an allegation by allegation basis, particularly where, as here, each Complaint asserts a single claim for relief.

The final approach, and the one that appears to best comport with Tenth Circuit case law, the history and purpose of the "original source" requirement, and the threshold nature of the jurisdictional inquiry is to sustain Relator's invocation of subject matter jurisdiction only if his contribution in terms of direct and independent knowledge was substantial. This must be judged in the context of the nature and scope of the allegations in the *Qui Tam* Complaints and the amount of information already in the public domain. If Relator's contribution is substantial, then portions of the equation may be completed with information derived from innocuous public sources.

In the Transwestern, Questar, and KN Complaints, Relator has alleged a broad-based scheme to defraud the government of royalties through the use of over 20 different measurement practices that cause an underreporting of volume and heating content. Relator's contribution in terms of direct and independent knowledge consists of an analysis of business records and testing that link each of these Defendant groups to a handful of the alleged practices. As to the remaining bulk of mismeasurement techniques, the linkage to the Transwestern, Questar, and KN Defendant groups is through a combination of second-hand information and speculation based on Relator's perception of the ubiquity of the practice. For the most part, the second-hand information comes not from ferreting out the Transwestern, Questar, and KN measurement practices

from innocuous public sources, but rather from simply questioning third parties who purport to have such Defendant-specific information.

Relator vigorously asserts that when viewed in the light most favorable to him, his independent investigation is at least the equivalent of that conducted by the relators in *Kennard*. The Special Master disagrees and finds *Kennard* to be distinguishable. First, as pointed out above, according to the Tenth Circuit's opinion, Relator Wright relied exclusively on his own business records. In contrast, Relator Grynberg's reliance on second-hand information far exceeded the amount of information derived from his personal business records. The Tenth Circuit opinion in *Kennard* noted that Relator Kennard relied heavily upon a review of innocuous public documents. Thus Wright and Kennard together ferreted out the fraud from a combination of knowledge derived from Wright's business records, supplemented by information derived from Kennard's public document analysis. Here, Relator Gynberg derived the vast majority of his knowledge from neither of these sources, but rather by interviewing a plethora of third parties who may have had first-hand knowledge of industry and Defendant-specific measurement practices. Thus, in large part, Relator's knowledge is simply a compilation of the knowledge of others.

Second, according to the Tenth Circuit's decision in *Kennard*, the suspicion that fraud was being committed originated entirely with Relator Wright. Wright's observation from his own business records that he was receiving less for his gas production after Comstock took over one of his leases was the impetus for his and Relator Kennard's subsequent investigation. Relator Grynberg did not commence his investigation based on conclusions or suspicions drawn from his own personal

observations or records, but rather because of information obtained during the course of discovery in his private litigation with Questar that a federal government employee had found a meter bypass in the Nitchie Gulch Field.

Third, Kennard and Wright's investigation completed the equation by producing company-specific information that directly linked Defendant Comstock to the fraudulent conduct alleged in the *Kennard Qui Tam* Complaint. As discussed in depth above, regardless of the source of Relator Grynberg's knowledge, his investigation did not produce information specifically linking many of the alleged mismeasurement practices to the Transwestern, Questar, and/or KN Defendant groups, and did not link any of alleged mismeasurement practices to particular named Defendants within these groups.

In sum, Relator's 1995 *qui tam* Complaints against Transwestern, Questar, and KN made broad allegations of fraudulent mismeasurement, which were then significantly expanded in the 1997 *Qui Tam* Complaints. But broad-based allegations of widespread mismeasurement of gas produced from federal and Indian lands did not originate with Relator. They had been circulating at least since 1980's, when the Senate Select Committee on Indian Affairs was conducting its investigation. Relator has amassed an impressive and detailed list of more than 20 ways in which gas can be mismeasured, but again, virtually all of these were previously the subject of much discussion in published articles and educational materials that were widely disseminated among members of the gas industry. To be sure, Relator was the first make allegations specifically identifying a number of Transwestern, Questar, and KN entities as either employing all of the mismeasurement techniques, or causing them to be employed. However, this critical

link is not substantially premised on direct and independent knowledge. Rather, it is based largely upon the knowledge of others, speculation, or a combination of both. Consequently, the Special Master finds and concludes that Relator has not met his burden of demonstrating that he is an original source of the allegations in his Complaints in 99 MD 1603, 99 MD 1604, and 99 MD 1608.

The issues presented by the "direct and independent knowledge" prong of the original source inquiry are not simple, and the proper resolution of them is fairly debatable. Relator has expended a very significant amount of resources in the course of his independent investigation. He asserts that, as a result of his investigation, he is now one of the foremost authorities on gas mismeasurement and industry practices, and his assertions in this regard may well be accurate. As repeatedly noted above, Relator does have knowledge that would qualify as "direct and independent" as to some allegations in some of the 1997 *qui tam* Complaints. Although the Special Master has concluded that Relator's investigation differed from the investigation described in *Kennard,* both in terms of its

nature and results, a plausible argument can be made to the contrary. The language of § 3730(e)(4)(B) is not particularly helpful, and the Tenth Circuit law, as well as the law in other Circuits, provides only limited guidance as to how § 3730(e)(4)(B) should be applied to this rather unique and complicated factual setting. Nevertheless, the Special Master finds and concludes that even viewing the record in the light most favorable to the Relator, he lacks sufficient direct and independent knowledge of information supporting the allegations in his 1997 *qui tam* Complaints to qualify as an original source.[47]

## III. THE DEFENDANTS' MOTIONS TO DISMISS BASED ON THE DISCLOSURE AND SEAL REQUIREMENTS OF THE FALSE CLAIMS ACT

### A. Is Compliance with 31 U.S.C. § 3730(b)(2) a Jurisdictional Requirement?

Defendants have moved to dismiss Relator's claims on the ground that he failed to comply with the disclosure and seal re-

---

**47.** Defendants have raised two other issues concerning Relator's status as an original source. First, they contend that a relator must be the original source of the public disclosures. Second, they assert that a relator must voluntarily provide his or her information to the government before any public disclosure of the allegations or transactions supporting the *qui tam* action occurs. There is case law in some other Circuits adopting one or the other of these additional requirements. *E.g., United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 16 (2d Cir.1990) (relator must be the source of the public disclosure); *FPC–Boron,* 105 F.3d at 690–91 (relator must have provided the information to the government before the disclosures on which his allegations are based were made public). The United States Court of Appeals for the Tenth Circuit has not ruled on the applicability of either of these two additional

requirements. The Special Master has serious doubts that our appellate court would look favorably on either of them. The Second Circuit requirement that a relator must be the source of the public disclosure is based upon a construction of § 3730(e)(4)(B) that is at odds with Tenth Circuit law. The District of Columbia Circuit's conclusion that a relator must voluntarily provide the government with his or her information before any public disclosure occurs appears inconsistent with the express language of the statute, which requires only that this task be completed before filing suit. In any event, since the Special Master has found and concluded that, as a matter of law, Relator has failed to meet the traditional direct and independent knowledge test, there is no need to engage in extended discussion regarding the merit of Defendants' additional arguments.

quirements of 31 U.S.C. § 3730(b)(2). Section 3730(b)(2) states:

> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to [Rule 4(i)(1), as amended] of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

Initially, the parties dispute whether the written disclosure and seal requirements of § 3730(b)(2) are "jurisdictional" or "procedural." The apparent import of the dispute is that a jurisdictional violation, as opposed to one that is merely procedural, requires complete dismissal of Relator's claims. It should be noted that in many instances, a claim that § 3730(b)(2)'s disclosure and/or seal requirements have been violated can be resolved without reaching the "jurisdictional" versus "procedural" dichotomy. For the most part, even procedural requirements demand strict compliance. *New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Co., Inc.*, 72 F.3d 830, 833 (10th Cir.1996) (stating that "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law;" quoting *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989)). Furthermore, regardless of whether a requirement is labeled jurisdictional or procedural, an action generally must be dismissed in the event of noncompliance if: (a) it is barred by the terms of the statute; and (b) dismissal would accomplish more than the mere creation of an additional procedural technicality. *Hallstrom*, 493 U.S. at 31, 110 S.Ct. 304. Nevertheless, for reasons that will become apparent in Section III(D), *infra*, dealing with Defendants' claim that Relator violated the seal requirements of § 3730(b)(2), the Special Master finds and concludes that it is not possible to avoid resolution of the "jurisdictional" versus "procedural" issue in this case.

Defendants' argument that the disclosure and seal requirements of § 3730(b)(2) are jurisdictional rests on two decisions in which the Tenth Circuit, in passing, attached a jurisdictional label to them: *United States ex rel. Woodard v. Country View Care Ctr., Inc.*, 797 F.2d 888 (10th Cir. 1986) (hereinafter *"Woodard"*) and *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039 (10th Cir.2004). Relator argues that the Tenth Circuit's prior labels were dicta, and that every court to directly address the question has concluded that the requirements are procedural.

In *Woodard*, defendants asserted that the relator failed to provide the government with substantially all the evidence in his possession as required by 31 U.S.C. § 232(C), later recodified as 31 U.S.C. § 3730(b)(2). The Tenth Circuit first recited the requirements of § 232(C) and described the materials disclosed to the government in purported satisfaction of the Section. The court then segued into its analysis with the following sentence: "Appellants have raised a number of questions on the *jurisdiction* of the trial court." *Woodard*, 797 F.2d at 891 (emphasis added). After finding no error in the district court's holding that the relator fully complied with the disclosure provision, the Tenth Circuit introduced its next discussion with the following sentence: "The other apparent purpose of the notification re-

quirement is the subject of the appellants' next *jurisdictional* challenge." *Id.* at 892 (emphasis added).

The substantive issues in *Kennard* all concerned the public disclosure/original source provisions of 31 U.S.C. § 3730(e)(4) which, as previously noted, are clearly jurisdictional. However, one of the arguments advanced by the relators was that they were immunized from the operation of 31 U.S.C. § 3730(e)(4) because they had provided the government with a copy of their complaint in advance of filing, as required by § 3730(b)(2). The Tenth Circuit rejected this argument by first observing that "[s]ection 3730(e)(4) does not contain an exception for complying with the mandatory *jurisdictional* requirements of § 3730(b)(2)." *Id.* (emphasis added).

From these passages in *Woodard* and *Kennard,* Defendants argue that the Special Master is bound by controlling authority to conclude that the disclosure and seal requirements in § 3730(b)(2) are jurisdictional. The Special Master disagrees. To the extent that the above described language in *Woodard* and *Kennard* is dicta, it is not considered binding precedent. *E.g., Nephew v. City of Aurora,* 766 F.2d 1464, 1466 (10th Cir.1985). The Tenth Circuit has defined "dicta" as "statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case at hand." *See OXY USA, Inc. v. Babbitt,* 230 F.3d 1178, 1184 (10th Cir.2000) (citing *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1184 (10th Cir.1995)), *rev'd on other grounds,* 268 F.3d 1001 (10th Cir.2001) (en banc). As a practical matter, if the statements can be removed from the opinion "without seriously impairing the analytical foundations of the holding," then the statements are not binding authority. *See id.* at 1184–85. Under this standard, the Special Master concludes

that the passages relied upon by Defendants do not rise to the level of binding authority. The statements introducing the analysis in *Woodard* appear to be iterations of the appellants' arguments rather than pronouncements of law. In *Kennard,* the force of the referenced statement would not be diminished if it read: "Section 3730(e)(4) does not contain an exception for complying with the mandatory [ ] requirements of § 3730(b)(2)." Since the references to "jurisdiction" could be removed from both cases without detracting from the Tenth Circuit's holdings therein, they are dicta.

Having concluded that there is no controlling Tenth Circuit precedent on the issue, the question becomes whether the requirements of § 3730(b)(2) are in fact "jurisdictional," as contended by Defendants. Relator asserts that when Congress intended to impose a jurisdictional bar in the FCA, it did so with clear and unmistakable language. He correctly notes that Congress expressly prefaced the public disclosure/original source requirements in § 3730(e)(4) with the phrase "[n]o court shall have jurisdiction." Defendants counter by observing that although the first-to-file bar in 31 U.S.C. § 3730(b)(5) contains no specific reference to the district court's jurisdiction, there seems to be no judicial disagreement that the first-to-file requirement is a jurisdictional limitation. *E.g., United States ex rel. Grynberg v. Koch Gateway Pipeline Co.,* 390 F.3d 1276 (10th Cir.2004); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.,* 149 F.3d 227 (3rd Cir.1998).

While the statutory language appears to be a rather unreliable indicator of whether § 3730(b)(2) was intended to be jurisdictional or procedural in nature, a substantial body of federal case law from other Circuits directly addressing the issue has

uniformly rejected attempts to read § 3730(b)(2) as implicating a court's subject matter jurisdiction. The oft-cited Ninth Circuit decision in *United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir.1995) includes the following statement: "The requirements of § 3730(b)(2) are not jurisdictional, and violation of those requirements does not per se require dismissal." No less than seven federal district court decisions have concurred with the conclusion reached in *Lujan*. *United States ex rel. King v. F.E. Moran, Inc.*, 2002 WL 2003219 at *13 (N.D.Ill.2002); *Castenson v. City of Harcourt*, 86 F.Supp.2d 866, 877–78 (N.D.Iowa 2000) (analogizing § 3730(b)(2) requirements to receiving a right-to-sue letter in Title VII cases); *United States ex rel. Mikes v. Straus*, 931 F.Supp. 248, 258–60 (S.D.N.Y.1996) (quoting extensively from *Lujan*; concluding that the requirements' objectives would not be served by dismissal); *Wisz ex rel. United States v. C/HCA Dev., Inc.*, 31 F.Supp.2d 1068, 1069 (N.D.Ill.1998); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F.Supp. 1040, 1054 (S.D.Ga.1990) (describing the section as an "ancillary procedural requirement;" suggesting that rigid adherence to the statutory text is inappropriate where the statutory objectives have been achieved by lesser means); *United States v. Fiske*, 968 F.Supp. 1347, 1350–51 (E.D.Ark.1997) (assuming the requirements are not jurisdictional); *United States ex rel. Ackley v. IBM, Corp.*, 76 F.Supp.2d 654, 666 n. 17 (stating that the disclosure requirement in § 3730(b)(2) is "more procedural in nature," as compared to the jurisdictional disclosure requirement in § 3730(e)(4)(B)). Additionally, the United States Court of Appeals for the Second Circuit, while finding no need to decide the issue, expressed hesitancy to label § 3730(b)(2) jurisdictional. *See Uniteded States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 1000 n. 4 (2d Cir.1995).

■ The Special Master concurs with the conclusion reached by these courts that a failure to comply with the disclosure and seal obligations imposed by 31 U.S.C. § 3730(b)(2) does not deprive a court of subject matter jurisdiction. The disclosure and seal provisions are generally regarded as protecting the government's ability to investigate claims of fraud and to assist the government in exercising its statutory right to elect to intervene. The FCA provides the government with adequate remedies in the event it determines that its interests have been undermined by a violation § 3730(b)(2). *See* 31 U.S.C. § 3730(c)(2)(A). In light of this, it is extremely doubtful that Congress would have intended that any violation of § 3730(b)(2), no matter how technical or trivial, automatically result in dismissal for lack of subject matter jurisdiction.

### B. Character, Timing, and Method of Service of the § 3730(b)(2) Disclosure

■ Section 3730(b)(2) imposes a variety of express and implied restrictions on the character, timing, and method of service of the disclosures mandated by the statute. These restrictions cabin the information that may be considered in determining whether a relator has complied with his or her statutory duty. For example, § 3730(b)(2) expressly provides that the disclosure of substantially all material evidence and information must be in writing. The clear and unambiguous import of the words "written disclosure" is that oral communications have no efficacy in terms of compliance with the statute. Although Relator contends that his oral communications with the government may also be considered, he proffers no authority this proposition, and the Special Master rejects

it as being inconsistent with the statutory language.[48]

Accordingly, the alleged verbal exchanges between Relator and various governmental officials are categorically excluded for purposes of evaluating § 3730(b)(2) compliance. These purported oral exchanges include, but are not limited to: (a) a day-long seminar in Santa Fe, New Mexico on May 15, 1995, *see* Relator's Br. at 24;[49] (b) a meeting in Washington, D.C. on October 16, 1995, *see id.* at 25; (c) alleged meetings in Denver, Colorado with Vince Terlap and others in 1997, *see id.* at 26; (d) phone conversations with Vince Terlap prior to filing of the 1997 Complaints, *see id.* at 26 n. 19; (e) meetings with Vince Terlap in his office, *see id.;* (f) a meeting with Michael Carey on July 15, 1997, *see id.* at 27; (g) "additional meetings" in Denver in 1997, *see id.* at 28; (h) site visits in 1998 with government personnel, *see id.;* and (i) a meeting with Vince Terlap in Denver in June 1998, *see id.* at 28–29.

Furthermore, even written materials are not automatically eligible for consideration. The statute plainly requires that a written disclosure of substantially all material evidence and information be served on the Government pursuant to Rule 4 of the Federal Rules of Civil Procedure. Rule 4 requires service on the United States Attorney for the District in which the action is brought and the United States Attorney General. The Special Master is unaware of any legislative purpose manifestly undermined by a literal interpretation of the Rule 4 service requirement. Equitable modification of this requirement would be especially inappropriate in the context of this case, wherein Relator Grynberg has always had the assistance of legal counsel. Therefore, the Special Master finds and concludes that writing disclosures which were provided to the government in some manner other than by formal service under Fed.R.Civ.P. 4 cannot be taken into account in assessing compliance with § 3730(b)(2). The evidentiary record reveals that a significant amount of written information was informally disclosed to various government officials and employees through correspondence, including but not limited to virtually all of the over 250 documents in the E series of Exhibits to Relator's Brief in Opposition to the Coordinated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to 31 U.S.C. § 3730(e)(4).

Another component of the overall inquiry is *when* the written disclosure of substantially all material evidence and infor-

---

**48.** Relator's contends that because § 3730(e)(4)(B) and § 3730(b)(2) serve similar purposes, oral communications, which are cognizable under (e)(4)(B)'s voluntary disclosure to the government requirement, should also be recognized as an appropriate vehicle for complying with (b)(2). The argument ignores the readily apparent differences in the wording of the two provisions. Section 3730(b)(2)'s express inclusion of the word "written" before disclosure, as well as its mandate that service be accomplished in accordance with Fed.R.Civ.P. 4, clearly demonstrates that it contemplates a more formal disclosure procedure than does § 3730(e)(4)(B).

**49.** In Section III of this Report and Recommendation, references to "Relators Br." are to Relator's Brief in Opposition to the Coordinated Defendants' Motion to Dismiss Based on the Disclosure and Seal Procedures of the False Claims Act, 31 U.S.C. § 3730(b)(2). References to "Def. Br." are to Coordinated Defendants' Memorandum in Support of Their Motion to Dismiss Based on the Disclosure and Seal Requirements of the False Claims Act. References to "Defts Reply" are to the Coordinated Defendants' Reply Brief in Support of Their Motion to Dismiss based on the Disclosure and Seal Requirements of the False Claims Act.

mation the person possesses must be served on the government. Defendants argue that the statute requires a "one-time" contemporaneous service of both the *qui tam* complaint and the material evidence and information. *See* Def. Reply at 2, 4–6. The Special Master finds little support for Defendants' suggestion that both the complaint and the material evidence and information must be served at the same time. At least one court has implicitly interpreted § 3730(b)(2) to allow service of the evidence and information after service of a copy of the filed complaint. *See United States ex rel. Kalish v. Desnick*, 765 F.Supp. 1352, 1355–56 (N.D.Ill.1991) (finding that the time period in which the government may elect to intervene does not run in lock-step with the time period in which the complaint must remain under seal). Defendants simply misstate § 3730(b)(2) in arguing that the "written disclosure submission triggers ... the 60 day investigation period." Def. Reply at 5. Rather, the 60–day period in which the government may elect to intervene begins when the government "receives *both* the complaint and the material evidence and information." 31 U.S.C. § 3730(b)(2) (emphasis added); *Kalish,* 765 F.Supp. at 1356. A relator certainly could elect to serve both components at the same time. However, the Special Master concludes that a relator could also choose to serve the complaint separately from the evidence and information in his or her possession.

■ Defendants also argue that the written disclosure of material evidence and information can not be accomplished "piecemeal." There is nothing in the statutory language from which such a requirement can be inferred. Defendants' reliance on *Kalish* is misplaced. *See* Def. Reply at 5. *Kalish* did not address a "piecemeal" disclosure of evidence and in-

formation. The Special Master can envision a variety of scenarios in which multiple disclosures might be warranted. For example, a relator might wish to supplement the initial disclosure with additional evidentiary material uncovered thereafter. Also, a relator seeking to maximize the likelihood of intervention might choose to serve the government with substantially all of his or her evidence and information even prior to filing a complaint. This disclosure could then be supplemented with additional disclosures before or after the complaint was filed. Furthermore, while a would-be relator would not be well-advised to put unnecessary time pressure on the government by disclosing his or her material evidence and information well after the filed complaint is served, the statute provides a mechanism for obtaining necessary extensions if the initial 60–day period is inadequate. *See Kalish,* 765 F.Supp. at 1356. Therefore, the fact that disclosures may occur at different times does not automatically disqualify any of them from consideration.

Based on the foregoing, the Special Master finds and concludes that the criteria qualifying a disclosure for consideration in assessing compliance with 31 U.S.C. § 3730(b)(2) are two-fold: (a) the disclosure must be in writing; and (b) it must be served in accordance with Fed. R.Civ.P. 4. Even when viewed in the light most favorable to Relator, the evidentiary record indicates that only the A series of exhibits previously discussed in Section II(B)(3)(a) meet this two-fold test. *See* Def. Exh. E–1, June 13, 1997 Letter from Jeff Reiman to Attorney General Janet Reno; Def. Exh. F, June 20, 1997 Letter from Jeff Reiman to Gordon A. Jones, Esq., Department of Justice, Civil Division. Indeed, for purposes of the instant motions, Defendants do not dispute that Relator served at least one set of the A

series of exhibits on the government in accordance with Rule 4.

The record further demonstrates that Relator advised the government of his intent to incorporate the previously served A series of documents by reference when serving the government with additional complaints against other Defendant groups. *See* Def. Exh. F. Defendants do not seriously dispute the efficiency and appropriateness of this arrangement under the circumstances. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.,* 755 F.Supp. 1040, 1053–54 (S.D.Ga. 1990) (refusing to dismiss a case where the relator notified the government that it was relying on evidence previously provided to the government in a related, but separate *qui tam* action).

C. *Sufficiency of Relator's Compliance with the Written Disclosure to the Government Requirement of 31 U.S.C. § 3730(b)(2)*

Having identified the types of materials properly considered under § 3730(b)(2), we now address whether there was a violation of the disclosure requirement in this case. At the outset, several of Defendants' criticisms regarding the *evidentiary quality* of Relator's disclosures in the A series of exhibits appear to be resolved by the statute's plain language. Specifically, § 3730(b)(2) does not facially support Defendants' arguments that Relator was required to serve the government with evidence: (a) referencing each Defendant (i.e. the 209 "No Document Defendants" not mentioned anywhere in the A series); (b) referencing each mismeasurement technique; or (c) linking each Defendant to each mismeasurement technique. *See* Def. Br. at 6–11; Def. Reply at 7–9. Section 3730(b)(2) requires only that the Relator disclose that which he or she "possesses."

It follows that if Relator did not possess specific evidence about every Defendant and/or their measurement practices—as he readily admits in many instances— § 3730(b)(2) was not violated by a failure to include such evidence in the disclosure. *See* Def. Br. at 11–12 (citing Grynberg's admissions in the record and observing that "Grynberg could not provide the government evidence or information that he did not have").

Defendants vigorously protest this conclusion, arguing that the disclosure requirement means "a relator must provide to the government significant evidence and information of a false claim." Def. Br. at 27. Defendants cite *United States ex rel. Made in the USA Found. v. Billington,* 985 F.Supp. 604 (D.Md.1997) (hereinafter *"Made in the USA"*) for the proposition that a relator's "mere guess, hunch or suspicion is insufficient." *Id.* In *Made in the USA,* the United States District Court for the District of Maryland stated that

[w]hile scant authority exists delineating what constitutes a disclosure statement sufficient to survive summary judgment, there is no doubt that it must be more substantive that the notion that "something fishy" is going on. It should, at a minimum, "comprise much of what [the relator] will rely upon to support the contentions in the case at bar." *United States ex rel. Stone v. Rockwell,* 144 F.R.D. 396, 398–400 (D.Colo.1992). It cannot gird itself simply with hearsay from an employee of the purported violator, and then use discovery as a fishing expedition to determine if there was, in fact, a violation.

The Special Master agrees that a relator's § 3730(b)(2) disclosure should include much of what he will rely upon to support his contentions and allegations. However, to the extent that the *Made in the USA* decision suggests a qualitative component

to the disclosures mandated by § 3730(b)(2), the Special Master respectfully declines to follow it. The plain language of the statute refers only to quantity ("substantially all") and subject matter ("material evidence and information the person possesses"). Theoretically, a relator could possess very little material evidence at the time of the disclosure. So long as he or she serves written disclosure of substantially all that he or she possesses, § 3730(b)(2) is not literally offended. There is nothing in the statute's language or underlying purpose indicating a Congressional intent that a relator's § 3730(b)(2) disclosures be tested against some standard of evidentiary sufficiency akin to that required under Fed.R.Civ.P. 56, at least in those situations where compliance is questioned by the defendants rather than the government.

Of course, the fact that the plain language of § 3730(b)(2) does not contemplate an evaluation of the evidentiary quality of a relator's disclosure does not preclude *the government* from evaluating the disclosure and seeking dismissal of entire actions or particular claims in the appropriate case. Indeed, this appears to have already occurred in the instant multi-district litigation. As this Court has previously observed:

> The FCA provides that the "Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A). The Government asserts that this provision permits it to dismiss *qui tam* suits over the objection of the relator if dismissal is rationally related to a legitimate governmental interest.... The government may seek such dismissal even where it decides not to intervene in the relator's action.

*See Order on United States' Motion to Dismiss Portions of Relator Grynberg's Complaints,* MDL Docket No. 1293 (Oct. 9, 2002) (citations omitted) (dismissing relator's valuation claims where government argued, *inter alia,* that relator "failed to provide the government with material evidence to substantiate these allegations;" cited in Def. Reply at 29 n. 24); *see also Ridenour,* 397 F.3d at 932–33; *Swift v. United States,* 318 F.3d 250, 252–53 (D.C.Cir.2003) (granting government's motion to dismiss on argument that the amount of money involved did not justify the expense of litigation even if the allegations could be proved). In this regard, the government's dismissal power very likely explains the qualitative analysis found in *Made in the USA,* as well as various comments on the subject by other courts.

In *Made in the USA,* the relator alleged that the Buy American Act had been violated by the Librarian of Congress in the procurement of historical preservation work. *Made in the USA,* 985 F.Supp. at 605. Relator further sought damages under the FCA against the companies awarded the contract, alleging that they violated their agreement to comply with the Buy American Act in performing the work. *See id.* The government declined to intervene, but nonetheless moved for dismissal of the claim against the Librarian on the grounds of sovereign immunity and for "summary judgment" [50] on the FCA claim

---

**50.** The purported resort to "summary judgment" procedures is curious to say the least. Fed.R.Civ.P. 56 grants two categories of litigants the opportunity to obtain "summary judgment:" (a) "[a] party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment;" and (b) "[a] party against whom a claim, counterclaim, or cross-claim is asserted." In a *Made in the USA* situation, however, the govern-

for failure to provide an adequate disclosure statement. *See id.* at 606. The court first found that relator failed to establish a genuine dispute of material fact that the Buy American Act had been violated. *See id.* at 606–09. In addition, the court granted the government's motion to dismiss because the relator's disclosure statement was nothing more than "a mere recitation of facts ... available to the government." *See id.* at 608. The *Made in the USA* court did not identify the statutory or procedural basis upon which the government brought its dispositive motion, but the Special Master observes that § 3730(c)(2)(A) would clearly grant the government, as the real party in interest in a *qui tam* action, such authority. *Ridenour*, 397 F.3d at 932–33; *see also United States' Memorandum in Support of Motion to Dismiss [Osterhoudt's] First Amended Complaint*, MDL Docket No. 1293 (July 28, 2000) (cited in Def. Br. at 27 n. 22) (criticizing relator's lack of knowledge and evidence in moving to dismiss the action).

■ While the government certainly could have done so, it has not chosen to intervene or to seek dismissal of Relator claims, and the Special Master is unaware of any case where *a defendant* has successfully challenged a relator's disclosure on qualitative grounds. *Compare United States ex rel. Doe v. X Corp.*, 862 F.Supp. 1502, 1508–09 (E.D.Va.1994) (denying defendant's motion to dismiss on the ground that "nothing in the Act precludes a relator from including all of her evidence and information in the complaint" and then submitting a separate "written disclosure" that merely incorporates, rather than repeats, the evidence and information in the complaint), *with United States ex rel. Doe v. CVS Corp.*, 1999 WL 33912815 at *3 (D.S.C.1999) (granting the government's motion to dismiss claims because the relator had not provided sufficient information through his complaint and disclosure of material evidence to proceed under the Act). More importantly, there is no language in the FCA granting defendants a similar right to dismiss for any legitimate purpose. Finally, the Special Master can discern no clearly expressed legislative intent contrary to the plain requirement that a relator serve a written disclosure of substantially all material evidence and information that he possesses, without regard to whether his disclosure rises to some unstated, minimum level of qualitative proof.

The well-recognized purpose of the disclosure requirement is to provide the government with ample information to investigate and permit an informed decision on intervention. If the relator possesses no evidence or information inculpating the defendant or supporting a particular claim, for example, and relies on a pure hunch, the government's intervention decision is easily made and the legislative intent is honored. Moreover, as has occurred in some of these cases, the government can also elect to seek dismissal of suspect claims. While Defendants are no doubt affected by the government's decision to allow a relator to go forward on claims that the Defendants believe have no merit,

---

ment is neither seeking to recover on a claim nor a party against whom a claim is asserted. Rather, the United States is effectively the plaintiff/real party in interest seeking to have "judgment" entered against itself. The Special Master places quotes around "judgment" here because the FCA expressly provides that the first-to-file bar does not apply to the government. 31 U.S.C. § 3730(b)(5). In other words, if the government obtained a dismissal of a previously-filed, but factually unsupported claim, the government would still have the right to refile the action if evidence later came to light. These observations further support the conclusion that the government's motion for dismissal in a *Made in the USA* situation is premised on § 3730(c)(2)(A).

nothing in the statute or the legislative history of § 3730(b)(2) indicates that the disclosure requirement is a mechanism for Defendants to effectively argue that relator has failed to establish a triable issue on the merits. This is precisely what Defendants have attempted to do here.

The plain language of § 3730(b)(2) requires written disclosure of a certain quantity ("substantially all") and type ("material") of evidence and information in the relator's possession. However, the Special Master is unaware of any court which has previously attempted to discern the plain meaning of this statutory language. Following the Tenth Circuit's process of statutory construction, the Special Master now turns to this analysis. According to Black's Law Dictionary, "substantially" means "[e]ssentially; without material qualification; . . . in a substantial manner." Black's Law Dictionary 1428–29 (Sixth ed.1990). "Substantial" is defined as "[o]f real worth or importance; of considerable value; valuable." *Id.* at 1428. Likewise, "material" means "[i]mportant; more or less necessary; having influence or effect. . . ." *Id.* at 976. "Material evidence" is defined as "[t]hat quality of evidence which tends to influence the trier of fact because of its logical connection with the issue." *Id.* Thus, a relator's obligation to disclose in writing "substantially all material evidence and information" could be

rephrased, for example, as an obligation to disclose "essentially all important evidence and information" or "all evidence of real worth or importance which would tend to influence" resolution of an issue.[51] However, the Special Master does not believe these alternative phrases shed definitive light on the original text. For example, the alternative definitions of "substantially" (i.e. "essentially," "without material qualification," "considerably") are as indeterminate as the principal term itself.[52]

A consideration of § 3730(b)(2) as a whole provides assistance in assessing the purpose sought to be achieved by Congress in requiring disclosure of "substantially all material evidence and information" in a relator's possession. The context of the statute makes it clear that the relator's disclosure obligation is connected to the government's right to elect to intervene and proceed with the action. The logical conclusion to be drawn from the provision as a whole is that service of the complaint and written disclosure of substantially all material evidence and information is intended to assist the government in deciding whether to exercise its statutory intervention right. *E.g., Woodard,* 797 F.2d at 892; *Mikes,* 931 F.Supp. at 259; *Stinson,* 755 F.Supp. at 1053.[53]

Defendants assert that Relator's compliance with § 3730(b)(2) should be found

---

**51.** The Special Master rejects the purported definition of "material evidence" urged by Defendants at page 28 of their opening brief. Defendants obtained their purported definition from *United States ex rel. Coates v. St. Louis Clay Prods. Co.,* 65 F.Supp. 645, 650 (E.D.Mo.1946). Defendants fail to point out, however, that the *Coates* court attempted to define the term "substantial evidence and information," not "substantially all material evidence and information." *See id.* at 650.

**52.** Interestingly, the *Made in the USA* court concluded that the phrase "substantially all" in the Buy American Act was indeterminate.

The court said that "substantially all" and "virtually all" were interchangeable, and even plaintiff's counsel "could not articulate a precise definition other than to say that it must be more than 50%." *Made in the USA,* 985 F.Supp. at 607 n. 5.

**53.** The Special Master has also looked to the legislative history of § 3730(b)(2) to determine if it provides guidance as to the meaning of the phrase "substantially all of the material evidence and information." The disclosure provisions in § 3730(b)(2) have remained essentially unchanged since their inclusion in the FCA in 1943. The history leading up to

lacking because: (a) there are aspects of his independent investigation that do not appear in the A series of exhibits; and (b) he failed to provide information in his possession that undermined the factual and/or legal viability of his *qui tam* claims. Specifically, Defendants point out that the A series of exhibits do not reference many of Relator's discussions with third parties; Relator's analysis of 10–Ks and annual reports; and site inspections. Additionally, Defendants contend that Relator withheld test results, judicial opinions, and other exculpatory evidence relating to his private litigation that cast doubt on the validity of some of the mismeasurement theories alleged in the 1997 *Qui Tam* Complaints.[54] The information obtained by Relator from undisclosed third party interviews, publicly available corporate reports, and well inspections adds little to the evidence and information that Relator concededly provided to the government in the form of the specific and detailed description of his investigation and claims that is contained in each of the 1997 *Qui Tam* Complaints, as well as the over 80 documents comprising the A series of exhibits. While some test

results and documents concerning Relator's private litigation were not provided to the government, it is far from clear that these materials were as damaging to Relator's *qui tam* claims as Defendants would have us believe. In essence, Defendants assert that § 3730(b)(2) requires the Special Master to engage in a detailed and intricate analysis of any evidence not provided to the government in writing, followed by a weighing and assessment of its probative value. Nothing in the either the statutory language or its underlying purpose support Defendants' position. Nor does the statute seem to contemplate lengthy and complex proceedings initiated by defendants rather than the government, aimed at second-guessing a relator's disclosures.

▅▅▅ At least where the government itself is not seeking dismissal under 31 U.S.C. § 3730(c)(2)(A), the Special Master finds and concludes that a relator complies with his duty to provide a copy of the complaint and written disclosure of "substantially all of the material evidence and information in his possession" if: (a) the complaint and written disclosures contains

---

the 1943 amendments to the FCA is well documented, but it sheds little light on the specific meaning of the words "substantially all" and "the material evidence and information" contained in § 3730(b)(2). The Defendants point out that in the 1980's Congress removed as surplus the words, "material to the effective prosecution of such suit," that further described the "evidence and information" to be disclosed. *See* Def. Reply at 30 (citing Historical and Statutory Notes attached at Def. Exh. (b)(2)-L); *Woodard,* 797 F.2d at 891. The Special Master agrees that the deletion of the surplusage did not alter the statutory intent, but this observation is not helpful in determining either the scope or the purpose underlying § 3730(b).

**54.** This evidence includes: (a) the complete record and the opinion of Judge Johnson in litigation with Questar where Judge Johnson struck Relator's opinions about allegedly sto-

len gas under *Daubert;* (b) details of Grynberg's unsuccessful litigation with KN; (c) details about his unsuccessful arbitration with Transwestern; (d) Grynberg's attorney's warnings about the lack of evidence in support of his claims; (e) details about changing industry standards on the wet vs. dry measurement issue; (f) gas analyses that did not support his claims; and (g) Grynberg's own applications for variances relating to the chart recording claims. *See* Def. Br. at 16–22; Def. Reply at 15–26. Grynberg responds that: (a) several suits against KN Defendants netted a $32 million settlement, thereby validating his claims; (b) the Transwestern arbitration did not end in a substantive determination of whether it mismeasured gas; (c) the Questar litigation ended in a substantial verdict for Grynberg and that Judge Johnson orders to strike did not validate Questar's practices. *See* Rel. Br. at 32–36.

substantially all of the evidence and information that the relator relies upon to support the *qui tam* claim; and (b) the government is able effectively to exercise its right of intervention. Relator's 1997 *Qui Tam* Complaints and the over 80 A series documents formally served on the government contain a very significant portion of the evidence and information Relator relied upon as supporting his claims against the various Defendant groups. It certainly exceeds the amount of evidence and information found to be sufficient by the Tenth Circuit in *Woodard.* The fact that much of the information was second-hand, or that many Defendants could not be linked to the alleged mismeasurement practices without making speculative assumptions is irrelevant to the § 3730(b)(2) inquiry. *See Detrick,* 909 F.Supp. at 1018 n. 24 ("Significantly, the question of the nature and quantum of a relator's knowledge of the fraud arises explicitly only in the context of an "original source" inquiry.").

The record also reveals that the government conducted its investigation and exercised its statutory right by electing not to intervene. Defendants make much of the fact that the government complained at times that it did not have sufficient information to link many of the Defendants to the mismeasurement practices alleged in Relator's *Qui Tam* Complaints. However, there is nothing in the record suggesting that Relator withheld significant evidence or information in his possession that would have been of further assistance to the government in establishing such a linkage. As previously discussed, § 3730(b)(2) does not contemplate imposition of a penalty against relators who fail to supply information that they do not have in their possession.

The Special Master also notes that Defendants have failed to demonstrate that they suffered any prejudice proximately caused by deficiencies in Relator's written disclosure. Defendants may have had a better argument regarding prejudice if, in fact, the government had decided to intervene, thereby potentially improving Relator's statistical chance of recovery,[55] but we are not faced with that situation here.

In conclusion, the Special Master finds and concludes that the terms "substantially" and "material" are ambiguous in the context of evaluating compliance with the disclosure requirement in § 3730(b)(2). While resolution of the meaning of such terms necessarily implicates some gray area, the primary legislative purpose of the disclosure provision does not support an interpretation granting Defendants an opportunity to enforce exacting standards on the quality and quantity of a relator's disclosure. The primary query should be whether the rights of the statutorily intended beneficiary of the evidence and information (i.e. the government) have been prejudiced because the relator withheld a substantial amount of evidence and information supporting his or her claims. Viewing the factual record in the light most favorable to Relator, the Special Master finds and concludes that no prejudice to the government has been demonstrated and that Relator made a meaningful effort to disclose a substantial portion of the evidence and information on which he was relying.

*D. Did Relator Grynberg Violate the Seal Requirement and, if So, Is Dismissal an Appropriate Remedy?*

Defendants argue that Relator violated the seal requirement of 31 U.S.C.

---

**55.** *See* Rel. Br. at 20 n. 13 (citing a report that cases in which the government intervenes have a much higher rate of success).

§ 3730(b)(2) by discussing the existence and substance of his 1997 *Qui Tam* Complaints with various potential victims and attorneys during the seal period. *See* Def. Br. at 23–25, 46–48. There is evidence in the record to support these allegations. *See* Affidavit of Joel M. Vincent (Def. Exh. OOO). While acknowledging that dismissal may be a "heavy club" for violation of the seal requirement, Defendants nevertheless seek dismissal because they claim that Relator's violations were knowing, and that he allegedly attempted to cover them up. *See* Def. Br. at 47.

Relator does not dispute that he gave numerous presentations during the seal period, but rather focuses on the fact that the substantive claims he discussed were already "embraced" in the then-public 1995 *Qui Tam* Complaint. Because of this unusual circumstance, Relator indicates that he believed he was not doing anything wrong. *See* Rel. Br. at 40, 46–51. However, Relator mounts his most vigorous defense in opposing Defendants' request for dismissal based on the alleged violation. *See id.* at 41–45. In this regard, he points out that he has already been adequately punished for violating the seal requirement by Judge Daniel in one of these now-consolidated cases, and argues that dismissal would be inappropriate in any event. *See id.* at 50.

The Special Master generally concurs with Defendants and Judge Daniel that Relator's presentations violated the seal requirement in § 3730(b)(2). Nevertheless, the Special Master agrees with Relator that under the circumstances presented here, the sanction of dismissal is unwarranted. As the Special Master has previously concluded in Section III(A), *supra,* violations of the disclosure and seal provisions of § 3730(b)(2) do not deprive a court of subject matter jurisdiction.

As noted in Section III(A) above, dismissal is often the appropriate remedy for violation of a statute that imposes procedural, as opposed to jurisdictional requirements. This is true if the terms of the statute bar the action, and dismissal would accomplish more than the mere creation of an additional procedural technicality. *See Hallstrom,* 493 U.S. at 31, 110 S.Ct. 304. Under the FCA, there are a number of potential actions that are expressly barred. For example, the self-explanatory heading for § 3730(e) is "Certain actions barred." *See* 31 U.S.C. § 3730(e). Of course, the public disclosure and original source limitations, addressed above, are included in this subsection. Furthermore, under § 3730(b)(5), the commonly-known first-to-file bar, the statute plainly states that "[w]hen a person brings an action under this subsection, *no person* other than the Government *may* intervene *or bring a related action* based on the facts underlying the pending action." Therefore, if a subsequent action is deemed related to a prior action, it is barred by the plain language of § 3730(b)(5).

These provisions, however, are unlike § 3730(b)(2), which contains no term indicating that a *qui tam* action may not be brought or is barred for failure to comply with the requirements of the Section. The Special Master finds and concludes that the plain language of § 3730(b)(2), when read in conjunction with the remainder of the statute, indicates that a violation of the disclosure and seal requirements of § 3730(b)(2) does not automatically *compel* dismissal. Defendants have not identified any manifest affront to Congressional intent flowing from this conclusion. The appropriate sanction for any violation of Section 3730(b)(2), therefore, must be analyzed on a case-by-case basis.

██ Relator's 1995 *Qui Tam* Complaint and his intent to refile new actions in purported compliance with Fed.R.Civ.P. 9(b) were well known before the 1997 *qui tam* cases were filed. Therefore, the Defendants had been "tipped off" by Relator years before, and the seal provision served only to hide the existence—not the substance—of Relator's new actions from Defendants' view for a brief period. The overwhelming weight of authority suggests that unless a seal violation incurably frustrates the purposes of the seal provision, the sanction of dismissal is inappropriate. *See* Rel. Br. at 41–45, 44 n. 30 (citing and discussing cases). There is nothing in the current record that would allow the Special Master to conclude that Relator Grynberg's various efforts to "shop" his claims to other alleged victims frustrated the purpose of the seal provision or impeded the government's investigation. Defendants propose no lesser sanction for Relator's violation, and the Special Master declines to impose one.

### *CONCLUSION*

Based on the foregoing, the Special Master Recommends that:

The Coordinated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction; Arco's Unocal's and Dauphin's Motion and Brief on Jurisdiction; and The Moving 1997 Defendants' Memorandum to Dismiss Relator's Complaints for Lack of Subject Matter Jurisdiction be **GRANTED IN PART AND DENIED IN PART,** and that an Order be entered

1. Dismissing the following cases for lack of jurisdiction over the subject matter: 99 MD 1601, 99 MD 1602, 99 MD 1603, 99 MD 1604, 99 MD 1605, 99 MD 1608; 99 MD 1609, 99 MD 1610, 99 MD 1611, 99 MD 1612, 99 MD 1613, 99 MD 1614; 99 MD 1621, 99 MD 1624, 99 MD 1625, 99 MD 1626, 99 MD 1628, 99 MD 1630; 99 MD 1632, 99 MD 1633, 99 MD 1634, 99 MD 1636, 99 MD 1637, 99 MD 1639; 99 MD 1640, 99 MD 1641, 99 MD 1643, 99 MD 1644, 99 MD 1645, 99 MD 1649; 99 MD 1650, 99 MD 1651, 99 MD 1652, 99 MD 1653, 99 MD 1654, 99 MD 1655; 99 MD 1656, 99 MD 1661 (only as to allegation of failure to pay for condensate); 99 MD 1668, 99 MD 1671, and 99 MD 1682; and

2. Denying the Motions in all other respects.

Relator's Cross Motion for Summary Judgment with Authority Pursuant to Fed. R.Civ.P. 56, on Issue of Public Disclosure Under 31 U.S.C. § 3729 Et Seq. be **GRANTED IN PART AND DENIED IN PART,** and that an Order be entered that

1. As a matter of law, the Court has jurisdiction over the subject matter of the claims in 99 MD 1607, 99 MD 1615, 99 MD 1616, 99 MD 1617, 99 MD 1618, 99 MD 1619, 99 MD 1622, 99 MD 1623, 99 MD 1627, 99 MD 1629, 99 MD 1631, 99 MD 1635, 99 MD 1638, 99 MD 1642, 99 MD 1646, 99 MD 1647, 99 MD 1648, 99 MD 1657, 99 MD 1658, 99 MD 1659, 99 MD 1660, 99 MD 1661 (except as to allegations regarding condensate); 99 MD 1662, 99 MD 1663, 99 MD 1664, 99 MD 1665, 99 MD 1666, 99 MD 1667, 99 MD 1669, 99 MD 1670, 99 MD 1672, 99 MD 1673, and 04 MD 1684; and

2. Denying the Motion in all other respects.

May 13th 2005.

### APPENDIX A
### UNHIGHLIGHTED DOCUMENTS
**(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)**

| | | |
|---|---|---|
| 33 | 393 | Supp. 4–19 |
| 37 | 394 | Supp. 4–20 |

43
69
90
98
119
120
121
122
125
172
175
182
189
193
197
205
214
215
219
223
227
238
272
293
328
334
335
358
360
369
389
392
Supp. 4–59
Supp. 4–60
Supp. 4–61
Supp. 4–62
Supp. 4–63
Supp. 4–64
Supp. 4–65
Supp. 4–66
Supp. 4–68
Supp. 4–69
Supp. 4–70
Supp. 4–71
Supp. 4–72
Supp. 4–73
Supp. 4–75
Supp. 4–76
Supp. 4–77
Supp. 4–78
Supp. 4–79
Supp. 4–80
Supp. 4–81
Supp. 4–82
Supp. 4–83
Supp. 4–84
Supp. 4–85

395
407
Supp. 1–2
Supp. 2–4
Supp. 2–22
Supp. 2–23
Supp. 2–27
Supp. 2–30
Supp. 2–35
Supp. 2–46
Supp. 2–49
Supp. 2–58
Supp. 3–19
Supp. 3–25
Supp. 3–36
Supp. 3–37
Supp. 3–39
Supp. 3–42
Supp. 3–44
Supp. 3–46
Supp. 4–4
Supp. 4–8
Supp. 4–9
Supp. 4–10
Supp. 4–11
Supp. 4–12
Supp. 4–13
Supp. 4–14
Supp. 4–15
Supp. 4–16
Supp. 4–17
Supp. 4–18
Supp. 4–121
Supp. 4–123
Supp. 4–124
Supp. 4–125
Supp. 4–126
Supp. 4–127
Supp. 4–128
Supp. 4–129
Supp. 4–130
Supp. 5–18
Supp. 5–19
Supp. 5–20
Supp. 5–25
Supp. 5–27
Supp. 5–32
Supp. 5–33
Supp. 5–35
Supp. 5–36
Supp. 5–37
Supp. 5–41
Supp. 5–42
Supp. 5–43
Supp. 5–44
Supp. 5–45
Supp. 5–58

Supp. 4–21
Supp. 4–22
Supp. 4–23
Supp. 4–24
Supp. 4–25
Supp. 4–26
Supp. 4–27
Supp. 4–28
Supp. 4–29
Supp. 4–30
Supp. 4–31
Supp. 4–32
Supp. 4–33
Supp. 4–34
Supp. 4–35
Supp. 4–36
Supp. 4–37
Supp. 4–38
Supp. 4–39
Supp. 4–40
Supp. 4–41
Supp. 4–44
Supp. 4–45
Supp. 4–47
Supp. 4–48
Supp. 4–49
Supp. 4–50
Supp. 4–51
Supp. 4–52
Supp. 4–55
Supp. 4–56
Supp. 4–57
Supp. 6–112
Supp. 6–114
Supp. 6–139
JDPD–1
JDPD–37

Supp. 4–87
Supp. 4–91
Supp. 4–92
Supp. 4–96
Supp. 4–97
Supp. 4–98
Supp. 4–99
Supp. 4–100
Supp. 4–102
Supp. 4–104
Supp. 4–105
Supp. 4–106
Supp. 4–107
Supp. 4–109
Supp. 4–110
Supp. 4–111
Supp. 4–112
Supp. 4–113
Supp. 4–114
Supp. 4–118
Supp. 4–119

Supp. 6–9
Supp. 6–18
Supp. 6–31
Supp. 6–36
Supp. 6–41
Supp. 6–45
Supp. 6–50
Supp. 6–51
Supp. 6–59
Supp. 6–62
Supp. 6–63
Supp. 6–67
Supp. 6–69
Supp. 6–82
Supp. 6–84
Supp. 6–85
Supp. 6–87
Supp. 6–91
Supp. 6–97
Supp. 6–106
Supp. 6–109

## APPENDIX B
### EDUCATIONAL AND INSTRUCTIONAL MATERIALS
**(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)**

78
79
80
81
82
83
84
85
86
87
88
89
91
92
93
94
95
96
97
99
112
113
114
115
116
117
118
123
126

231
235
236
242
245
248
252
264
268
270
283
290
306
307
316
322
373
390
391
396
397
398
399
408
Supp. 2–1
Supp. 2–2
Supp. 2–3
Supp. 2–5
Supp. 2–6

Supp. 2–18
Supp. 2–19
Supp. 2–20
Supp. 2–21
Supp. 2–24
Supp. 2–25
Supp. 2–26
Supp. 2–28
Supp. 2–29
Supp. 2–30
Supp. 2–31
Supp. 2–32
Supp. 2–33
Supp. 2–34
Supp. 2–36
Supp. 2–37
Supp. 2–38
Supp. 2–39
Supp. 2–40
Supp. 2–41
Supp. 2–42
Supp. 2–43
Supp. 2–44
Supp. 2–45
Supp. 2–47
Supp. 2–48
Supp. 2–50
Supp. 2–51
Supp. 2–52

127
128
129
130
181
196
198
199
200
226
230
Supp. 3–45
Supp. 4–42
Supp. 4–43
Supp. 4–46
Supp. 4–53
Supp. 4–54
Supp. 4–58
Supp. 4–67
Supp. 4–74
Supp. 4–86
Supp. 4–88
Supp. 4–89
Supp. 4–90
Supp. 4–93
Supp. 4–94
Supp. 4–95
Supp. 4–101
Supp. 4–103
Supp. 4–108
Supp. 4–115
Supp. 4–116
Supp. 4–117
Supp. 4–120
Supp. 4–122
Supp. 4–131
Supp. 5–1
Supp. 5–2
Supp. 5–3
Supp. 5–4
Supp. 5–5
Supp. 5–6
Supp. 5–7
Supp. 5–8
Supp. 5–9
Supp. 5–10
Supp. 5–11
Supp. 5–12
Supp. 5–13
Supp. 5–31
Supp. 5–34
Supp. 5–38
Supp. 5–39
Supp. 5–40
Supp. 5–46
Supp. 5–47
Supp. 5–48

Supp. 2–7
Supp. 2–8
Supp. 2–9
Supp. 2–10
Supp. 2–11
Supp. 2–12
Supp. 2–13
Supp. 2–14
Supp. 2–15
Supp. 2–16
Supp. 2–17
Supp. 5–49
Supp. 5–50
Supp. 5–57
Supp. 5–59
Supp. 6–1
Supp. 6–2
Supp. 6–3
Supp. 6–4
Supp. 6–5
Supp. 6–6
Supp. 6–7
Supp. 6–8
Supp. 6–10
Supp. 6–11
Supp. 6–12
Supp. 6–13
Supp. 6–14
Supp. 6–15
Supp. 6–16
Supp. 6–17
Supp. 6–19
Supp. 6–20
Supp. 6–21
Supp. 6–22
Supp. 6–23
Supp. 6–24
Supp. 6–25
Supp. 6–26
Supp. 6–27
Supp. 6–28
Supp. 6–29
Supp. 6–30
Supp. 6–32
Supp. 6–33
Supp. 6–34
Supp. 6–35
Supp. 6–37
Supp. 6–38
Supp. 6–39
Supp. 6–40
Supp. 6–42
Supp. 6–43
Supp. 6–44
Supp. 6–46
Supp. 6–47
Supp. 6–48

Supp. 2–53
Supp. 2–54
Supp. 2–55
Supp. 2–56
Supp. 2–57
Supp. 2–59
Supp. 2–60
Supp. 3–24
Supp. 3–40
Supp. 3–41
Supp. 3–43
Supp. 6–49
Supp. 6–52
Supp. 6–53
Supp. 6–54
Supp. 6–55
Supp. 6–56
Supp. 6–57
Supp. 6–58
Supp. 6–60
Supp. 6–61
Supp. 6–64
Supp. 6–65
Supp. 6–66
Supp. 6–68
Supp. 6–70
Supp. 6–71
Supp. 6–72
Supp. 6–73
Supp. 6–74
Supp. 6–75
Supp. 6–76
Supp. 6–77
Supp. 6–78
Supp. 6–79
Supp. 6–81
Supp. 6–83
Supp. 6–86
Supp. 6–88
Supp. 6–89
Supp. 6–90
Supp. 6–92
Supp. 6–93
Supp. 6–94
Supp. 6–95
Supp. 6–96
Supp. 6–98
Supp. 6–99
Supp. 6–100
Supp. 6–101
Supp. 6–102
Supp. 6–103
Supp. 6–104
Supp. 6–105
Supp. 6–107
Supp. 6–108
Supp. 6–110

Supp. 6–111
Supp. 6–113
Supp. 6–115
Supp. 6–116
Supp. 6–117
Supp. 6–118
Supp. 6–119
Supp. 6–120
Supp. 6–121
Supp. 6–122
Supp. 6–123
Supp. 6–124
Supp. 6–125
Supp. 6–126
Supp. 6–127
Supp. 6–128
Supp. 6–129
Supp. 6–130
Supp. 6–131
Supp. 6–132
Supp. 6–133
Supp. 6–134
Supp. 6–135
Supp. 6–136
Supp. 6–137
Supp. 6–138
JDPD–27
JDPD–28
JDPD–29
SD–1
SD–3
SD–5
SD–6

## APPENDIX C
### SENATE COMMITTEE DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

1
2
3
4
5
6
7
77
100
101
102
103
104
105
282
365
Supp. 3–33

## APPENDIX D

**1995 *QUI TAM* ACTION DOCUMENTS**
(All items are included in Exhibit 2 to
Coordinated Defendants' Public
Disclosure/Original Source Brief and are
identified here by document number)

41
42
106
107
108
109
110
111
131
165
166
167
187
188
249
253
254
255
256
257
258
259
260
261
262
263
321
327
349
388
403
Supp. 3–12
Supp. 3–14
Supp. 5–30
SD–2

## APPENDIX E

**DEFENDANTS IN THE 1997 *QUI TAM* CASES TO
WHOM THE PUBLIC DISCLOSURE BAR APPLIES
AS A RESULT OF THE ALLEGATIONS IN THE 1995
*QUI TAM* ACTION DOCUMENTS**

| | DEFENDANT | CASE NUMBER |
|---|---|---|
| 1 | Pacific Interstate Offshore Co. | 99 MD 1601 |
| 2 | Pacific Offshore Pipeline Co. | 99 MD 1601 |
| 3 | Southern California Gas Co. | 99 MD 1601 |
| 4 | Pacific Gas & Electric Co. | 99 MD 1602 |
| 5 | Pacific Gas Transmission Co. | 99 MD 1602 |
| 6 | KN Energy, Inc. | 99 MD 1603 |
| 7 | Rocky Mountain Natural Gas Co. | 99 MD 1603 |
| 8 | KN Interstate Gas Transmission Co. | 99 MD 1603 |
| 9 | KN Natural Gas, Inc. | 99 MD 1603 |
| 10 | Northern Gas Co. | 99 MD 1603 |
| 11 | TCP Gathering Co. | 99 MD 1603 |
| 12 | Westar Transmission Co. | 99 MD 1603 |
| 13 | Wildhorse Energy Partners, LLC | 99 MD 1603 |
| 14 | Questar Corporation | 99 MD 1604 |
| 15 | Questar Gas Company | 99 MD 1604 |
| 16 | Questar Gas Management Co. | 99 MD 1604 |
| 17 | Questar Pipeline Co. | 99 MD 1604 |
| 18 | Universal Resources Corp. | 99 MD 1604 |
| 19 | Wexpro Co. | 99 MD 1604 |
| 20 | The Coastal Corp. | 99 MD 1605 |
| 21 | Coastal Chem, Inc. | 99 MD 1605 |
| 22 | Coastal States Gas Transmission Co. | 99 MD 1605 |
| 23 | Colorado Interstate Gas Co. | 99 MD 1605 |
| 24 | Coastal Field Services Co. | 99 MD 1605 |
| 25 | Coastal Gas Marketing Co. | 99 MD 1605 |
| 26 | Enron Corp. | 99 MD 1608 |
| 27 | Black Marlin Pipeline Co. | 99 MD 1608 |
| 28 | Enron Gas Marketing, Inc. | 99 MD 1608 |
| 29 | Enron Oil & Gas Co. | 99 MD 1608 |
| 30 | Florida Gas Transmission | 99 MD 1608 |
| 31 | Houston Pipeline Co. | 99 MD 1608 |
| 32 | Louisiana Resources Co. | 99 MD 1608 |
| 33 | Northern Border Pipeline Co. | 99 MD 1608 |
| 34 | Northern Natural Gas Co. | 99 MD 1608 |
| 35 | Northern Natural Gas Production Co. | 99 MD 1608 |
| 36 | Transwestern Pipeline Co. | 99 MD 1608 |
| 37 | El Paso Natural Gas Co., Inc. | 99 MD 1609 |
| 38 | Cornerstone Natural Gas, Inc. | 99 MD 1609 |
| 39 | El Paso Energy Marketing Co. | 99 MD 1609 |

| 40 | El Paso Field Services Co. | 99 MD 1609 |
|---|---|---|
| 41 | El Paso Gas Marketing Co. | 99 MD 1609 |
| 42 | El Paso Tennessee Pipeline Co. | 99 MD 1609 |
| 43 | Premier Gas Co. | 99 MD 1609 |
| 44 | Tennessee Gas Pipeline Co. | 99 MD 1609 |
| 45· | TransColorado Gas Transmission Co. | 99 MD 1609 |
| 46 | PanEnergy Corp. | 99 MD 1610 |
| 47 | Centana Energy Corp. | 99 MD 1610 |
| 48 | Dauphin Island Gathering Co., L.P. | 99 MD 1610 |
| 49 | Pan Gas Storage Co. | 99 MD 1610 |
| 50 | Panenergy Field Services, Inc. | 99 MD 1610 |
| 51 | Panenergy Natural Gas Corp. | 99 MD 1610 |
| 52 | Panenergy Services, Inc. | 99 MD 1610 |
| 53 | Panhandle Eastern Pipeline Co. | 99 MD 1610 |
| 54 | Texas Eastern Pipeline Co. | 99 MD 1610 |
| 55 | Trunkline Gas Co. | 99 MD 1610 |
| 56 | Westana Gathering Co. | 99 MD 1610 |
| 57 | Aquila Energy Corp. | 99 MD 1611 |
| 58 | Aquila Gas Pipeline Corp. | 99 MD 1611 |
| 59 | Tristar Gas Investments Corp. | 99 MD 1611 |
| 60 | UtiliCorp Energy Solutions, Inc. | 99 MD 1611 |
| 61 | UtiliCorp Pipeline Systems, Inc. | 99 MD 1611 |
| 62 | Utilicorp United Inc., n/k/a Aquila, Inc. | 99 MD 1611 |
| 63 | Public Service Co. of Colorado | 99 MD 1612 |
| 64 | Western Gas Resources, Inc. | 99 MD 1613 |
| 65 | MGTC, Inc. | 99 MD 1613 |
| 66 | MIGC, Inc. | 99 MD 1613 |
| 67 | The Williams Companies, Inc. | 99 MD 1614 |
| 68 | Kern River Gas Transmission Co. | 99 MD 1614 |
| 69 | Northwest Pipeline Co. | 99 MD 1614 |
| 70 | Texas Gas Transmission Corp. | 99 MD 1614 |
| 71 | Transcontinental Gas Pipeline Co. | 99 MD 1614 |
| 72 | Transcontinental Gas Supply | 99 MD 1614 |
| 73 | Transcontinental Oil Corp. | 99 MD 1614 |
| 74 | Williams Field Services Co. | 99 MD 1614 |
| 75 | Williams Gas Marketing | 99 MD 1614 |
| 76 | Williams Gas Supply | 99 MD 1614 |
| 77 | Williams Interstate Natural Gas Systems | 99 MD 1614 |
| 78 | Williams Natural Gas Co. | 99 MD 1614 |
| 79 | Williams Production Co. | 99 MD 1614 |
| 80 | Bridgeline Gas Distribution LLC | 99 MD 1624 |
| 81 | Sonat, Inc. | 99 MD 1625 |
| 82 | Bear Creek Storage Co. | 99 MD 1625 |
| 83 | Citrus Corp. | 99 MD 1625 |
| 84 | Citrus Interstate Pipeline Co. | 99 MD 1625 |
| 85 | Florida Gas Transmission Co. | 99 MD 1625 |
| 86 | Sea Robin Pipeline Co. | 99 MD 1625 |
| 87 | Sonat Energy Services Co. | 99 MD 1625 |
| 88 | Sonat Exploration Co. | 99 MD 1625 |
| 89 | Sonat Marketing Co., L.P. | 99 MD 1625 |
| 90 | Southern Natural Gas Co. | 99 MD 1625 |
| 91 | The Columbia Gas System, Inc. | 99 MD 1628 |
| 92 | Columbia Energy Services Corp. | 99 MD 1628 |
| 93 | Columbia Gas Development Corp. | 99 MD 1628 |
| 94 | Columbia Gas of Kentucky, Inc. | 99 MD 1628 |
| 95 | Columbia Gas of Maryland, Inc. | 99 MD 1628 |
| 96 | Columbia Gas of Ohio, Inc. | 99 MD 1628 |
| 97 | Columbia Gas of Pennsylvania, Inc. | 99 MD 1628 |
| 98 | Columbia Gas Systems Service Corp. | 99 MD 1628 |
| 99 | Columbia Gas Transmssion Co. | 99 MD 1628 |
| 100 | Columbia Gulf Transmission Co. | 99 MD 1628 |
| 101 | Columbia LNG Corp. | 99 MD 1628 |
| 102 | Columbia Natural Resources Inc. | 99 MD 1628 |
| 103 | Commonwealth Gas Services, Inc. | 99 MD 1628 |
| 104 | Cove Point LNG Limited Partnership | 99 MD 1628 |
| 105 | Equitable Resources, Inc. | 99 MD 1630 |
| 106 | Equitable Storage Co. (n/k/a Jefferson Island Storage & Hub LLC | 99 MD 1630 |
| 107 | Equitrans, LP | 99 MD 1630 |

| | | |
|---|---|---|
| 108 | Louisiana Intrastate Gas Co., LLC | 99 MD 1630 |
| 109 | ANR Pipeline Co. | 99 MD 1632 |
| 110 | ANR Production Co. | 99 MD 1632 |
| 111 | ANR Storage Co. | 99 MD 1632 |
| 112 | Blue Lake Gas Storage Co. | 99 MD 1632 |
| 113 | High Island Offshore System | 99 MD 1632 |
| 114 | U–T Offshore System | 99 MD 1632 |
| 115 | CMS Enterprises Co. | 99 MD 1633 |
| 116 | CMS Gas Co. | 99 MD 1633 |
| 117 | CMS Gas Marketing | 99 MD 1633 |
| 118 | CMS Gas Transmission & Storage Co. | 99 MD 1633 |
| 119 | CMS NOMECO Oil & Gas Co. | 99 MD 1633 |
| 120 | Consumers Energy | 99 MD 1633 |
| 121 | Michigan Gas Storage Co. | 99 MD 1633 |
| 122 | Terra Energy, Ltd. | 99 MD 1633 |
| 123 | Michigan Consolidated Gas Co. | 99 MD 1634 |
| 124 | Michcon Pipeline Co. | 99 MD 1634 |
| 125 | Gas Company of New Mexico | 99 MD 1636 |
| 126 | PNM Gas Services of New Mexico | 99 MD 1636 |
| 127 | Public Service Co. of New Mexico | 99 MD 1636 |
| 128 | Sunterra Gas Gathering Co. | 99 MD 1636 |
| 129 | Sunterra Gas Processing Co. | 99 MD 1636 |
| 130 | Oklahoma Natural Gas Co. | 99 MD 1637 |
| 131 | ONEOK, Inc. | 99 MD 1637 |
| 132 | ONEOK Resources Co. | 99 MD 1637 |
| 133 | LG & E Natural Gathering and Processing Co. | 99 MD 1639 |
| 134 | LG & E Natural Marketing, Inc. | 99 MD 1639 |
| 135 | LG & E Natural Pipeline Co. | 99 MD 1639 |
| 136 | Enogex, Inc. | 99 MD 1641 |
| 137 | Enogex Services Corp. | 99 MD 1641 |
| 138 | Oklahoma Gas & Electric Co. | 99 MD 1641 |
| 139 | Woodward Pipeline, Inc. | 99 MD 1643 |
| 140 | Arkansas Louisiana Gas Co. | 99 MD 1644 |
| 141 | Arkla | 99 MD 1644 |
| 142 | Arkla Energy Resources Co. | 99 MD 1644 |
| 143 | Louisiana Intrastate Gas Corp. | 99 MD 1644 |
| 144 | Minnegasco | 99 MD 1644 |
| 145 | Mississippi River Transmission Corp. | 99 MD 1644 |
| 146 | Noram Energy Corp. | 99 MD 1644 |
| 147 | Noram Energy Services, Inc. | 99 MD 1644 |
| 148 | Noram Field Services Corp. | 99 MD 1644 |
| 149 | Noram Gas Transmission Co. | 99 MD 1644 |
| 150 | Noram USA, Inc. | 99 MD 1644 |
| 151 | Delhi Gas Pipeline Corp. | 99 MD 1645 |
| 152 | Marathon Oil Co. | 99 MD 1645 |
| 153 | Marathon Pipeline Co. | 99 MD 1645 |
| 154 | Leviathan Gas Pipeline Partners, LP n/k/a El Paso Energy Partners, LP | 99 MD 1649 |
| 155 | Manta Ray Gathering Co. LLC | 99 MD 1649 |
| 156 | Viosca Knoll Gathering Co. | 99 MD 1649 |
| 157 | Blue Dolphin Pipeline Co. | 99 MD 1650 |
| 158 | Alaska Pipeline Co. | 99 MD 1651 |
| 159 | ENSTAR Natural Gas Co. | 99 MD 1651 |
| 160 | Seagull Energy Corp. | 99 MD 1651 |
| 161 | Seagull Marketing Services, Inc. | 99 MD 1651 |
| 162 | Seagull Mid–South, Inc. | 99 MD 1651 |
| 163 | Seagull Pipeline Co. | 99 MD 1651 |
| 164 | Montana–Dakota Utilities Co. | 99 MD 1652 |
| 165 | Williston Basin Interstate Pipeline Co. | 99 MD 1652 |
| 166 | Overland Trail Transmission Co. | 99 MD 1653 |
| 167 | Montana Power Co. | 99 MD 1654 |
| 168 | North American Resources Co. | 99 MD 1654 |
| 169 | FMC Corp. | 99 MD 1655 |
| 170 | FMC Wyoming Corp. | 99 MD 1655 |
| 171 | Midcon Corp. | 99 MD 1668 |
| 172 | Midcon Gas Services Corp. | 99 MD 1668 |
| 173 | Midcon Marketing Corp. | 99 MD 1668 |
| 174 | Midcon Texas Pipeline Operator, Inc. | 99 MD 1668 |

1244

| | | |
|---|---|---|
| 175 | Natural Gas Pipeline Co. of America | 99 MD 1668 |
| 176 | Occidental Energy Ventures Corp. | 99 MD 1668 |
| 177 | Occidental Oil & Gas Corp. | 99 MD 1668 |
| 178 | Oxy USA Inc. | 99 MD 1668 |
| 179 | Placid Oil Co. | 99 MD 1668 |
| 180 | Stingray Pipeline Co. | 99 MD 1668 |
| 181 | Arkansas Oklahoma Gas Corp. | 99 MD 1671 |
| 182 | Stephens Group, Inc. | 99 MD 1671 |
| 183 | Stephens Production Co. | 99 MD 1671 |
| 184 | GPM Gas Corp. | 99 MD 1682 |

## APPENDIX F

### GRYNBERG PRIVATE LITIGATION DOCUMENTS

**(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)**

| | | | |
|---|---|---|---|
| 134 | 183 | 164 | 273 |
| 135 | 184 | 170 | 274 |
| 136 | 185 | 171 | 279 |
| 137 | 186 | 173 | 280 |
| 138 | 190 | 174 | 284 |
| 139 | 191 | 176 | 285 |
| 140 | 204 | 178 | 289 |
| 141 | 206 | 179 | 291 |
| 142 | 207 | 180 | 292 |
| 143 | 208 | 294 | 402 |
| 144 | 209 | 295 | 405 |
| 145 | 210 | 296 | Supp. 3–17 |
| 146 | 211 | 297 | Supp. 3–18 |
| 147 | 212 | 299 | Supp. 3–27 |
| 148 | 213 | 300 | Supp. 3–30 |
| 149 | 216 | 303 | Supp. 3–31 |
| 150 | 217 | 304 | Supp. 3–32 |
| 151 | 218 | 320 | Supp. 5–16 |
| 152 | 220 | 323 | Supp. 5–17 |
| 153 | 221 | 324 | Supp. 5–28 |
| 154 | 222 | 325 | Supp. 5–29 |
| 155 | 228 | 326 | Supp. 5–52 |
| 156 | 241 | 329 | Supp. 5–53 |
| 157 | 243 | 330 | Supp. 5–54 |
| 158 | 244 | 331 | Supp. 5–55 |
| 159 | 247 | 332 | Supp. 5–56 |
| 160 | 265 | 336 | Supp. 5–60 |
| 161 | 266 | 337 | |
| 162 | 267 | 338 | |
| 163 | 269 | 339 | |
| | 271 | 340 | |
| | | 341 | |
| | | 342 | |
| | | 343 | |
| | | 344 | |
| | | 345 | |
| | | 346 | |
| | | 347 | |
| | | 348 | |
| | | 350 | |
| | | 351 | |
| | | 353 | |
| | | 354 | |
| | | 355 | |
| | | 357 | |
| | | 359 | |
| | | 361 | |
| | | 363 | |
| | | 371 | |
| | | 372 | |
| | | 374 | |
| | | 376 | |
| | | 377 | |
| | | 400 | |
| | | 401 | |

## APPENDIX G

### NON–GRYNBERG LITIGATION DOCUMENTS

**(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)**

1. United States ex rel. Precision v. Koch et al., (N.D.Okla.1991)

 Alleges Koch and related entities made false records and statements to the federal government by, among other things, improperly integrating gas measurement charts, miscalibrating meters, understating Btu value, and using wrong size orifice plates

 Docs 132 (Complaint)

 239 (10th Cir decision)

2. Studley Resources v. Exxon Corp and Beothos (Oklahoma state court)

 Doc 133 (transcript of trial testimony)

 Discusses audit of Exxon field meter stations. Findings included nicked plates, wrong plate sizes, with an indication that these can cause undermeasurement. Also discussion of visit to a lab that didn't utilize proper temperatures. Also lack of straightening veins.

 Doc. Supp. 5–51 (transcript of trial testimony)

 Discusses fact that flow commuter is more accurate than chart recorder (NAT)

3. Hunt Oil v. Trunkline Gas (East Baton Rouge Docket No. 425888F)

 Doc. 177 (Petition)

 Alleges that Trunkline's test producers report less than true Btu content

4. Hales et al v. Seeco, Inc., Arkansas Western Gas Co. and Southwestern Energy (Arkansas state court 96–327)

 Doc 192 (Complaint)

 Alleges that Seeco committed fraud by failing to enforce its contract rights—failure resulted in underpayment of royalties pursuant to contract terms

 Doc. 193 (Amended Complaint)

 Alleges that MMS found that SEECO did not sell gas produced at arms length contract prices (claims involved federal leases)

5. Anadarko Basin Production Service, Inc. v. Transok, Inc, Transok Gas Co., Transok Gas Transmission Co. and Boyd Rosene and Associates, Inc. (Oklahoma state court CJ 95–318)

 Doc. 194 (Petition)

 Alleges that Transok Gas Transmission Co. failed to accurately measure gas produced from certain wells in Washita, Caddo, and Custer Countys, Oklahoma, in violation of certain gas transportation contracts.

6. Funk v. Ladd Petroleum Corp. & Waterford Energy (USDC Western District of Okla, 88 572M)

 Doc. 201 (Second Amended Complaint)

 Alleges that Ladd and Waterford have been selling liquid condensate without accounting for Funk's share of profits

7. Amoco v. Williams Nat. Gas Co., 90–C–208 (Wyoming state court 1990)

 Doc. 202 (Complaint)

 Alleges that Williams did not comply with AGA Measurement Standards at wells in Wamsutter area because it failed to insure smooth inside pipe walls, failed to have required length of straight pipe preceding and following orifice place,

and failed to use straightening vanes. Also alleges that Williams received payment for more gas that it paid Amoco for.

8. Bridenstine v. Kaiser–Francis Oil Co. (Oklahoma State Court CV 95–54, class action)

Doc 203 (Findings of Fact regarding class certification)

Discusses, among others, allegations that defendant didn't pay royalties on profits from sale of gas plant liquids; may not have included the value of gas condensate from various points in the system; and underpaid royalty on condensate

9. Woods Petroleum Corp. v. Delhi Gas Pipeline Corp. (Oklahoma state court)

Doc. 234 (Oklahoma Ct. of Gas Appeals decision)

Describes allegations in the case that Delhi had used too large an orifice plate, resulting in a lower volume calculation.

10. Long v. Texaco, Inc., Texaco Exploration and Production, Inc., and Bridgeline, (USDC Middle Dist of La. 92–745)

Doc. 404 (Third Supplemental Amended and Restated Complaint)

Alleges that Texaco and Texaco Exploration and Production failed to pay royalties on part of the condensate.

11. Ginther v. McCulloch Gas Transmission Co, C74–60 (USDC Wyoming 1974)

Doc. Supp. 1–3 (Findings of Fact and Conclusions of Law)

Finding that McCulloch took gas from Ginther through an unmetered line.

12. Exxon v. United States Department of Energy (ND Tex.) CA 3–75–0836

Doc. JDPD–3 (Mobil's Supplemental Responses to Interrogatories and Requests for Production of Documents)

Acknowledges a reduction in residue gas sales resulting from extraction of liquids.

13. Colorado Interstate Gas Co. v. MAPCO, Inc. (Tex.Ct.App.1978)

Doc. JDPD 17 (opinion)

Discusses an agreement relating to extraction of helium

14. Northern Natural Gas Co. v. Grounds (10th Cir.1971)

Doc. JDPD 18 (Tenth Circuit opinion)

Describes the action as one to determine title to helium sold by extraction companies and parent pipeline companies to the United States

15. Northern Natural Gas Co. v. Grounds (10th Cir.1981)

Doc. JDPD 19 (Tenth Circuit opinion)

Describes action as one wherein lessee producers of natural gas brought action to recover reasonable value of helium extracted by natural gas processors and sold to government

16. Northern Natural Gas Co. v. Grounds (D.Kan.1974)

Doc. JDPD 20 (District Court decision)

Describes action as one brought by pipeline company relating to title and rights to crude helium

17. Arkansas Louisiana Gas Co. v. Hall, 79–1896

Doc. JDPD 26 (Petitioner's Reply to Respondents Brief Opposing Petition for Writ of Certiorari)

Significance unclear

Doc. JDPD 30 (Brief of the FERC as amicus curiae)

Discusses the filed rate doctrine, and states that gas may be sold at the mouth of the well or after removal of liquids or other impurities at processing plants

Doc. JDPD 31 (Brief of Respondents)

Doc. JDPD 32 (Petition for Writ of Certiorari)

Describes the issue as whether it was error to award Hall respondents a retroactive price increase to a point higher than rate on file with the commission as damages for breach of contract.

18. Arkla Energy Resources v. Lehnertz, 39–468 (Harrison County, Texas)

Doc. JDPD 33 (Original Petition)

Alleges that Arkla programmed metering devices to cause an underreporting of gas extraction.

Doc. JDPD 34 (First Amended Original Petition)

## APPENDIX H
### NOTICES OF INCIDENTS OF NONCOMPLIANCE AND RELATED CORRESPONDENCE
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

57
58
59
60
61
62
63
64
65
66
67
68
70
71

72
Supp. 3–7
Supp. 3–8
Supp. 3–10
Supp. 3–11
Supp. 3–34
Supp. 3–35
Supp. 3–38
JDPD 14
JDPD 21
JDPD 22
JDPD 23
JDPD 36
SD–4

## APPENDIX I
### FERC ORDER 93 DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

32
36
38
169
237
275
277
281
305
Supp. 5–14
Supp. 5–15
JDPD 4
JDPD 5
JDPD 6

## APPENDIX J
### OPINIONS AND DECISIONS OF THE IBLA, DOI, BIA, AND MMS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

21
22
23
24
25
26
27
28
29
30
31
34
35

JDPD 10
JDPD 11
JDPD 12
JDPD 13

## APPENDIX K
### AUDIT AND INVESTIGATION DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

8
74
75
276
308
309
364
370
380
381
387
Supp. 1–15
Supp. 3–23
Supp. 3–29
Supp. 4–1
Supp. 4–2

## APPENDIX L
### BLM/MMS RULES AND COMMENTS DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

9
10
11
12
13
14
15
16
17
18
19
20
286
287
JDPD 2

## APPENDIX M
### BLM AND MMS CORRESPONDENCE DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

44
45
46
47
48
49
52
53
54
56
73
195
240
246
317
318
366
367
378
382
383
384
385
406
Supp. 1–4
Supp. 1–12
Supp. 1–13
Supp. 3–9
Supp. 3–15
Supp. 3–16
Supp. 3–21
Supp. 3–26
Supp. 6–140
Supp. 6–141
Supp. 6–143
Supp. 6–144
JDPD 7
JDPD 16

## APPENDIX N
### STATE GOVERNMENT CORRESPONDENCE AND MEMORANDA DOCUMENTS
(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

39
76
224
310

311
312
313
314
315
379
386
Supp. 1–1
JDPD 8
JDPD 24
JDPD 25

## APPENDIX O

### INTER–COMPANY AND INTRA–COMPANY CORRESPONDENCE DOCUMENTS

(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

124
288
298
302
319
362
375
Supp. 3–13
Supp. 3–20
Supp. 3–22
Supp. 3–28
Supp. 6–142

## APPENDIX P

### NEWSPAPER ARTICLES RELATING TO MICHIGAN STATE INVESTIGATION OF UNDERPAYMENTS OF STATE GAS ROYALTIES

(All items are included in Exhibit 2 to Coordinated Defendants' Public Disclosure/Original Source Brief and are identified here by document number)

Supp. 1–5
Supp. 1–6
Supp. 1–7
Supp. 1–8
Supp. 1–9
Supp. 1–10
Supp. 4–3
Supp. 4–5

## APPENDIX Q

### THE A SERIES OF EXHIBITS

(All items are included in A series of exhibits to Coordinated Defendants Memorandum in Support of their Motion to Dismiss Based on the Disclosure and Seal Requirements of the False Claims Act)

A–1 (resume of Jack Grynberg containing details about his experience and expertise in the gas industry)

A–2 (Dr. Robert Lee's resume shows Lee's expertise in gas measurement)

A–3 (document entitled "Physical Constants of Parafin Hydrocarbons and Other Components of Natural Gas")

A–4 (fax cover sheet dated 2/22/94 to Grynberg from Lee with a graph entitled "Nitchie Gulch Unit # 2–20 Well Core Laboratories Report, May 15, 1984," apparently regarding Grynberg's wet/dry adjustment allegation)

A–5 (two graphs of MCF over time based on data provided by Questar from the North Baxer or Nightingale Master Meter showing overages and underages apparently designed to show underreporting of gas volume by Questar)

A–6 (gas Btu content analysis report from Chemical and Geological Laboratories dated October 9, 1961, on a federal well in Nitchie Gulch showing measurement to C6+)

A–7 (graphs of reported wet Btu over time for wells in Nitchie Gulch)

A–8 (blank FERC form 16—Report of Gas Supply and Requirements apparently supplied because line six shows that company use and shrinkage should be a negative number)

A–9 (fax from FERC to Grynberg dated 11–5–93 of instructions for filling out Form 16 saying that line 6 is to report any

company compressor use, losses, deductions due to gas or liquid extractions and unaccounted for gas)

A–10 (FERC form 16 for Questar showing positive numbers on line 6 for several months allegedly indicating that Questar sells more gas in some months than it buys)

A–11 (chart apparently used as an exhibit in the Questar v. Grynberg private litigation summarizing Questar's FERC 16 information on company use and shrinkage volumes)

A–12 (FERC form 16 for Mountain Fuel Resources, Inc., 10–9–85)

A–13 (chart plotting reported Btus on wells in Blue Gravel Field, showing substantial variations from month to month allegedly indicating improper analysis of heating content)

A–14 (similar charts plotting reported Btu on wells in Pecos Slope (Abo) Gas Field (Transwestern))

A–15 (charts plotting BTU on wells in Pecos Slope (abo) Gas Field over time)

A–16 (chart showing analysis of gas done by Grynberg in November 1994 compared to BTU results from Transwestern showing Transwestern analysis is lower)

A–17 (chart showing the differing results of an analysis of Btus in Abo Field done by Grynberg from a sample taken upstream of the meter as compared to the Btu analysis from Transwestern, done from sample downstream of meter)

A–18 (Enron–Transwestern Meter Gas Volume Statements for December 1994 for various wells);

A–19 (Empact Labs Natural Gas Analysis done in 1994 for various wells)

A–20 (chart showing that extended analysis to C10+ instead of C6+ on Pecos Slope (Abo) Gas Field wells resulted in an average 9.4 increase)

A–21 (chart showing Transwestern gas use and shrinkage figures from line 6 FERC Form 16, some actual, some projected, from 1980 to 1992)

A–22 (North American Pipeline Map)

A–23 (51 pages of Grynberg interview notes discussed above)

A–24 (report done by M.L. Williams of Gulf States Measurement Service Co. dated March 10, 1995 indicating problems with meter charts, beta ratios, analyzing gas through C6+, heating the samples, failure to change orifice plates or do anything to improve measurement accuracy)

A–25 (resume of M.L. Williams)

A–26 (MMS Report entitled "Mineral Revenues 1993" (144 pages))

A–27 (Gas Purchase Contract dated July 14, 1975 between Grynberg and Rocky Mountain relating to leases in Moffat County, Colorado (Blue Gravel Field))

A–28 (Dr. Lee's Report on 'BTU Analysis for Wells in Abo Gas Field' concluding that decreases in BTU over a three-year period is due to mismeasurement)

A–29 (Dr. Lee's Report on "Comparison of BTU Measurements of Gas Production Between Upstream and Downstream Positions from the Orifice In Gas Meter" dated April 11, 1995 concluding a 9% reduction in BTUs if gas is measured downstream)

A–30 (photograph of pipes apparently relating to Questar bypass)

A–31 (photograph with caption "Location of Bypass Piping Downstream of Meter" apparently relating to Questar bypass)

A–32 (photographs and schematics of differential pressure recorders)

A–33 (two pages discussing chart records "Conditions Which Indicate Immediate Attention Required" and "Conditions Which

Need Clear Explanation on the Chart Record")

A–34 (sales materials from Daniel Flow Products, Inc. entitled "Straightening Vanes," with pictures, discussion of uses and installation, and a chart of types and sizes available)

A–35 (bar chart indicating it was used in or prepared for Questar Pipeline Co. v. Jack J. Grynberg comparing size of Questar, KN, and CIG based on amount of gas sold and transported and Questar and KN on miles of pipeline)

A–36 (chart from Natural Gasoline Supply Men's Association, 1957, of Flange Taps–Basic Orifice Factors Fb)

A–37 (bar charts comparing actual shrinkage on Questar, KN, and CIG pipeline systems as reported on FERC 16s and the projected amount of company use and shrinkage)

A–38 (Dr. Lee Expert Report in TUFCO indicating that gas analysis presented by TUFCO on wells in Brazos East Gas Field show sharp decline from initial production in 1976 which is not logical)

A–39 (Grynberg's Affidavit in opposition to Questar's motion in limine on btu claims in Questar v. Grynberg in USDC Wyo.)

A–40 (charts on a well-by-well basis relating to the Questar by-pass issue)

A–41 (letter from KN to customers in 1995 relating to a projected increase in natural gas rates as a result of the 1995 Court of Appeals decision in the Jeffco litigation)

A–42 (chart relating to Questar by-pass issue showing how bypass allows gas to bypass sales meter)

A–43 (chart of Gas Meter Bypass Volume and Damages Summary (Dr. Karl Nelson))

A–44 (chart comparing "Company Use of Gas and Shrinkage" For Three (3) Pipeline Systems for 1990, 1991, and 1992 from FERC Form 16 (Questar, KN, CIG))

A–45 (Empact Analytical Systems Inc. Gas Analysis in Oct. 1995 for the Con-Camp State # 1 Well apparently to C6+)

A–46 (chart showing FERC 16 shrinkage and company use from 1980 to 1992 for Transwestern and El Paso)

A–47 (chart showing FERC 16 line six for Transwestern from 1980 to 1992)

A–48 (comparison chart showing 1983 through 1992 FERC Form 16 Company Use and Shrinkage Volumes for Questar, KN and CIG)

A–49 (page from Transwestern Form 16 showing line 6 numbers as positive)

A–50 (chart showing Nitchie Gulch # 2–20 reported btu over time and what it should look like according to Dr. Lee)

A–51 (Empact Analytical Systems, Inc. gas analysis from Federal 2–26 Master Meter at Blue Gravel Field in Craig Colo. 1995 done for Grynberg Petroleum to C6+)

A–52 (chart of Btu over time for Boise Southern Well)

A–53 (chart comparing gas analyses on Pecos Slope (Abo) Gas Filed done by Empact Analytical Systems (independent) and Precision Gas Measurement, Inc. (Gas pipelines) showing higher btus from Empact analysis on average 37.5 Btu points)

A–54 (chart showing increase in Btus of C10+ analysis over C6+ for Pecos Slope (Abo) wells showing average increase of 9.4 Btus)

A–55 (Judgment in South Dakota case of Grynberg and others vs Citation Oil & Gas Company; in deposition, Relator Grynberg seemed to indicate that these types of materials were provided to show that he

was "winning" when he took the gas industry to court)

A–56 (decision of the Colorado Court of Appeals in the Jefferson County litigation with Rocky Mountain and KN)

A–57 (Jewell Busch 1993 affidavit in USDC Grynberg v. KN, Rocky Mountain and GASCO, indicating that KN reported the wrong size orifice and stole condensate)

A–58 (deposition of Larry Connolly 1993, in Questaar v. Grynberg USDC Wyo., explaining line 6 of the FERC 16s)

A–59 (picture of Grynberg making a donate to Colo. School of Mines)

A–60 (letter to Lee enclosing btu plots on two gas wells in California showing no variation of Btu over time and indicating this was because purchaser was honest and because there was never two-phase flow)

A–61 (miscellaneous charts)

A–62 (one page document entitled "Effect upon BTU values when volume is measured under two different pressures" concluding that it reduces amount paid for the gas by 2%)

A–63 (Nitchie Gulch charts plotting Btu over time)

A–64 (Questar v. Grynberg document entitled "Corrected BTU vs Reported Btu Damage Summary Nitchie Gulch Btu Adjustment")

A–65 (summary of KN Form 16s 1980 to 1991)

A–66 (summary of FERC Form 16s for Questar)

A–67 (a FERC Form 16 for Questar)

A–68 (another copy of Empact analysis of btus Powell C master meter 1995)

A–69 (letter from Grynberg to Hall of KN dated Oct. 13, 1995, indicating that Grynberg had installed digital meters on three locations in Blue Gravel and they showed that KN had shortchanged him)

A–70 (letter to Salzman, Melhoff and Lovato Sept. 14, 1995, reporting that Grynberg had learned that KN used a plug valve in the Blue Gravel Field and that Questar takes samples downstream of gas meter when it buys, but upstream of the sales meter when it sells)

A–71 (letter from Grynberg to Melhoff, Lovato, Salzman, Reiman, and Davis (Bd. of Land Commissioners) indicating that Emily Miller of AMOCO had spot checked and integrated charges on 800 gas wells in the Denver Basin (KN measurements) and found that AMOCO had reported a surplus of 30% of gas for which it was not paid)

A–72 (letter Lovato, Arguedas, and Salzman dated May 18, 1995 indicating that KN had unilaterally increased Btu values by 20 points)

A–73 (excerpt from deposition of Ronald Horinek on Dec. 6, 1996 in Grynberg v. KN in which Horinek indicates that it would be better to take samples upstream of orifice, but KN takes them downstream)

A–74 (Questar v. Grynberg (USDC Wyo.) jury verdict forms)

A–75 (letter to Janet Reno dated April 13, 1995, from Reiman enclosing copy of complaint, the material evidence, a letter to Solano, and the Bingham letter)

A–76 (affidavit of Grynberg in the Questar case dealing with decline rates)

A–77 (66 more pages of interview notes discussed above)

A–78 (chart entitled "Calculations of Saturated (Wet) Heating Values at Different Pressures and with Different BTU Value Gas" apparently regarding the wet vs. dry allegation)

A–79 (fax from Dr. Lee to Grynberg dated 3/7/97 enclosing charts showing pressure and temperature distribution and gas Btus at various pressures)

A–80 (Amendatory Gas Purchase Agreement between Terra Resources and Mountain Fuel Supply Co, dated April 4, 1974 (relates to Nitchie Gulch))

A–81 (apparently excerpt from a draft *qui tam* complaint describing the allegations and information)

A–82 (1996 diagram and notes signed by Dr. Lee—import unknown—deals with retrograde condensation).